UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Jeffrey S. White, Judge

```
UNITED STATES OF AMERICA,      )
                               )
          Plaintiff,           )
                               )
  VS.                          )        NO. CR 23-00264-2 JSW
                               )
MORTEZA AMIRI,                 )
                               )
          Defendant.           )
                               )
_____)
```
                              Oakland, California
                              Monday, August 5, 2024

**TRANSCRIPT OF PROCEEDINGS (EXCERPT)**

**APPEARANCES:**
For Plaintiff:
                         ISMAIL RAMSEY
                         United States Attorney
                         1301 Clay Street - Suite 340S
                         Oakland, California  94612
              BY:  **AJAY K. KRISHNAMURTHY**
                   **ALETHEA SARGENT**
                   **ERIC CHENG**
                   **ASSISTANT UNITED STATES ATTORNEYS**


For Defendant Patrick James Berhan:
                         COBLENTZ PATCH DUFFY & BASS LLP
                         One Montgomery Street - 3000
                         San Francisco, CA  94104
              BY:  **TIMOTHY P. CRUDO**
                   **OLIVER W. HAMILTON**
                   **RACHEL R. SUHR**
                   **ATTORNEY AT LAWS**

Also Present:           **James Cho, Paralegal**
                        **Jessie Chelsea, Paralegal**

Reported By:  Ruth Levine Ekhaus, CSR No. 12219, RDR, FCRR
                  Official Reporter

# I N D E X

Monday, August 5, 2024 - Volume 2

| GOVERNMENT'S WITNESSES | PAGE | VOL. |
|---|---|---|
| **SCHNITZIUS, TREVOR** | | |
| (SWORN) | 4 | 2 |
| Direct Examination by Mr. Cheng | 5 | 2 |
| Cross-Examination by Mr. Crudo | 22 | 2 |
| Redirect Examination by Mr. Cheng | 50 | 2 |
| **WENTZ, PATRICK** | | |
| (SWORN) | 54 | 2 |
| Direct Examination by Mr. Krishnamurthy | 54 | 2 |
| **TUCKER, MURL** | | |
| (SWORN) | 70 | 2 |
| Direct Examination by Mr. Krishnamurthy | 70 | 2 |
| Cross-Examination by Mr. Crudo | 93 | 2 |
| Redirect Examination by Mr. Krishnamurthy | 135 | 2 |
| **BLALOCK, JOYCE** | | |
| (SWORN) | 138 | 2 |
| Direct Examination by Mr. Cheng | 138 | 2 |
| **PERRY, CRAIG** | | |
| (SWORN) | 144 | 2 |
| Direct Examination by Mr. Cheng | 214 | 2 |
| Redirect | | |
| **REED, SAVANNAH** | | |
| (SWORN) | 164 | 2 |
| Direct Examination by Ms. Sargent | 164 | 2 |

# E X H I B I T S

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 2 | | 17 | 2 |
| 3 | | 21 | 2 |
| 10 | | 60 | 2 |
| 12 | | 64 | 2 |
| 13 | | 68 | 2 |

# I N D E X

## E X H I B I T S

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 14 | | 66 | 2 |
| 26 | | 58 | 2 |
| 27 | | 67 | 2 |
| 43 | | 45 | 2 |
| 50 | | 78 | 2 |
| 51 | | 88 | 2 |
| 52 | | 89 | 2 |
| 55 | | 82 | 2 |
| 56 | | 88 | 2 |
| 82 | | 162 | 2 |
| 90 | | 153 | 2 |
| 300 | | 9 | 2 |
| 305 | | 90 | 2 |
| 306 | | 91 | 2 |
| 315 | | 115 | 2 |
| 316 | | 115 | 2 |
| 317 | | 115 | 2 |
| 318 | | 115 | 2 |
| 319 | | 115 | 2 |
| 320 | | 115 | 2 |

Monday - August 5, 2024                              7:49 a.m.

P R O C E E D I N G S

---oOo---

(Proceedings heard in the presence of the jury.)

(Begin Excerpt.)

**MR. CHENG:**  Your Honor, the Government calls Trevor Schnitzius.

**THE COURT:**  Okay.  Thank you, ladies and gentlemen.

(Trevor Schnitzius steps forward to be sworn.)

**THE COURT:**  Just while we're waiting for reasons, that may be obvious, we don't have witnesses here while other witnesses testify so they don't hear the other witnesses.  So physically they have to remain -- with some exceptions have to remain outside the courtroom until their time comes.  So sometimes there's a slight delay, and that's the reason we don't have -- we're not ready to go immediately.

Please come forward, sir, and be sworn by my courtroom deputy.

**THE CLERK:**  Please raise your right hand.

TREVOR SCHNITZIUS,

called as a witness for the Government, having been duly sworn, testified as follows:

**THE WITNESS:**  I do.

**THE CLERK:**  I'm going to need you to speak clearly into the microphone.

1          Please state your full name and spell your last name

2    for the record.

3          **THE WITNESS:**  Trevor, last name is spelled

4    S-C-H-N-I-T-Z-I-U-S.

5          **THE COURT:**  Welcome.

6          You may proceed.

7          **MR. CHENG:**  Thank you, Your Honor.

8                          <u>**DIRECT EXAMINATION**</u>

9    **BY MR. CHENG:**

10   **Q.**   Good morning.

11   **A.**   Good morning.

12   **Q.**   Who is your employer?

13   **A.**   I'm currently employed by the County of Sacramento.

14   **Q.**   And are you employed by a particular division for the

15   County of Sacramento?

16   **A.**   Yes.

17   **Q.**   What's that?

18   **A.**   The Sacramento County Regional Parks, Park Rangers.

19   **Q.**   Do you have a title there?

20   **A.**   I am a sergeant.

21   **Q.**   And can you just briefly describe what your

22   responsibilities are as a sergeant there?

23   **A.**   I'm currently assigned to the administrative branch of the

24   unit.  So I'm responsible for training, recruiting, retention,

25   and internal affairs investigations.

1   Q.    How long have you been employed by Sacramento County?

2   A.    I believe today is my one-year anniversary.

3   Q.    Congratulations.

4         Before working for Sacramento County, where did you

5   work?

6   A.    For the City of Antioch.

7   Q.    I'd like to get into that some more, but before we do, can

8   you just briefly describe what your educational background is?

9   A.    I have a high school diploma.  I have an associate's

10  degree from Diablo Valley College in Pleasant Hill.  I also

11  hold a Bachelor of Science degree from Sacramento State in

12  criminal justice with concentration in law enforcement

13  management and investigation.

14  Q.    You mentioned that you have a bachelor's in criminal

15  justice.  What were some of the things that were covered in

16  your degree for criminal justice?

17  A.    Intro to crimes; law of evidence; law of arrest; search

18  and seizure; terrorism, I took a terrorism course; basic

19  crimes; crime scene investigation, things along the lines of

20  that.

21  Q.    Did you find those courses relevant to your law

22  enforcement work?

23  A.    Absolutely.

24  Q.    Now, after college, what did you do next?

25  A.    I was hired by the City of Antioch as a police trainee.

1    **Q.**    And about when was that?

2    **A.**    19 -- the end of 1997.

3    **Q.**    And about how long did you work at the Antioch Police

4    Department?

5    **A.**    Roughly 25 and a half, 26 years.

6    **Q.**    Can you just briefly describe some of the roles you held

7    over that 25-year career at Antioch?

8    **A.**    Sure.  Initially I was assigned to the patrol unit.  After

9    being in patrol for a while, I was transferred to the

10   investigations unit, where I started off in auto theft;

11   subsequently moved over to crimes against persons, where I

12   worked missing persons, sex offenders, crimes against children,

13   sexual assault crimes, sex offender compliance.

14           And then I rotated back out to patrol, was promoted to

15   the rank of corporal where I supervised, with a sergeant, a

16   team of patrolmen.

17           Later promoted to the rank of sergeant.  Again,

18   assigned to patrol, responsible for a patrol team.

19           Promoted to the rank of lieutenant.  Remained on

20   patrol, responsible for a larger patrol team, a shift, a side

21   of a week, in addition to additional administrative duties.

22           And then subsequently promoted to the rank of police

23   captain, where I was in charge of support services, which

24   oversees the investigations unit, the professional standard

25   units, the communications unit, and the records unit.

Q.   And was that the role you held at the time that you

retired from Antioch?

A.   Yes, sir.

Q.   Now, you described a long career at Antioch.

     During your time there, did you become familiar with

the Antioch Police Department policies?

A.   Yes, sir.

Q.   Did you also become familiar with the labor agreements

between the Antioch Police Department and the City of Antioch?

A.   Yes, sir.

Q.   And as a line police officer -- let's start with, as a

line police officer, were you required to be familiar with

these things as well?

A.   Policy, yes; the labor agreement, not necessarily.

Q.   As you rose in the ranks and became a part of the

leadership, did you come to need to be familiar with those

things as well?

A.   I did.  There was a period of time in which I also served

on the Antioch Police Officers Association board.

Q.   Now, during your time at Antioch, did the City of Antioch

have policies on compensation and offering the Antioch Police

Department personnel educational incentives?

A.   I -- I don't know that it was codified in policy, if

memory serves me correctly, but it was in the labor agreement.

Q.   Okay.  Did you become familiar with those rules about

1  educational incentives during your time at APD?

2  A.  Yes, sir.

3  Q.  I'd like to show you a document that's been marked as

4  Exhibit 300.

5       MR. CHENG:  Your Honor, may I approach the witness?

6       THE COURT:  Yes, you may.

7  BY MR. CHENG:

8  Q.  And in that binder there's an exhibit that's marked with

9  300.  Can you tell me when you're there, please?

10  A.  (Witness examines document.)  Yes.

11  Q.  Do you recognize this document?

12  A.  Yes, sir.

13  Q.  And what is it?

14  A.  The memorandum of understanding between the Antioch Police

15  Officers Association and the City of Antioch that covers the

16  period of September 1, 2016, through August 31st of 2021.

17       MR. CHENG:  Your Honor, the Government moves to admit

18  Exhibit 300.

19       THE COURT:  Any objection?

20       MR. CRUDO:  No objection, Your Honor.

21       THE COURT:  Admitted.

22       (Trial Exhibit 300 received in evidence.)

23       MR. CHENG:  May we publish?

24       THE COURT:  You may.

25       And for the record, "publish" is a fancy word for

1    showing it to you.  So we use some legalese, but that's just

2    the way we talk here.

3            You may go for it.

4            **MR. CHENG:**  Thank you, Your Honor.

5    **BY MR. CHENG:**

6    **Q.**   Now, Sergeant Schnitzius, you said that during your time

7    at Antioch, you became quite familiar with -- with the labor

8    agreement due to your roles at Antioch; correct?

9    **A.**   Yes, sir.

10   **Q.**   Okay.  If you could please turn to page 14 of this

11   document.

12           Was there an agreement between the Antioch Police

13   Department and the City of Antioch about compensation?

14   **A.**   If you could give me one second, Counselor.  I went to

15   page 14 that's listed on the actual document, not the exhibit

16   number.

17           (Witness examines document.)  I'm sorry.

18   **Q.**   Yes.  And just for clarity of the record, when I'm

19   referring to page numbers, there are exhibit numbers on the

20   bottom right-hand corner.  I know there's also internal page

21   numbering, but I'm going to refer to the exhibit numbering.

22   Okay?

23   **A.**   Yes, sir.

24   **Q.**   All right.  So did the City of Antioch and the Antioch

25   Police Department have an agreement about compensation?

1  A.    Yes.  Every MOU typically has an article covering

2  compensation.

3  Q.    Okay.  And in this particular document, were there -- was

4  there a description of predetermined ranges for salary raises

5  over time?

6  A.    Yes, sir.

7  Q.    Okay.  And how often would these predetermined raises

8  generally occur?

9  A.    Well, there would be two.  If you were entry level, you'd

10  have a step increase, which would occur on your anniversary;

11  but there would also be a cost-of-living allowance, which was

12  identified in the MOU, which would be annually as well.

13  Q.    At least on an annual basis, is that correct, there would

14  be raises?

15  A.    Yes, sir.

16  Q.    And did the MOU pertain to sworn police officers?

17  A.    Sworn and unsworn.

18  Q.    Okay.  And are community services officers, are they an

19  example of nonsworn officers?

20  A.    Yes, sir.

21  Q.    And would these annual pay raises, would these be on top

22  of any additional things, like educational incentives?

23  A.    Yes, sir.

24  Q.    So if you could please turn now in the document to

25  page 32.

1          Did Antioch have an educational incentive program?

2     **A.**    Yes.

3     **Q.**    And what did it provide as far as reimbursements go?

4     **A.**    I don't know what the reimbursement was from the City to

5     earn your degree; but once you attained the degree, you

6     received additional incentive pay in the form of 2 and a

7     half percent for an associate's degree and 5 percent of pay for

8     a bachelor's or -- excuse me -- a BS or BA.

9     **Q.**    Okay.  Well, let's focus on what's marked as Section B.

10    Do you see that's labeled as "Educational Incentive Pay"?

11    **A.**    Yes, sir.

12    **Q.**    And when you described a 2 and a half percent raise for an

13    AA degree and a 5 percent raise for a bachelor's degree, is

14    that what you're referring to right there in Section B?

15    **A.**    Yes, sir.

16    **Q.**    Okay.  And was that for sworn police officers?

17    **A.**    Yes, sir.

18    **Q.**    Now, would those percentages -- when they applied to base

19    pay, how could that affect other -- other incentives or other

20    raises?

21    **A.**    It would affect your holiday pay.  It would affect your

22    overtime rate.  It would affect any future raises, any other

23    incentives that you would be eligible for that would be based

24    off a percentage.

25    **Q.**    And did the policy on educational incentives, did it also

cover nonsworn employees like community services officers?

**A.**    It did.

**Q.**    And what would be provided as an educational incentive for nonsworn officers?

**A.**    I believe it was a flat rate, but I'd have to refer to the document to -- to be sure.

**Q.**    In Section B of the document, under Section 3, does it provide for the dollar-based increases for nonsworn officers?

**A.**    Yes.

**Q.**    And what would that be for someone receiving a bachelor's degree?

**A.**    $105 per month.

**Q.**    Okay.  Now, did the educational incentive article, did that also cover additional incentives, under Section C, for POST certificate pay?

**A.**    You could receive -- my understanding is you could receive one or the other but not both.  They were not stackable, if that makes sense.

**Q.**    And, briefly, what is POST certification?

**A.**    It's a certification of your training and experience and meeting the requirements of POST to obtain those degrees. Possession of a bachelor's degree or an AA degree does help accelerate the receipt of those certificates in terms of the amount of time which is required -- the time and training which is required to attain them.

1   Q.    So education would be a factor in determining how quickly

2   you could achieve eligibility for POST certification; is that

3   right?

4   A.    Yes.

5   Q.    Okay.  And work experience, was that also a factor?

6   A.    Yes.

7   Q.    So continuing, in this document, to page 33, Section F,

8   can you describe the process for submitting and requesting

9   these educational incentives?

10  A.    The employee is responsible for submitting and notifying

11  the department head or the personnel department of any degree

12  or certificate attained.

13  Q.    And what does that mean?

14  A.    Typically that's done through a personnel action form and

15  supporting documentation.  The employee would submit that to

16  either the department head or the personnel department, and

17  then a form would be generated.  And then once the certificate

18  was verified or the degree verified or transcripts verified,

19  then they would be eligible for whatever incentives were that

20  they were applying for.

21  Q.    So I think you described providing some proof of the

22  degree, is that right, that would be required for the

23  incentive?

24  A.    Yes.

25  Q.    And was actually receiving the degree required for

1   receiving the incentive?

2   **A.**   I don't believe so.  I think a transcript indicating that

3   a degree was awarded would suffice.

4   **Q.**   Okay.  So things like a transcript or a diploma submitted

5   to the department would be sufficient?

6   **A.**   Yes, sir.

7   **Q.**   Okay.  And what was the importance of a police officer

8   having earned the degree to receive this educational incentive?

9   **A.**   Well, one, it's obviously their responsibility to earn the

10  degree, since it's issued in their name.  In addition to that,

11  you know, the -- kind of the understanding behind it is a more

12  educated police force is a better police force.  Because of the

13  amount and variation of classes that are required to attain a

14  degree, it helps with critical thinking, report writing,

15  grammar, you know, comprehension, things along the lines of

16  that.

17  **Q.**   So I'd like to now turn to some specifics with respect to

18  this case.

19          Are you familiar with an individual by the name of

20  Morteza Amiri?

21  **A.**   I am.

22  **Q.**   Do you recognize him in the courtroom today?

23  **A.**   I do.

24  **Q.**   Would you please identify him by an article of clothing

25  that he's wearing?

1    A.    Blue suit, white shirt, red tie.

2    Q.    Now, in your capacity as a captain at the Antioch Police

3    Department, did you collect and review personnel files for the

4    defendant, Mr. Amiri?

5    A.    A number of people, yes.

6    Q.    Okay.  You did do so with respect to Mr. Amiri; is that

7    right?

8    A.    Yes, sir.

9    Q.    And did you also review personnel files for others,

10   including Community Services Officer Samantha Peterson?

11   A.    I believe so, yes.

12   Q.    And did both Mr. Amiri and Ms. Peterson submit requests

13   for educational incentives from Antioch?

14         MR. CRUDO:  Objection.  Lacks foundation.

15         THE COURT:  Sustained.  You need to lay more of a

16   foundation.

17   BY MR. CHENG:

18   Q.    And in those personnel files that you collected and

19   reviewed, did those include requests identified for Mr. Amiri

20   and Ms. Peterson for educational incentives from the City of

21   Antioch?

22   A.    Yes, there were personnel action forms in their personnel

23   files for that.

24   Q.    All right.  So I'd like to now turn to a particular

25   document.  I'd like to approach you with what's been marked as

1    Exhibit 2.

2              MR. CHENG:  May I approach, Your Honor?

3              THE COURT:  Yes, you may.

4                   (Counsel approaches witness.)

5    BY MR. CHENG:

6    Q.   Do you recognize Exhibit 2?

7    A.   I do.

8    Q.   And what is it?

9    A.   I'm sorry?

10   Q.   I'm sorry.  And what is Exhibit 2?

11   A.   City of Antioch personnel action form.

12   Q.   And who does this personnel action form pertain to?

13   A.   This one in specific, Exhibit 02-001, is for Morteza

14   Amiri.

15             MR. CHENG:  Your Honor, the Government moves to admit

16   Exhibit 2.

17             THE COURT:  Any objection?

18             MR. CRUDO:  No objection.

19             THE COURT:  Admitted.

20       (Trial Exhibit 2 received in evidence.)

21             MR. CHENG:  May we publish?

22             THE COURT:  Yes, you may.

23   BY MR. CHENG:

24   Q.   And is there an effective date of this personnel action

25   form?

1   A.   Excuse me while I look.

2        (Witness examines document.)  Yes, sir.

3   Q.   And what's that?

4   A.   April 17th of 2020.

5   Q.   All right.  Now, in this personnel action form, is this

6   one of the examples of forms that you had described earlier as

7   far as receiving -- or requesting and receiving educational

8   incentive pay?

9   A.   Yes, sir.

10  Q.   Okay.  Now, just to walk us through this form, there's a

11  section that has the gray heading of "Change in Salary Status."

12  Do you see that?

13  A.   Yes, sir.

14  Q.   And can you explain what we're seeing here?

15  A.   So there's a number of categories under which that -- an

16  action can take place.  This particular one is for incentive

17  pay, which articulates a change from a 2.5 percent of base pay

18  to a 5 percent of base pay, and the reason for the change

19  indicating BA degree provided.

20  Q.   Okay.  Now, under the remarks, there's some statements

21  there.  Can you explain what that remarks section is referring

22  to?

23  A.   Essentially it's justification for the change, and it

24  indicates, per the Antioch Police Officers Association MOU,

25  employee is eligible to receive 5 percent of base pay for the

1  bachelor's degree.

2  Q.    Now, that reference there to the MOU, was that the

3  Exhibit 300 we were just looking at?

4  A.    Yes, sir.

5  Q.    Now, on this form there's a few signatures here, and do

6  you see that one of the signatures is listed as "Department

7  Head Signature"?

8  A.    Yes, sir.

9  Q.    And do you recognize whose signature that is?

10  A.    Yes, sir.

11  Q.    And who is that?

12  A.    Former Chief of Police Tammany Brooks.

13  Q.    So during your time as captain, during this time, did you

14  report up to then-Chief Brooks?

15  A.    Yes.

16  Q.    Now, in this case, we have the chief's signature here.  In

17  his absence, were you sometimes the signatory for these types

18  of forms?

19  A.    In the absence of the chief, yes, I would sign as a

20  department head.

21  Q.    And, indeed, did you sign some other forms that were

22  similar to this during your time as captain?

23  A.    Yes, sir.

24  Q.    Would you sign those forms upon review of their contents

25  and upon confirming that they were acceptable?

1      **MR. CRUDO:**  Objection.  Relevance.

2      **THE COURT:**  Overruled.

3      You may answer.

4      **THE WITNESS:**  It would depend on the circumstance.  At

5  times it would be just a step increase, which would be the

6  annual steps.  Sometimes it would be from like a trainee status

7  to a full-time status if someone graduated from the police

8  academy.  So it would really just depend; but, yes, I would

9  review these and sign these as appropriate.

10  BY MR. CHENG:

11  **Q.**   Okay.  Now, you mentioned earlier the reason for change

12  said "BA degree provided."

13      Could you please turn your attention to what's been

14  marked as Exhibit 3?

15  **A.**   Yes.

16  **Q.**   Do you recognize Exhibit 3?

17  **A.**   I do.

18  **Q.**   And what is it?

19  **A.**   It's a degree from California Coast University issued to

20  Morteza Amiri.

21  **Q.**   And in the course of collecting materials from the APD

22  personnel file, did that include this particular California

23  Coast University diploma for Mr. Amiri?

24  **A.**   I believe so, yes.

25      **MR. CHENG:**  Your Honor, we move to admit Exhibit 3.

1          THE COURT:  Any objection?

2          MR. CRUDO:  No objection.

3          THE COURT:  Admitted.

4       (Trial Exhibit 3 received in evidence.)

5          MR. CHENG:  May we publish, please?

6          THE COURT:  Yes, you may.

7   BY MR. CHENG:

8   Q.   And, Sergeant Schnitzius, do you see that there's a stamp

9   on this particular diploma copy?

10  A.   Yes, sir.

11  Q.   And what does it say?

12  A.   "Received" with a date of April 23 of 2020 by the human

13  resources department.

14  Q.   And on this diploma, does it also give a date that it was

15  awarded to Mr. Amiri?

16  A.   Yes.

17  Q.   And what is that?

18  A.   April 17th of 2020.

19  Q.   So this was stamped by the human resources department just

20  under a week after the diploma was awarded; correct?

21  A.   Roughly, yes.

22  Q.   Sergeant Schnitzius, as someone that reviewed some of

23  these forms, would the department have given the incentive had

24  an officer not actually earned a degree?

25  A.   No.

SCHNITZIUS - CROSS / CRUDO

1  Q.   If the department had determined and resolved that a

2  degree was not actually earned by an officer, would it continue

3  paying that incentive?

4  A.   No.

5  Q.   Thank you, Sergeant Schnitzius.

6       **MR. CHENG:**  The Government has no further questions at

7  this time.

8       **THE COURT:**  Thank you, Counsel.

9       You may cross.

10                      <u>CROSS-EXAMINATION</u>

11 BY MR. CRUDO:

12 Q.   Good morning, Mr. Schnitzius.  My name is Timothy Crudo,

13 and I'm one of the lawyers for Mr. Amiri.

14      We've never spoken, have we?

15 A.   No, sir.  I believe you left me a message, but I was

16 unable to return your message.

17 Q.   Okay.  And you haven't spoken to any other lawyers

18 representing Mr. Amiri, have you?

19 A.   No, sir.

20 Q.   You haven't talked to Mr. Amiri about this case; right?

21 A.   No, sir.

22 Q.   All right.  Now, you have had a chance to talk to the

23 Government a couple of times; right?

24 A.   Yes, sir.

25 Q.   Including about a month ago?

1    A.   I don't know that it was a month ago, but --

2    Q.   Relatively recently?

3    A.   Yes, sir.

4    Q.   In preparation for your testimony today?

5    A.   Yes, sir.

6    Q.   And you met with all the folks sitting at the table here?

7    A.   I believe most of them, yes, sir.

8    Q.   Okay.  And then you met again last Thursday?

9    A.   Yes.  Oh, spoke via phone.

10   Q.   Okay.  Again, to prepare for your testimony today?

11   A.   Yes, sir.

12   Q.   All right.  So you were an employee at the Antioch Police

13   Department for 25 years?

14   A.   Yes, sir.

15   Q.   The police department is located on L Street in Antioch?

16   A.   Yes, sir.

17   Q.   And the police department is one of many departments in

18   the City of Antioch; right?

19   A.   That's true.

20   Q.   About a dozen or so?

21   A.   Roughly.

22   Q.   All right.  There's public works, recreation, animal

23   services, et cetera; right?

24   A.   Animal services isn't housed at the police department.

25   Q.   But there are about a dozen other departments in addition

1    to the police department; right?

2    **A.**    Yes, sir.

3    **Q.**    Okay.  And one of those separate departments was human

4    resources?

5    **A.**    Yes, sir.

6    **Q.**    And it had its own department head?

7    **A.**    Yes.

8    **Q.**    And that was located in a different building --

9    **A.**    Yes, sir.

10   **Q.**    -- in the police department; right?

11   **A.**    Yes, sir.

12   **Q.**    About half a mile away?

13   **A.**    Sounds about right.

14   **Q.**    So you have a Bachelor of Science degree from Sacramento

15   State?

16   **A.**    Yes, sir.

17   **Q.**    And you said that was in criminal justice?

18   **A.**    Yes, sir.

19   **Q.**    How long did it take you to get that?

20   **A.**    All in all, to earn my bachelor's degree was roughly

21   six years.

22   **Q.**    Six years.  About how many hours did -- well, did you

23   spend time in the classroom?

24   **A.**    Oh, yes, sir.

25   **Q.**    And what did you do in the classroom?

1   A.   Reviewed, had study group sessions, took tests, listened

2   to lecture.

3   Q.   About how many hours, in the course of getting your

4   bachelor's degree, did you spend in the classroom or in

5   discussion groups with other students?

6   A.   I -- I couldn't even fathom a guess.  I switched majors

7   while I was at the college, so it took me a while.

8   Q.   Hundreds of hours, fair to say, at least?

9   A.   Roughly, yes, sir.

10  Q.   Okay.  And once you became an officer, you continued to

11  get training; right?

12  A.   Yes, sir.

13  Q.   And education?

14  A.   Yes, sir.

15  Q.   All right.  And that's true of all police officers at

16  least in the Antioch Police Department; right?

17  A.   Yes, sir.

18  Q.   All right.  There's academy training, field training, and

19  other types of training; correct?

20  A.   Yes, sir.

21  Q.   And some of those trainings are in areas such as evidence

22  and basic crimes and others that you described learning about

23  in the course of getting your bachelor's degree; right?

24  A.   Yes, sir.

25  Q.   Now, you knew Mr. Amiri as a police officer at the Antioch

1  Police Department; right?

2  A.   Yes, sir.

3  Q.   You didn't socialize with him, but you knew him just from

4  the job?

5  A.   Yes, sir.

6  Q.   Okay.  And he was supervised by a sergeant at that time,

7  as a police officer?

8  A.   Yes, sir.

9  Q.   Okay.  And Mr. Amiri prior to -- do you remember when he

10 started with the Antioch Police Department?

11 A.   I'm not sure, sir.

12 Q.   Do you recall it was about 2017?

13 A.   That would sound about right.

14 Q.   All right.  And before that, he was a police officer at

15 the Brentwood Police Department; right?

16 A.   Yes, sir.

17 Q.   And had been there for several years before he moved over

18 to Antioch?

19 A.   Yes, sir.

20 Q.   And when he came over to Antioch, Antioch gave him a

21 top-step salary; right?

22 A.   I believe so.

23 Q.   Okay.  What is a top-step salary?

24 A.   That means it's the highest step in the salary range that

25 could be received.

1  Q.   Okay.  Antioch is -- Antioch Police Department is a bigger

2  force by number than Brentwood, fair to say?

3  A.   Yes, sir.

4  Q.   A little more sophisticated police work?

5  A.   I would say so, yes.

6  Q.   More opportunity for growth?

7  A.   Yes, sir.

8  Q.   Better money?

9  A.   I believe so.

10 Q.   Okay.  You talked a little bit, on some questions from

11 Mr. Cheng, about the MOU between the City of Antioch and the

12 Antioch Police Officers Association Do you recall that?

13 A.   Yes, sir.

14 Q.   An MOU is just a memorandum of agreement; right?

15 A.   Memorandum of understanding, yes.

16 Q.   Okay.  I'm sorry.

17      And it's -- essentially it's an agreement; right?

18 A.   Yes, sir.

19 Q.   Okay.  And it's negotiated between the City of Antioch and

20 the Police Officers Association every few years; correct?

21 A.   Yes, sir.

22 Q.   The Exhibit 300 that you were shown covered the years --

23 covered the period September 1, 2016, to August 31, 2021;

24 right?

25 A.   I believe that's correct, yes, sir.

1   Q.   And one purpose of that MOU, and other MOUs before and

2   after it, is to establish rates of pay; right?

3   A.   Yes, sir.

4   Q.   And hours of work?

5   A.   Yes, sir.

6   Q.   And other conditions of employment?

7   A.   Yes, sir.

8   Q.   And one purpose is to promote harmonious labor relations

9   between the City and the police; right?

10  A.   That was the goal.

11  Q.   It's actually a labor document for the Police Officers

12  Association; right?

13  A.   Yes, sir.

14  Q.   That agreement covers only certain levels of police

15  officers; correct?

16  A.   Yes, sir.

17  Q.   It doesn't cover lieutenants and above; right?

18  A.   That is correct.

19  Q.   They're covered by a separate agreement; correct?

20  A.   Yes, sir.

21  Q.   And Mr. Amiri was a police officer with the Antioch Police

22  Department, so would be covered by the MOU that's at

23  Exhibit 300; right?

24  A.   Yes, sir.

25  Q.   And that Exhibit 300 and all other MOUs are the product of

1    negotiations between the City and the POA; right?

2    A.    Yes, sir.

3    Q.    And then when it's done, another one is renegotiated;

4    right?

5    A.    Yes, sir.

6    Q.    And sometimes the terms change from MOU to MOU; correct?

7    A.    That is correct.

8    Q.    Sometimes terms are added; right?

9    A.    Yes, sir.

10   Q.    And sometimes they're removed; right?

11   A.    Yes, sir.

12   Q.    Now, lieutenants and above, those who are not subject to

13   the MOU, are required to have a bachelor's degree when they

14   apply or are appointed; correct?

15   A.    Under the most current MOU, yes, sir.

16   Q.    Okay.  Everybody above sergeant; right?

17   A.    Yes, sir.

18   Q.    All right.  And lieutenants are paid a little more?

19   A.    Yes, sir.

20   Q.    Those subject to that other agreement, paid a little more?

21   A.    Typically, yes, sir.

22   Q.    All right.  And is it true that, in response to that price

23   differential, at some point the Police Officers Association

24   asked for that incentive, the educational incentive, to be

25   included in the MOU; correct?

1    **A.**    Yes, sir.

2    **Q.**    Okay.  The MOU has -- provides for lots of different

3    incentives, not just the educational incentive; correct?

4    **A.**    That is correct.

5    **Q.**    It provides a percentage increase depending on the kind of

6    shift you have --

7    **A.**    Yes, sir.

8    **Q.**    -- right?

9            Depending on your language skills; right?

10   **A.**    Yes, sir.

11   **Q.**    Depending on your seniority; right?

12   **A.**    Yes, sir.

13   **Q.**    So let's take a look, if you would, please, at

14   Exhibit 300, and that's been admitted.

15           So let's pull that up on the screen and go -- I think

16   you were looking at page 32, if memory serves.

17   **A.**    I'm not sure.  Exhibit -- I'm sorry, Exhibit 1, sir?

18   **Q.**    Well, let's go to Exhibit 300.  Do you have 300 there?

19   **A.**    I'm not sure that I do.

20           (Witness examines document.)  Oh.  Yeah, I have it.

21   Sorry.

22   **Q.**    All right.  Well, let's put -- let's put pages 32 and 33

23   on the screen a little bit so we can see both pages.

24           While we're doing that, I'm going to focus your

25   attention just -- this is Article X, Educational Incentive;

1  right?  That's what's covered by this section?

2  A.   Yes, sir.

3  Q.   Okay.  So Section -- there we go -- Section B -- wait a

4  sec.  There we go.

5       Okay.  So we have page 32 and 33 up on the screen

6  there.

7       I want you to focus on page 32, Section B, and you

8  talked about -- so there is a 2.5 percent pay bump for an

9  officer getting an AA degree; right?

10  A.   Yes, sir.

11  Q.   And a 5 percent bump for getting a bachelor's degree,

12  whether Bachelor of Arts or Bachelor of Science; right?

13  A.   Yes, sir.

14  Q.   And those figures aren't cumulative; right?

15  A.   In terms of?

16  Q.   So if you had an AA degree and then went on to get a BS

17  degree, you wouldn't get 7 and a half percent --

18  A.   No, sir.

19  Q.   -- right?

20       Okay.  You could only get --

21       THE COURT:  Just a moment.  Let him finish the

22  question before you respond, please.  Even if you guess

23  correctly, we'll have too much overlap on the transcript.

24  Okay?  Just so wait a beat before answering.

25       THE WITNESS:  Yes, Your Honor.

1        **THE COURT:**  Thank you very much.

2  **BY MR. CRUDO:**

3  **Q.**  Sorry.  My questions sometimes are a little long.

4        So if someone had an AA degree and then went on to get

5  a bachelor's degree, they could still only get a maximum, under

6  this incentive, of 5 percent; correct?

7  **A.**  That is my understanding.

8  **Q.**  And you talked a little bit about the purpose of education

9  incentive pay; right?  Do you remember that testimony?

10  **A.**  Yes, sir.

11  **Q.**  To aid in critical thinking and communication and other

12  skills?

13  **A.**  Yes, sir.

14  **Q.**  Did the City of Antioch have a list of approved schools

15  for this incentive program?

16  **A.**  My understanding, sir, is that it just had to be an

17  accredited institution.

18  **Q.**  Okay.  So the Antioch -- City of Antioch or the Police

19  Department didn't actually do anything to look into a school's

20  coursework to see if it was sufficiently rigorous to actually

21  develop the skills that it was paying for; right?

22  **A.**  I believe all it required was that it was from an

23  accredited institution.

24  **Q.**  Okay.  Other than that, nobody, to your knowledge, ever

25  looked into the actual courses or the quality of the education

1   that was being provided; right?

2            **MR. CHENG:**  Objection, Your Honor.  Asked and

3   answered.

4            **THE COURT:**  Well, sustained.

5   **BY MR. CRUDO:**

6   **Q.**   Have you heard of a school called California Coast

7   University?

8   **A.**   Yes, sir.

9   **Q.**   And that school was well known to officers within the

10  Antioch Police Department; right?

11  **A.**   That, I don't know.

12  **Q.**   Were you aware that -- are you familiar with the Police

13  Officers Research Association of California?

14  **A.**   Yes, sir.

15  **Q.**   Sometimes called PORAC?

16  **A.**   Yes, sir.

17  **Q.**   Are you aware that California Coast University advertised

18  in the PORAC magazine?

19  **A.**   I am.

20  **Q.**   That's -- PORAC is the largest law enforcement

21  organization in California; right?

22  **A.**   I believe so, sir.

23  **Q.**   And that magazine is distributed to officers and police

24  departments all over the state; right?

25  **A.**   My understanding.

1  Q.   And you were aware that there were many officers who were

2  taking classes at California Coast University; right?

3  A.   I was not.

4  Q.   Did you ever hear of California Coast University, while

5  you were at the Antioch Police Department, being referred to as

6  a joke school or words to that effect?

7  A.   No, sir.

8  Q.   All right.  Let's go, please -- we can take that down --

9  to Exhibit 2, which I think should be in your binder there.

10       That's the personnel action form that you looked at a

11  little earlier; right?

12  A.   Yes, sir.

13  Q.   Do you have that in front of you?

14  A.   Yes, sir.

15  Q.   Okay.  Great.

16       Now, you didn't have any role in drafting or creating

17  this document, did you?

18  A.   No, sir.

19  Q.   You didn't review it at the time.  You didn't approve it,

20  sign off on it, anything like that; right?

21  A.   No, sir.

22  Q.   In fact, you never saw this particular document until the

23  Government asked you to go find it --

24  A.   That's correct.

25  Q.   -- right?

1    Okay.  Would you take a look at the document here

2    where -- do you see where it says "Change in Salary" I think

3    it's, slash, "Status."  Do you see there about halfway down?

4    **A.**    Yes, sir.

5    **Q.**    And then there's a couple of columns, and there's a column

6    that says "From" to a column that says "To"; right?

7    **A.**    Yes, sir.

8    **Q.**    And where it says "Incentive Pay," do you see that line

9    there in that section "Changes of Salary/Status" box?

10   **A.**    Yes, sir.

11   **Q.**    And that is the incentive pay that was -- Mr. Amiri was

12   receiving at the time; right?

13   **A.**    Yes, sir.

14   **Q.**    2 and a half percent of base pay --

15   **A.**    Yes.

16   **Q.**    -- right?

17          And then, the next box over, it says "to 5 percent of

18   base pay"; right?

19   **A.**    Yes, sir.

20   **Q.**    And the 5 percent of base pay, the reason for that change

21   was because a BA degree was provided?  That's what the document

22   says; right?

23   **A.**    Yes, sir.

24   **Q.**    But the actual increase in pay was only 2 and a half

25   percent from what Mr. Amiri had been receiving; right?

1  **A.**   That is correct.

2  **Q.**   Okay.  It wasn't a 5 percent increase; right?

3  **A.**   No.  It was an additional 2 and a half percent --

4  **Q.**   Okay.

5  **A.**   -- from what he was already receiving.

6  **Q.**   Okay.  Let's go back, please, to Exhibit 300.  That's the

7  MOU.  And let's pull up again, please -- let me get there

8  myself.

9         And let's go back, Mr. Schnitzius, to pages 32 and 33.

10 We were looking at these a few minutes ago.

11        And let's get those up on the screen.  There we go.

12        Do you have those in front of you?

13 **A.**   I have one page in front of me.

14 **Q.**   Okay.

15 **A.**   I don't have the second page.

16 **Q.**   Okay.  If you look at Exhibit 300, three zero zero.

17 **A.**   Yes, sir.

18 **Q.**   Is that what you have in front of you?

19 **A.**   I have -- it's denoted as 01.

20 **Q.**   Okay.  Do you have an Exhibit 300 in your binder there?

21        **MR. CRUDO:**  Your Honor, may I approach?

22        **THE COURT:**  Yes, you may.

23        **MR. CRUDO:**  All right.  Hopefully this will fix

24 things.

25        **THE WITNESS:**  I think I have a different one.

BY MR. CRUDO:

Q.   Okay.  Try that one.

A.   Yes, sir.

Q.   So take a look, please, at Exhibit 300.  Just let me know when you get there.  And in particular, I want to point your attention to pages 32 and 33.

A.   (Witness examines document.)  Yes, sir.

Q.   All right.  So this -- again, this is Article X.  This whole section is on educational incentives; right?

A.   Yes, sir.

Q.   And we talked about Section B, Educational Incentive, and I want to ask you some questions about some of the other educational incentives.

So if you look above that, at paragraph A.

And maybe we could enlarge that on the screen.  There we go.

So paragraph A is entitled "Educational Reimbursement Program"; right?

A.   Yes, sir.

Q.   Okay.  And it reads (as read):

"Employees are eligible to receive reimbursement

for approved courses through a recognized college or

university in accordance with City policy on

educational reimbursement up to a limit of 800," and

no 100s- -- "$800 per year."

1  A.    Yes.

2  Q.    Do you see that there?

3          So Mr. Amiri was eligible for this educational

4  reimbursement program while he was at the Antioch Police

5  Department; right?

6  A.    Yes, sir.

7  Q.    And that reimbursement program covers the cost the

8  classes, books, and other items; correct?

9  A.    I believe so.

10 Q.    And that's up to $800 a year?

11 A.    Yes, sir.

12 Q.    Every year?

13 A.    Yes, sir.

14 Q.    And that program is processed through the HR department

15 and not the police department; right?

16 A.    Yes, sir.

17 Q.    And you looked into whether Mr. Amiri had ever sought

18 reimbursement, educational reimbursement, under this program;

19 right?

20 A.    I don't believe I did.

21 Q.    Let me hand you what's been marked as Exhibit 385.  Let me

22 grab that.  I'll get you a copy.

23          MR. CRUDO:  Your Honor, may I approach?

24          THE COURT:  Yes, you may.

25               (Counsel approaches witness.)

1    MR. CRUDO:  Your Honor, I don't know that you have a

2    copy.  I could hand one up.

3        THE COURT:  That's okay.  I'll look at the one on the

4    screen when you put it up.

5        MR. CRUDO:  Well, we may not publish it.

6        THE COURT:  All right.  I can follow along.  Thank

7    you.

8        MR. CRUDO:  Okay.

9    BY MR. CRUDO:

10   Q.   Mr. Schnitzius, does Exhibit 385 refresh your recollection

11   that, in fact, you investigated whether Mr. Amiri ever sought

12   reimbursement under the educational reimbursement program?

13   A.   It does.

14   Q.   Okay.  And, in fact, you did investigate; right?

15   A.   I did make an inquiry, yes.

16   Q.   And you determined that he did not apply for that -- for

17   educational reimbursement; correct?

18   A.   Based off this correspondence, yes, sir.

19   Q.   Okay.  You can put that aside.  Thank you.

20        I want to now -- so we're going to stay on

21   Article X -- so this is still educational incentives -- and I

22   point you down to the bottom of the page, bottom of page 32,

23   Section C, entitled "Police Officer Standard Training," POST,

24   "POST Certificate Pay."  Do you see that?

25   A.   Yes, sir.

1   Q.   And we can take the enlargement down off the screen.

2   Thank you.

3         But let's keep those two pages up so the jury can see.

4         Okay.  I think you talked about POST training during

5   your direct testimony.

6         Are you familiar with the State of California

7   Commission on Police Officer Standard -- Standards and

8   Training?

9   A.   I am.

10  Q.   What is it?

11  A.   Basically it's a certification through the state for

12  officers to receive certificates based on the amount of

13  education and training that they receive during the course of

14  their career.

15  Q.   And that state commission sets the selection and training

16  standards for California law enforcement; right?

17  A.   Yes.

18  Q.   Including the City of Antioch Police Department?

19  A.   They don't set our selection standards for officers but

20  for trainings --

21  Q.   Okay.

22  A.   -- and what they'll accept in terms of training to meet

23  the qualifications for the certification -- certificates.

24  Q.   All right.  So this Section C, down at the bottom of

25  page 32, provides an additional educational incentive; correct?

1  **A.**   Yes, sir.

2  **Q.**   And Mr. Amiri, as a police officer, would have been

3  eligible to participate in that incentive as well; correct?

4  **A.**   Yes, sir.

5  **Q.**   All right.  So reading section -- the first paragraph

6  there, it says (as read):

7        "Effective September 1, 2016, sworn employees in

8        the classifications of police officer, police

9        corporal, and police sergeant shall receive POST

10       certificate pay as a percentage of base monthly pay

11       as follows..."

12       Do you see that?

13 **A.**   Yes, sir.

14 **Q.**   What is a POST certificate?

15 **A.**   It is a certificate issued by the Commission on Peace

16 Officer Standards and Training for officers who attain a

17 certain level of education -- a combination of education and/or

18 years of service and training.

19 **Q.**   And officers at the Antioch Police Department could get a

20 bump in pay if they had one of those POST certificates; right?

21 **A.**   Yes, sir.

22 **Q.**   So if you look down at the bottom of page 32, an

23 intermediate certificate would get an officer a 2 and a half

24 percent pay raise; right?

25 **A.**   Yes, sir.

1  Q.   And the top of the next page, an advanced certificate

2  would get 5 percent.  Do you see that?

3  A.   Yes, sir.

4  Q.   Again, those are not cumulative; right?

5  A.   That is correct.

6  Q.   So if you had both an intermediate and then got an

7  advanced certificate, you'd still only get 5 percent?

8  A.   That is correct.

9  Q.   So what is an intermediate certificate?

10 A.   There are three levels.  There's basic, which you see it

11 upon completion of your probationary period with your agency.

12      And then there's the intermediate, which is issued

13 based on education and training.  I can't remember the amount

14 of education off the top of my head or the amount of -- the

15 number of years of service required to attain that degree.  But

16 it's basically a recognition, for lack of a better term, that

17 you have a certain level of education -- knowledge, education,

18 and experience.

19 Q.   And you were familiar with the POST eligibility

20 requirements while you were at the Antioch Police Department?

21 A.   Yes.  I can't recall off the top of my head.

22 Q.   Okay.  And what's an advanced certificate?

23 A.   Again, another certificate based off of your education,

24 training, and experience issued by the Police Officers

25 Standards and Training Commission.

1  Q.   And these are both for -- the intermediate and the

2  advanced certificate, these are uniform standards that the

3  commission sets that apply to police officers all across the

4  state; right?

5  A.   Yes, sir.

6  Q.   You mentioned the basic certificate, and that's a

7  certificate that police officers get when they get through

8  their probationary periods; right?

9  A.   Yes, sir.

10 Q.   So Mr. Amiri had a basic certificate; correct?

11 A.   Yes, sir.

12 Q.   All right.  There are other types of certificates in

13 addition to basic, intermediate, and advanced that POST awards;

14 correct?

15 A.   That is correct.

16 Q.   There's certificates for supervisory, for management, for

17 others; correct?

18 A.   That is correct.

19 Q.   But Antioch pays an incentive -- additional incentive only

20 for the intermediate and the advanced; right?

21 A.   Yes, sir.

22 Q.   So I want to -- we can take that enlargement off the

23 screen but keep the page under there.

24      I want to have you take a look on that page 33,

25 Section E.  So this is still in the educational incentive

1    program.

2           And let's blow up that section.

3           Do you see that there?

4    A.   Yes, sir.

5    Q.   Okay.  And Section E says (as read):

6           "Employees are only eligible to receive either

7      the education incentive or a POST incentive, but not

8      both."

9           Do you see that?

10   A.   Yes, sir.

11   Q.   And the education incentive that's referred to here is the

12   educational incentive pay at Section B on the prior page;

13   right?

14   A.   Yes, sir.

15   Q.   All right.  So you couldn't get 5 percent for having a

16   bachelor's degree under the incentive pay period and an

17   additional 5 percent for getting a POST advanced certificate;

18   right?

19   A.   Yes, sir.

20   Q.   You could only get 5 percent max?

21   A.   Yes, sir.

22   Q.   Okay.  I'm going to hand you what's been marked as

23   Exhibit 43.

24           MR. CRUDO:  May I approach, Your Honor?

25           THE COURT:  Yes, you may.

1              (Counsel approaches witness.)

2         **THE COURT:**  Ladies and gentlemen, we're going to take

3    our first break at 9:45, just for your own planning purposes.

4    **BY MR. CRUDO:**

5    **Q.**   So the POST requirements to obtain a certificate that

6    we've been talking about -- again, those are published by the

7    California Commission; right?

8    **A.**   Yes, sir.

9    **Q.**   And those are set out in the California Code of

10   Regulations?

11   **A.**   I believe so.

12   **Q.**   Okay.  And those are set out actually in the regulations

13   that are at Exhibit 43; right?

14   **A.**   It appears to be.

15   **Q.**   Okay.

16        **MR. CRUDO:**  Your Honor, we would move the admission of

17   Exhibit 43, please.

18        **THE COURT:**  Any objection?

19        **MR. CHENG:**  No objection, Your Honor.

20        **THE COURT:**  It's admitted.

21        (Trial Exhibit 43 received in evidence.)

22        **MR. CRUDO:**  Let's pull that up on the screen.  And

23   let's highlight Section A that -- just the top half of that

24   page there.  Blow it up a little bit.  I know it can be kind of

25   hard to read.

1    BY MR. CRUDO:

2    Q.   Mr. Schnitzius, if you have trouble reading that, just let

3    me know.

4            So Section A -- let me get to it myself.

5            Section A, at the top, says "Professional

6    Certificates/Peace Officers."  Do you see that?

7    A.   Yes, sir.

8    Q.   And then it says "Section 1," and below that it says (as

9    read):

10           "POST professional certificates are awarded to

11           peace officers who achieve increasingly higher levels

12           of education, training, and experience in their

13           pursuit of professional excellence."

14           Do you see that?

15   A.   Yes, sir.

16   Q.   And those certificates are the certificates that are

17   referred to in the educational incentives at the Antioch Police

18   Department we were just talking about; right?

19   A.   Yes, sir.

20   Q.   I want you to take a look, please, at page 4 of

21   Exhibit 43.

22           And let's highlight Sections 7 and 8.

23           Actually, just to make it easier, let's just highlight

24   Section 8, please.

25           And Section 8 sets out the requirements to get an

1    advanced POST certificate; right?

2    A.    Yes, sir.

3    Q.    You had mentioned various education and experience

4    requirements.  Are those -- to get an advanced certificate.

5    Are those set out here on page 4 of Exhibit 43?

6    A.    Yes, sir.

7    Q.    All right.  So I want to ask you about those.

8          Where it says "degree or education units," do you see

9    that?

10   A.    I do.

11   Q.    And what does "degree" refer to there?

12   A.    The type of degree one would attain from a college.

13   Q.    Okay.  And how about education units?  What are education

14   units?

15   A.    Those are also coursework each -- my understanding of

16   college coursework is that each class is awarded a certain

17   number of educational units.  So my understanding is that would

18   reflect successful completion of a certain amount of

19   coursework.

20   Q.    Okay.  So if you completed one college semester unit, you

21   get one educational unit; right?

22   A.    I believe it might be three credits for -- I don't know

23   how that works.  I'd have to double-check that.

24          I want to say for each course usually there are

25   typically three units, so one course would equal three units.

1   Q.   But you get credit -- even if you don't have a degree, you

2   get credit for taking some classes; right?

3   A.   Up to a limit of 45.

4   Q.   Okay.  And then the next column over, it says "Law

5   Enforcement Experience."  Do you see that?

6   A.   Yes, sir.

7   Q.   And what's referred to there?

8   A.   Those are your years of service as a law enforcement

9   officer.

10  Q.   Okay.  Not just at Antioch Police Department; right?

11  A.   No, sir.

12  Q.   So Mr. Amiri, who spent some time at the Brentwood Police

13  Department, would get credit for the time that he spent at

14  Brentwood plus the time that he spent for -- at Antioch;

15  correct?

16  A.   Yes, sir.

17  Q.   And then the next column over, it says "Training Points."

18  Do you see that?

19  A.   Yes, sir.

20  Q.   And what's reflected in that column?

21  A.   For the first three, is -- first three down are zeros and

22  then 45 and 30, which is commensurate with the educational

23  units.

24  Q.   Okay.  And training points, you get a point for a certain

25  amount of law enforcement training; right?

1   **A.**   Yes.

2   **Q.**   Okay.  The law enforcement -- you guys do a lot of

3   training; right?

4   **A.**   We do.

5   **Q.**   And certain number of hours gives you a point; right?

6   **A.**   I -- I believe it depends on whether or not you received

7   credit through the college for that training.  A lot of

8   training centers are affiliated with colleges, junior colleges.

9   **Q.**   Okay.  But you could get -- accumulate points for law

10   enforcement training if it qualified; right?

11   **A.**   Yes, sir.

12   **Q.**   Okay.  So someone is entitled to get an advanced

13   certificate if they could satisfy any of these five criteria;

14   right?  Five scenarios?

15   **A.**   Yes, sir.

16   **Q.**   So just to be clear, because that wasn't a great question,

17   someone with a master's degree and four years of law

18   enforcement experience would get an advanced POST certificate;

19   right?

20   **A.**   Yes, sir.

21   **Q.**   And someone with an associate's degree and nine years of

22   law enforcement experience would get the same certificate --

23   **A.**   Yes, sir.

24   **Q.**   -- right?

25          And someone with 30 education units and 12 years of

1  law enforcement experience and 30 training points would also

2  get the very same certificate; right?

3  **A.**  Yes, sir.

4  **Q.**  So once Mr. Amiri satisfied any of these five scenarios,

5  he would receive a POST advanced certificate; right?

6  **A.**  Yes, sir.

7  **Q.**  Thank you, Mr. Schnitzius.

8  　　　　**MR. CRUDO:**  Your Honor, no further questions.

9  　　　　**THE COURT:**  Thank you.

10  　　　　Counsel, any redirect?

11  　　　　**MR. CHENG:**  Yes, Your Honor.

12  　　　　　　　　**REDIRECT EXAMINATION**

13  BY MR. CHENG:

14  **Q.**  Sergeant Schnitzius, during cross-examination, Mr. Crudo

15  asked you some questions about the POST certificate

16  eligibility; is that right?

17  **A.**  Yes, sir.

18  **Q.**  And eligibility for these certificates are based on a

19  combination of education, as well as work experience; is that

20  right?

21  **A.**  And in some cases training points, yes, sir.

22  **Q.**  Thank you for that clarification.

23  　　　　Now, I believe Mr. Crudo had some questions for you

24  about an advanced certificate.

25  　　　　Now, when you reviewed Mr. Amiri's personnel file, had

1  Mr. Amiri ever applied for an incentive based on an advanced

2  POST certificate?

3  **A.**   I don't recall.

4  **Q.**   And earlier Mr. Crudo had gone over Exhibit 43 with you.

5        And if we could please look at Exhibit 43, at page 4.

6        Under Section 8, eligibility for an advanced

7  certificate for someone with an associate degree would require

8  an associate degree and nine years of experience; is that

9  correct?

10 **A.**   Yes, sir.

11 **Q.**   Now, at the time that we reviewed this -- excuse me.

12       At the time of the personnel action forms that we

13 reviewed in Exhibit 2, when -- when were those submitted again?

14 **A.**   I believe those are in 2020.

15 **Q.**   And at that time, Mr. Amiri had been employed with the

16 Antioch Police Department for just about three years; is that

17 correct?

18 **A.**   I'm not exact on how many years.

19 **Q.**   Okay.  If we take a look at that form, Exhibit 2,

20 Mr. Crudo had some questions for you about the change in salary

21 status.  Do you recall that?

22 **A.**   Yes, sir.

23 **Q.**   Now, according to this form, in April of 2020, the change

24 in salary status took Mr. Amiri from 2.5 percent up to a

25 5 percent total educational incentive; is that right?

1   A.    Yes, sir.

2   Q.    And if you look at the following two pages in Exhibit 2,

3   do you see another personnel action form dated September of

4   2020?

5   A.    September -- excuse me.  September 29th of 2020, yes, sir.

6   Q.    And this also describes a salary change; is that right?

7   A.    Yes, sir.

8   Q.    And is this an example of one of those annual salary

9   raises that we discussed earlier, out of that MOU?

10  A.    Yes, sir.

11  Q.    And did the 5 percent educational incentive factor on top

12  of this salary raise?

13  A.    With each annual increase, it would.

14  Q.    And if you look at the third page, do you see another

15  personnel action form dated in April of 2022?

16  A.    I do.

17  Q.    And this provides another salary increase effective

18  September 2021; is that right?

19  A.    Yes, sir.

20  Q.    And, again, would -- the 5 percent increase to educational

21  pay, did that factor into the total salary amount in addition

22  to the raise described here?

23  A.    It -- this sets the new base for top step.  So, yes, every

24  year it would affect that.

25  Q.    Thank you, Sergeant Schnitzius.

1    **MR. CRUDO:**  We have no further questions.  Thank you.

2    **THE COURT:**  Anything further, Mr. Crudo?

3    **MR. CRUDO:**  No, Your Honor.

4    **THE COURT:**  Thank you.

5    You may be excused, sir.  Thank you very much.  You

6    can leave the exhibits there.  Counsel will take care of those.

7    (Witness excused.)

8    **THE COURT:**  Next witness, please.

9    Why don't we do this:  It's 20 to 9:00.  Let's take

10   our 15-minute break.

11   And please remember the admonitions I gave you.  Keep

12   an open mind, don't talk to anybody about the case or let

13   anyone talk to you.

14   Enjoy your 15-minute break.  Thank you.

15   **THE CLERK:**  All rise.

16   (The jury leaves the courtroom.)

17   (Proceedings were heard out of the presence of the jury.)

18   **THE COURT:**  All right.  15 minutes, Counsel.

19   **MR. CHENG:**  Thank you.

20   (Recess taken at 9:39 a.m.)

21   (Proceedings resumed at 9:55 a.m.)

22   **THE CLERK:**  All rise.

23   (The jury enters the courtroom.)

24   (Proceedings were heard in the presence of the jury.)

25   **THE CLERK:**  Please be seated.

1      (Pause in proceedings.)

2          **THE CLERK:**  Please remain seated and come to order.

3  Court is back in session.

4          **THE COURT:**  Welcome back, ladies and gentlemen.

5          Please call your next witness.

6          **MR. KRISHNAMURTHY:**  Thank you.  The Government calls

7  Patrick Wentz.

8      (Patrick Wentz steps forward to be sworn.)

9          **THE CLERK:**  Good morning, sir.  If you could step up

10  on the stand, please.

11          Please raise your right hand.

12                        <u>**PATRICK WENTZ**</u>,

13  called as a witness for the Government, having been duly sworn,

14  testified as follows:

15          **THE WITNESS:**  Yes, I do.

16          **THE CLERK:**  Put your hand down and take a seat,

17  please.

18          If you could speak clearly into the microphone,

19  please.  State your full name and spell your last name for the

20  record.

21          **THE WITNESS:**  My first name is Patrick.  My last name

22  is Wentz, W-E-N-T-Z.

23                      <u>**DIRECT EXAMINATION**</u>

24  BY MR. KRISHNAMURTHY:

25  Q.   Good morning.

1    Where are you currently employed?

2    **A.**    I'm currently employed with the City of Antioch Police

3    Department.

4    **Q.**    And what is your current title?

5    **A.**    Police captain.

6    **Q.**    How long have you held that position?

7    **A.**    In Antioch, about four months.

8    **Q.**    Where did you work before that?

9    **A.**    The Pittsburg Police Department.

10    **Q.**    When did you leave the Pittsburg Police Department?

11    **A.**    In November of 2023.

12    **Q.**    Are Antioch and Pittsburg neighboring cities in Contra

13    Costa County?

14    **A.**    Yes, they are.

15    **Q.**    What position did you hold at the Pittsburg Police

16    Department before you left in November 2023?

17    **A.**    I was a captain also.

18    **Q.**    Briefly, what were your responsibilities at the Pittsburg

19    Police Department?

20    **A.**    It was to oversee personnel, develop policy, procedure,

21    deploy personnel accordingly.

22    **Q.**    About how long did you work at the Pittsburg Police

23    Department?

24    **A.**    26 years, thereabouts.

25    **Q.**    Besides being captain, did you also hold other assignments

1   at the Pittsburg Police Department?

2   **A.**   Yes, I did.

3   **Q.**   Are you familiar with the Pittsburg -- Pittsburg Police

4   Officers' Association?

5   **A.**   Yes, I am.

6   **Q.**   Did you hold any roles with the police officer

7   associations when you were at Pittsburg?

8   **A.**   Yes, I did.

9   **Q.**   Which ones?

10   **A.**   I served as the president of the Police Officers'

11   Association a number of years ago.

12   **Q.**   During your time at the Pittsburg Police Department and

13   your time with the POA, as well as your time with the Antioch

14   Police Department, did you become familiar with the California

15   Peace Officers Standards and Training, or POST?

16   **A.**   Yes.

17   **Q.**   What is POST, briefly?

18   **A.**   POST is a governing body for all law enforcement agencies

19   in the state of California.

20   **Q.**   Does POST offer certificates to officers for having

21   completed certain types of training?

22   **A.**   Yes, they do.

23   **Q.**   What types of certificates does it offer?

24   **A.**   They start with a basic.  You can get an intermediate and

25   advanced.  There's a supervisory and a management certificate.

Q.    And do you -- do you yourself hold any POST certificates?

A.    Yes, I do.

Q.    Are you familiar with the general types of qualifications necessary to earn a POST certificate?

A.    Yes, I am.

Q.    And briefly, what are the general types of qualifications that are necessary?

A.    It's based on education and experience.

Q.    I'd like to hand you a set of documents.

        **MR. KRISHNAMURTHY:**  Your Honor, permission to approach.

        **THE COURT:**  Yes.

                (Counsel approaches witness.)

**BY MR. KRISHNAMURTHY:**

Q.    Captain Wentz, can you please turn to what's been marked as Exhibit 26?

A.    Okay.

Q.    Have you seen this document before?

A.    Yes, I have.

Q.    What is it?

A.    This is the POST certificate outline, if you will.

        **MR. KRISHNAMURTHY:**  Your Honor, I move to admit Exhibit 26.

        **THE COURT:**  Any objection?

        **MR. HAMILTON:**  No, Your Honor.

1          THE COURT:  Would you do me a favor?  Would you

2     reintroduce yourself.  Since you're going to be talking,

3     reintroduce yourself to the jury and for the court reporter,

4     please.

5          MR. HAMILTON:  Yes, Your Honor.  I'm Oliver Hamilton

6     on behalf of defendant, Morteza Amiri.

7          THE COURT:  Thank you very much.

8          Proceed.

9          It's admitted.

10     (Trial Exhibit 26 received in evidence.)

11          MR. KRISHNAMURTHY:  Permission to publish as well.

12          THE COURT:  You may.

13          MR. KRISHNAMURTHY:  Could we zoom in on the advanced

14     portion of the document?

15     BY MR. KRISHNAMURTHY:

16     Q.   So, Captain Wentz, earlier you just testified that earning

17     a certificate was based on a combination of education and

18     experience?

19     A.   That's correct.

20     Q.   Can you explain what that means in the context of earning

21     an advanced degree?

22     A.   So as you'll see on the left column, it indicates

23     experience for 6, 9, and 12 years.  To the right of that is a

24     degree, master's -- going down, master's, bachelor's,

25     associate's, or there are training-point options there.

1    In essence, if you go back to the very top for

2  experience, four years, if you have a master's degree, you will

3  earn your advanced certificate.  Below that would be six years

4  of experience and a bachelor's would get you an advanced

5  certificate.

6  Q.   Thank you.

7    And we can take that exhibit down.  Thank you.

8    During your time at the Pittsburg Police Department,

9  did the City of Pittsburg offer financial incentives for its

10 employees, including its police officers, to earn college

11 degrees and POST certificates?

12 A.   Yes, they did.

13 Q.   Did the City of Pittsburg issue a memorandum of

14 understanding that contains specific policies related to those

15 educational incentives?

16 A.   Yes, they did.

17 Q.   Can you please turn, in your binder, to Exhibit Number 10?

18 A.   (Witness examines document.)  Okay.

19 Q.   Are you familiar with this document?

20 A.   Yes, I am.

21 Q.   What is it?

22 A.   This is the portion of the memorandum of understanding

23 that outlines the education reimbursement component.

24 Q.   And if you turn the page, Section 7.7.

25 A.   Correct.

1    Q.    In addition to the educational reimbursement portion, is

2    this -- does this also capture any other policies?

3    A.    Yes, it does.

4    Q.    And what are they?

5    A.    The certificates and the incentives as it relates to

6    those.

7    Q.    Thank you.

8          MR. KRISHNAMURTHY:  Your Honor, I move to admit

9    Exhibit Number 10.

10          THE COURT:  Any objection?

11          MR. HAMILTON:  No objection, Your Honor.

12          THE COURT:  Admitted.

13    (Trial Exhibit 10 received in evidence.)

14          MR. KRISHNAMURTHY:  And permission to publish?

15          THE COURT:  Yes.

16   BY MR. KRISHNAMURTHY:

17   Q.    Let's start with Section 7.7 first.

18          And if we could blow up the top half of

19   Exhibit 10-003, please.

20          While we find that page, Captain Wentz, I can ask you

21   a couple of questions.

22          What does the policy provide about the incentives that

23   the City of Pittsburg offered related to college degrees?

24   A.    So it indicates in the MOU that an additional 5 percent of

25   the employee's base monthly salary upon proof of obtaining a

1    bachelor's degree.

2    **Q.**   And what if they obtained a master's degree?

3    **A.**   That would be an additional 10 percent.

4    **Q.**   What about the incentives for earning a POST certificate?

5    **A.**   POST certificates, it says an additional 2 and one-half

6    percent of the employee's base monthly salary for possession of

7    a POST intermediate certificate.

8    **Q.**   And the advanced certificate?

9    **A.**   That would be 5 percent.

10   **Q.**   Was there a maximum combined incentive that could be

11   earned if an employee had both a college degree and a POST

12   certificate?

13   **A.**   Yes, there was.

14   **Q.**   And what was the combined maximum incentive?

15   **A.**   That is 15 percent.

16   **Q.**   Thank you.

17        Did the City of Pittsburg also reimburse certain costs

18   that went towards the cost of obtaining a higher education?

19   **A.**   Yes, they did.

20   **Q.**   Can we please turn to Exhibit 10-001 and focus on

21   Section 6.10?

22        Captain Wentz, what was the City of Pittsburg's

23   reimbursement policy for tuition costs?

24   **A.**   It was $2400 for tuition.  There was also the opportunity

25   for an additional $300 in books, supplies, and potentially

1   other costs.

2   Q.   Under this policy, did students have to pass the class to

3   receive a reimbursement?

4   A.   Yes, they did.

5   Q.   Thank you.

6        And I think we're done with that exhibit.

7        Captain Wentz, are you familiar with the process by

8   which an officer at the Pittsburg Police Department would

9   request a financial incentive after being awarded a college

10  degree or a POST certificate?

11  A.   Yes, I am.

12  Q.   Briefly, what was the process?

13  A.   To receive reimbursement for classes, they would submit

14  proof of having attended the class, along with the grade or

15  passing grade, and a memorandum for the dollar amount that they

16  were requesting.

17  Q.   And what about for the financial incentives?

18  A.   Ultimately, they -- once they obtained a degree, whether

19  it be the bachelor's or master's, again, they would provide

20  proof of that, the diploma, the transcripts, et cetera, and

21  that would in turn qualify them for the incentive.

22  Q.   Is that a process that you went through yourself during

23  your time at the Pittsburg Police Department?

24  A.   Yes, I did.

25  Q.   Did you earn a degree while you were at the Pittsburg

1  Police Department?

2  **A.**   Yes, I did.

3  **Q.**   What degree did you earn?

4  **A.**   I earned a Bachelor of Science degree.

5  **Q.**   Are you familiar with a document called a personnel action

6  form?

7  **A.**   Yes, I am.

8  **Q.**   What is a personnel action form?

9  **A.**   It's a form that's used to adjust salary, incentives, or

10 promotions.

11 **Q.**   Does a personnel action form document whenever an employee

12 received a change in salary due to one of those educational

13 incentives that we were just talking about?

14 **A.**   Yes, it is.

15 **Q.**   I'd like to go back to the policy for a moment.

16       Based on your long-time experience in the Pittsburg

17 Police Department, as well as your experience in leadership

18 there, why did the police department incentivize the earning of

19 college degrees and POST certificates?

20 **A.**   Overall it was determined that a well-educated workforce

21 was better informed, could make better decisions.

22 **Q.**   Was it important that the student actually had taken the

23 classes necessary to earn the degree?

24 **A.**   Yes, it was.

25 **Q.**   Are you familiar with someone by the name of Patrick

1  Berhan?

2  A.    I am.

3  Q.    Was Mr. Berhan employed by the Pittsburg Police Department

4  during your tenure there?

5  A.    He was.

6  Q.    Did Mr. Berhan submit requests for financial incentives on

7  the basis of having been awarded a college degree or a POST

8  certificate?

9  A.    Yes, he did.

10  Q.    And are those financial incentives documented in personnel

11  action forms?

12  A.    Yes.

13  Q.    Would you please turn to Exhibit Number 12?

14  A.    (Witness examines document.)

15  Q.    Okay?

16  A.    Okay.

17  Q.    What is this document?

18  A.    This is a personnel action form for Mr. Berhan.

19        MR. KRISHNAMURTHY:   Move to admit Exhibit Number 12

20  and publish to the jury.

21        MR. HAMILTON:   No objection, Your Honor.

22        THE COURT:   It's admitted.

23     (Trial Exhibit 12 received in evidence.)

24  BY MR. KRISHNAMURTHY:

25  Q.    So, first, can we focus on the effective date of this

1    personnel action form?

2           What's the effective date, Captain Wentz?

3    A.    It is August 25th of 2019.

4    Q.    And what does this personnel action form document?

5    A.    This is documenting obtaining the bachelor's degree and

6    earning the 5 percent incentive.

7    Q.    Can we please zoom in on the remarks towards the bottom?

8           Under the section that says "Department Head

9    Approval," do you recognize that signature?

10   A.    Yes, I do.

11   Q.    And whose signature is that?

12   A.    That's Chief Brian Addington.

13   Q.    Police Chief Brian Addington?

14   A.    Correct.

15   Q.    And if you turn the page, what is attached to this

16   particular personnel action form?

17   A.    This is an e-mail, appears from a representative of the

18   college he attended indicating that he's successfully earned

19   the degree.

20   Q.    And can you please go to the next page as well?

21          Okay.  And what is this document?

22   A.    These are the transcripts from the college indicating

23   earning the degree.

24   Q.    All right.  Thank you very much.

25          Next I'd like to turn to Exhibit Number 14 in your

1    binder, please.

2    **A.**    (Witness examines document.)  I'm there.

3    **Q.**    What is this document?

4    **A.**    This is an advanced certificate for Mr. Berhan from the

5    Peace Officers Standards and Training.

6            **MR. KRISHNAMURTHY:**  Your Honor, I move to admit and

7    publish Exhibit Number 14.

8            **THE COURT:**  Objection?

9            **MR. HAMILTON:**  No objection, Your Honor.

10            **THE COURT:**  It's admitted.

11        (Trial Exhibit 14 received in evidence.)

12            **THE COURT:**  You may publish.

13            **MR. KRISHNAMURTHY:**  Thank you.

14    **BY MR. KRISHNAMURTHY:**

15    **Q.**    And I'm sorry, could you repeat the date of that?

16    **A.**    November 18th, 2021.

17    **Q.**    Thank you.

18            We can take that down.

19            Next can you please turn to Exhibit Number 27 in your

20    binder?

21    **A.**    (Witness examines document.)  I'm there.

22    **Q.**    Are you familiar with this document?

23    **A.**    Yes, I am.

24    **Q.**    What is it?

25    **A.**    This is another personnel action form for Mr. Berhan.

1          **MR. KRISHNAMURTHY:** Your Honor, I move to admit and

2  publish Exhibit Number 27.

3          **THE COURT:** Objection?

4          **MR. HAMILTON:** No objection.

5          **THE COURT:** Admitted.

6      (Trial Exhibit 27 received in evidence.)

7  **BY MR. KRISHNAMURTHY:**

8  **Q.** Can we go to page 27-003, please?

9         What does this personnel action form document?

10  **A.** Excuse me one minute while I get the correct date.

11         Could you repeat the exhibit number for me? I

12  apologize. 27?

13  **Q.** 27-003, effective date of November 14th, 2021.

14  **A.** (Witness examines document.) Okay. I'm there.

15  **Q.** Can we zoom in on the remarks at the bottom?

16         What does this personnel action form document?

17  **A.** This documents having earned the advanced certificate and

18  the 5 percent incentive.

19  **Q.** Thank you. We can take that down.

20         Captain Wentz, can you next, please, turn to

21  Exhibit Number 13?

22  **A.** (Witness examines document.) Okay. I'm there.

23  **Q.** Are you familiar with this document?

24  **A.** Yes, I am.

25  **Q.** And what is it?

1  A.    This is a log of education reimbursements Mr. Berhan

2  received from the City of Pittsburg.

3        MR. KRISHNAMURTHY:  Your Honor, I move to admit and

4  publish Exhibit Number 13.

5        THE COURT:  Objection?

6        MR. HAMILTON:  No objection, Your Honor.

7        THE COURT:  It's admitted and you may publish.

8     (Trial Exhibit 13 received in evidence.)

9        MR. KRISHNAMURTHY:  Thank you.

10 BY MR. KRISHNAMURTHY:

11 Q.    And what are the dates of the two invoices?

12 A.    One is dated January 6th of 2020, and the other is

13 December 3rd of 2020.

14 Q.    And if we go to page 13-002, can you please tell us the

15 total amounts of the two invoices?

16 A.    I'm sorry, the total amount of the two invoices?

17 Q.    Both invoices, correct.

18 A.    That would be --

19 Q.    Each one separately.

20 A.    I'm sorry.  I thought you wanted the combined total.

21        The first one, excuse me, is $2,700 and the second one

22 is it 2,442 or $2,442.

23 Q.    Thank you.  We can take that down as well.

24        Captain Wentz, are you familiar with two people by the

25 name of Ernesto Mejia-Orozco and Amanda Theodosy, or

1    Amanda Nash?

2    **A.**    Yes, I am.

3    **Q.**    During your time at the Pittsburg Police Department, were

4    they also officers at the Pittsburg Police Department?

5    **A.**    Yes, they were.

6    **Q.**    And have you reviewed personnel action forms for those two

7    officers?

8    **A.**    Yes, I have.

9    **Q.**    Did those two officers also request -- submit requests for

10    educational incentives based on having been awarded a college

11    degree?

12    **A.**    Yes, they did.

13         **MR. KRISHNAMURTHY:**  Thank you very much.

14         **THE COURT:**  Thank you, Counsel.

15         You may cross.

16         **MR. HAMILTON:**  Yes, Your Honor.  The Defense has no

17    questions for Mr. Wentz.

18         **THE COURT:**  Very well.

19         You may step down, Officer.  Thank you very much.

20                    (Witness excused.)

21         **THE COURT:**  Please call your next witness.

22         **MR. KRISHNAMURTHY:**  The United States calls Murl

23    Tucker.

24       (Murl Tucker steps forward to be sworn.)

25         **THE CLERK:**  I'm going to have you raise your right

1  hand for me.

2                         **MURL TUCKER**,

3  called as a witness for the Government, having been duly sworn,

4  testified as follows:

5            **THE WITNESS:**  I do.

6            **THE CLERK:**  You can put your hand down.  Please be

7  seated.

8            If you could speak clearly into the microphone, state

9  your full name and spell your last name for record.

10           **THE WITNESS:**  Murl Tucker, T-U-C-K-E-R.

11                      **DIRECT EXAMINATION**

12  BY MR. KRISHNAMURTHY:

13  **Q.**   Good morning, sir.

14           Where are you currently employed?

15  **A.**   With California Coast University.

16  **Q.**   Is it also known as CCU?

17  **A.**   Yes.

18  **Q.**   What is California Coast University?

19  **A.**   We're an online University.

20  **Q.**   And what's your role at CCU?

21  **A.**   I am the chief academic officer and now the interim

22  president, as of last week.

23  **Q.**   Generally, what are your responsibilities?

24  **A.**   I oversee the -- all of the academic programs, faculty,

25  program development, curriculum development.

1  Q.    How long have you worked at CCU in total?

2  A.    In total, about 23 years.

3  Q.    Have you held any other positions at CCU?

4  A.    Yes.  Originally faculty and psychology, associate dean of

5  psychology, and then the position of chief academic officer and

6  now the new position.

7  Q.    What types of degrees does CCU offer its students?

8  A.    We have actually 43 degrees and certificates in areas of

9  business -- let's see, business administration, management,

10 human resource management, healthcare, marketing, in criminal

11 justice, psychology, education, several different areas of

12 education.

13 Q.    And what levels of degrees does CCU offer?

14 A.    Associate, bachelor's, master's, and doctoral degrees and

15 undergraduate and graduate certificates.

16 Q.    You mentioned that CCU is an online University.  Has CCU

17 always been a distance-learning institution?

18 A.    Yes, from the beginning in 1973, it was founded.

19 Q.    Are there any CCU students on-site?

20 A.    No.

21 Q.    Let's say a student wanted to enroll at CCU.  What does

22 that process look like?

23 A.    They would first apply, and then our requirements are they

24 submit their transcripts or specialized training documentation,

25 résumé.  So that's evaluated by us.  We then send an academic

1    plan back to them with an enrollment agreement.  We then get

2    official documents before they can actually start their

3    programs.  And then they can start at any time.  It's open

4    enrollment, open graduate -- open exit.

5           The programs are self-paced, so they can work at their

6    own pace within certain time guidelines.

7    Q.   You mentioned something called an enrollment agreement?

8    A.   Mm-hmm.

9    Q.   Can you explain more about what that is?

10   A.   That's basically a contract that kind of details -- we're

11   different in the sense that, when students start, they know all

12   the classes they have to take to obtain their degree or

13   certificate.  So they would know they have 14 classes to take,

14   12 classes, whatever it might be.  And so then there's a

15   contract that details that many classes with what the cost of

16   those are, and what -- they have the ability to sign up for

17   different payment plans or they can pay in full.  They could --

18   they get some various options.

19   Q.   Does CCU generally keep records related to a student's

20   application?

21   A.   Yes.  That's a part of our requirement by the State, our

22   accreditor.

23   Q.   Once a student is enrolled, how do they access their

24   courses and the course material?

25   A.   So when they first start, they're connected with a student

1    success adviser, who goes through the program at an

2    orientation.  They then log in through a student portal, and

3    that's all kind of explained to them.

4            They access courses through the student portal they

5    download.  They complete their tests; they receive their study

6    guides.  So everything's kind of sent to them electronically if

7    they option for that.  They can also option for mail and it can

8    sent to them.  They complete their courses online, submit their

9    tests online, submit their papers online.

10   Q.   And so submitting papers and tests is all done through the

11   student portal?

12   A.   Yes.

13   Q.   Is the student portal password protected?

14   A.   Yes.

15   Q.   Once a student has picked a degree program and filled out

16   an enrollment application with the student adviser, do they

17   have flexibility in the courses they select towards their

18   degree?

19   A.   Only in the elective courses.  So we have -- at other

20   schools, you would have choices in general education.  We just

21   have a series of general ed that fill the different categories:

22   Sciences, humanities, social sciences, basic subjects.  So they

23   complete our group of courses, and then they have major courses

24   that are prescribed, and then they get to pick from a list of

25   electives if they have any elective requirements.

1  Q.   So everyone taking courses towards a certain major would

2  fulfill the same major-related courses?

3  A.   Yes.

4  Q.   Are courses at CCU structured similarly?

5  A.   Yes.

6  Q.   Can you explain how that is?

7  A.   Yeah.  We actually do that so that students kind of have a

8  sense, from course to course -- just to lessen their own

9  anxiety about them.  So each course requires students to

10  complete four unit examinations, multiple choice examinations,

11  a final examination multiple choice, and then they have to

12  write four papers.

13  Q.   You mentioned examinations.  What constitutes a passing

14  grade at CCU?

15  A.   At the undergraduate bachelor's level, they have to get a

16  grade of C or higher in order to pass, or they have to repeat

17  the course.

18  Q.   And as far as the exams, how are the exams created?

19  A.   We have a department under my direction that -- working

20  with faculty where we pick standard college textbooks.  We

21  develop the tests based on those textbooks, the multiple choice

22  examinations as well as the written assignments.

23        And we also have outside reference or resources and

24  other learning activities that they -- that are also available

25  to them through the student portal.

1   Q.   You talked earlier about how these classes are

2   self-directed.

3   A.   Uh-huh.

4   Q.   If multiple people were taking the same course, would

5   there be overlap in the examination materials?

6   A.   The examinations themselves are -- the multiple choice

7   examinations are -- come from a test bank pool.  So when

8   they're generated, they're actually unique.  I mean, it's

9   possible some of the questions would be the same, but each

10  examination is separate and unique from person to person just

11  because of the way our system generates the test.

12  Q.   What about the essay exams?

13  A.   The essays would be the same if it was the same revision.

14  They have three choices at the undergraduate level.  So there's

15  four writing assignments.  For each writing assignment, there's

16  three choices of questions they can pick from.  So it's

17  possible a person could pick the same question on the same

18  writing assignment.

19  Q.   Once a student has completed all the courses they need to

20  fulfill CCU's graduation requirements, what is the process for

21  them actually requesting to graduate?

22  A.   To graduate?  There's a list of things.  They have to

23  submit a petition.  They have to have a minimum time

24  requirement of at least nine months.  They have to have met all

25  their financial requirements.  They have to have a minimum

1  grade -- the minimum grade point average required to complete

2  all of the courses.  So we check all of that before we would

3  issue the degree.

4  Q.   Does CCU keep records of each class that a student took

5  and the grade that he or she received?

6  A.   Yes.

7  Q.   Does CCU also keep records of all course materials,

8  including exam questions and answers?

9  A.   Yes, mm-hmm.

10  Q.   And does it also generate and retain transcripts for

11  students when they have successfully passed enough classes to

12  graduate?

13  A.   I'm sorry.  Could you repeat that?

14  Q.   Does CCU also generate and retain transcripts for

15  students?

16  A.   Yes.

17  Q.   Does CCU have an academic honesty or academic integrity

18  policy?

19  A.   Yes, we do.

20  Q.   And does that policy -- what does that policy generally

21  require?

22  A.   That -- sort of what, you know, its name implies; that

23  students are agreeing to, you know, complete work on their own,

24  that they're not copying from someone else, using work from

25  another source.  That's in our catalog.  And part of the

1  catalog is -- or part of the enrollment agreement is that

2  they're signing that they've read and agree to the terms of

3  what's in the catalog.  It's also posted in the student

4  handbook, and it's also on the student portal itself.  There's

5  a tab on there about that; and those are grounds for

6  termination if we find that out, but they -- but they're

7  agreeing to those terms.

8  Q.   Thank you.

9       I'd like to hand you a set of documents.

10      MR. KRISHNAMURTHY:  Permission to approach?

11      THE COURT:  Yes.

12           (Counsel approaches witness.)

13  BY MR. KRISHNAMURTHY:

14  Q.   Can you please turn to Exhibit Number 50?

15  A.   (Witness examines document.)  Okay.

16  Q.   What is this document?

17  A.   It's our University catalog.

18  Q.   Does it contain CCU's academic integrity policy?

19  A.   Yes.

20      MR. KRISHNAMURTHY:  Your Honor, I move to admit and

21  publish Exhibit Number 50.

22      MR. CRUDO:  Your Honor, this is the 2022 catalog.  If

23  counsel can lay a foundation --

24      THE COURT:  Will you go to the microphone, please, to

25  state your objections?  Thank you.

1          MR. CRUDO:  Sorry, Your Honor.

2          This is the 2022 policy, so it's outside the time

3   period; but if counsel can just ask a couple of questions to

4   establish it's substantially the same, then we can withdraw the

5   objection.

6          THE COURT:  Fair enough.

7          Would you do that, please, sir?

8   BY MR. KRISHNAMURTHY:

9   Q.   Dr. Tucker, in preparation for your testimony, did you

10  review the 2021 and 2020 course catalogs?

11  A.   Yes, I did.

12  Q.   And did you compare the academic integrity policies in all

13  three catalogs?

14  A.   Yes.

15  Q.   Were they substantially the same?

16  A.   Yes, they were.

17         MR. KRISHNAMURTHY:  Your Honor, I move to admit and

18  publish Exhibit 50.

19         MR. CRUDO:  No objection.

20         THE COURT:  Admitted.

21     (Trial Exhibit 50 received in evidence.)

22         THE COURT:  And you may publish.

23         MR. KRISHNAMURTHY:  Thank you.

24  BY MR. KRISHNAMURTHY:

25  Q.   Can we please turn to Exhibit 50-130, page 130?

1          And can we blow up the middle part of the page,

2    please?

3    **A.**    Yes.

4    **Q.**    Does the course catalog set forth some examples of what

5    CCU would consider to be cheating?

6    **A.**    Yes, it does.

7    **Q.**    And could you please read for the jury the common examples

8    of cheating provided in the course catalog?

9    **A.**    Starting with the examples?

10   **Q.**    Correct.

11   **A.**    Okay.  (as read):

12          "Cheating examples would include copying the work

13          of another student or examination materials that

14          should not be in the possession of the student."

15          Second, taking an examination for a student" --

16          **THE COURT:**  Excuse me, Counsel.

17          You know, this is in evidence now and it's on the

18   screen.  I don't think you need to have him read it.  The jury

19   can read it and you can even summarize it in your closing

20   argument.

21          **MR. KRISHNAMURTHY:**  Yes, Your Honor.

22          We can take that down.

23          **THE WITNESS:**  Okay.

24   BY MR. KRISHNAMURTHY:

25   **Q.**    Dr. Tucker, you mentioned earlier that there are certain

1  instances -- certain occasions in which a student is required

2  to acknowledge that they have received and reviewed this.  Can

3  you remind the jury what that is?

4  A.    Yes.   In the enrollment agreement, there's a line in the

5  enrollment agreement where they initial that they received the

6  catalog and understand the terms of the catalog.  That's part

7  of our enrollment agreement.

8  Q.    Does CCU also have procedures in place for trying to

9  enforce its academic integrity policies?

10  A.    If we have any type of evidence of that or faculty, you

11  know, are checking for, you know, duplicate, if we're able to

12  obtain that, then we would -- we have sort of an informal -- if

13  we think it's a chance that there may just be something

14  innocent about -- you know, that they've quoted something that

15  maybe they didn't cite, then we would go back to the student

16  and give them the opportunity to fix that.

17         So it depends on the level of, you know, how -- what

18  we think because -- how big the problem is, but we would

19  dialogue with the faculty and the student about that first.

20  Q.    Does CCU also have a practice in place for requiring

21  proctors for certain types of exams?

22  A.    Yes, we do.

23  Q.    Can you explain what that is?

24  A.    Yes.  Our accreditor requires that there be a minimum

25  amount of proctoring.  We actually require more than the

1  accreditor requires.  We require all of the major courses as

2  well as the general ed to be proctored.

3          A proctor is actually someone that the student

4  themselves can designate, but it can't be a family member, a

5  friend, someone living in the same residence, a student or a

6  former student or graduate.  We check the e-mail addresses.  We

7  would send a code to the e-mail of the proctor once we approve

8  them, and it's just the final examination for the test that

9  goes to the proctor.

10 Q.   So you mentioned receiving an e-mail address for the

11 proctor and sending the proctor the code?

12 A.   Uh-huh.

13 Q.   What does the proctor do with the code?

14 A.   Sets up a time with the student to complete the final

15 examination, and under -- and the proctor verifies who the

16 student is with two forms of government-issued ID and signs off

17 on the proctor form and returns it to us that they verified

18 that and they were basically overseeing the completion of the

19 final examination.

20 Q.   Does CCU retain records of who the proctors were for every

21 exam for which it was required?

22 A.   Yes.

23 Q.   Okay.  I'd like to go through some of the records that

24 we've discussed earlier, including some of the transcripts and

25 contracts that we were just talking about.

1    A.    Okay.

2    Q.    Can you please turn to Exhibit 55?  And I think that's

3    going to be in the other binder.

4    A.    All right.

5    Q.    Have you seen Exhibit 55 before?

6    A.    I'm sorry?  What's that?

7    Q.    Have you seen this set of documents before?

8    A.    Yes.

9    Q.    What is it?

10   A.    The first page is a transcript.

11   Q.    And does the exhibit also contain other student files?

12   A.    Yes, it does.

13          MR. KRISHNAMURTHY:  Your Honor, I move to admit and

14   publish Exhibit Number 55.

15          THE COURT:  Objection?

16          THE WITNESS:  Do you want me to go say what they are?

17          THE COURT:  No, just a moment.

18          THE WITNESS:  Oh, sorry.

19          THE COURT:  Any objection?

20          MR. CRUDO:  No objection, Your Honor.

21          THE COURT:  Admitted.

22       (Trial Exhibit 55 received in evidence.)

23          MR. KRISHNAMURTHY:  Thank you.

24   BY MR. KRISHNAMURTHY:

25   Q.    Can we go to 55-002, please?

1   **A.**   Yes.

2   **Q.**   And first focusing on the top left portion of the page,

3   what is this document?

4   **A.**   This is an official transcript.

5   **Q.**   For which student?

6   **A.**   For Morteza Amiri.

7   **Q.**   And looking at the document as a whole, what, if anything,

8   does this transcript reflect about Mr. Amiri's degree status?

9   **A.**   Reflect on what was that?

10   **Q.**   Reflect about his degree status.

11   **A.**   Oh, okay.

12       Let's see, it shows that he graduated.  So --

13   **Q.**   And perhaps we could zoom in on the text at the --

14   **A.**   To the right, in the second column, graduated with a

15   Bachelor of Science in criminal justice on April 17th, 2020.

16   **Q.**   Thank you.

17       And again, focusing on the top left portion of the

18   page, there's a section for transferred units.

19       A little bit over that, please.

20       What does that mean?

21   **A.**   So that is -- that section covers transfer credit that was

22   received from other institutions; and if there is a -- the top

23   part shows, I think, that's a community college, so there's a

24   course, English 7, that's Las Positas.  That's a course that we

25   took in for one of our classes, a psychology class, Psych 13,

1    Music 5.  Those all met general ed requirements.

2           There's specialized training, which is generally for

3    police officers or criminal justice people.  That's usually

4    POST training from a police academy.

5           And then two CCU courses, that means that it's a

6    direct -- like, correlation, parallel to a course that we

7    offer.  So those courses, same thing from the community

8    college, went to some course directly with us.

9           And down -- I don't know if you're going to get to

10   that next, but down below that, where it says --

11   Q.   Could I actually just stop you right there?  Thank you

12   very much.

13   A.   Okay.  Where it says "CBT," those courses that are listed

14   from above from Las Positas would correspond to our courses in

15   that next area down below that.

16   Q.   Great.  Thank you.

17          Now, if we could focus at the very bottom of the

18   left-hand side, where it says "Winter 2020."

19   A.   Uh-huh.  Yes.

20   Q.   I just want to draw your attention to the prefixes at the

21   left-hand side.

22          There's a GED and a BCJ.  Are you familiar with those

23   prefixes?

24   A.   Yes.

25   Q.   And what do they stand for?

1  A.    GED are general education courses.  BCJ are criminal

2  justice courses.

3  Q.    Great.

4        And if we focus on the top right, there's another

5  acronym that I wanted you to explain.  I also see a BAM.  Do

6  you know what that stands for?

7  A.    That's a business course.

8  Q.    Could we go to 55-003, please?

9  A.    (Witness examines document.)  Okay.  Yes.

10  Q.    What is this document?

11  A.    A résumé for Mr. Amiri.

12  Q.    Is this the type of document that CCU collects in terms of

13  its application materials?

14  A.    Yes.  We ask students to submit a résumé.

15  Q.    And focusing on the middle part of the page, where it says

16  "Work Experience" for a minute.

17        Can you explain why work experience is relevant to

18  CCU's structuring of its courses?

19  A.    We're allowed to give up to 25 percent what we call

20  challenge exams.  Generally police officers don't really get a

21  lot of challenge exams because the POST training, that's

22  specialized training -- I'm sorry.  This is a little confusing.

23        But specialized training and challenge exams go

24  together, so we're allowed to give up to 25 percent of the

25  program for that combination.

1    So if they have already POST training or specialized

2  training, they don't get a lot of challenge exams.  But, say,

3  for the business students, they would submit a résumé and we

4  might be able to give them something; like say they were a

5  manager, we can give them a challenge exam in management.  So

6  that's why we ask for that, detailing what their work

7  experience is.

8  Q.   Thank you.

9        Earlier you were describing the student portal.

10 A.   Uh-huh.

11 Q.   Can students communicate with CCU or their instructors

12 through a student portal?

13 A.   Yes.

14 Q.   And does CCU generally retain that type of information as

15 well?

16 A.   We do.  If it's through like the notes or it's an e-mail

17 or something, that -- that is documented, memorialized.

18 Q.   Can we go to page 67, please?

19      MR. CRUDO:  Your Honor, I'm sorry.  If we could

20 just ask counsel to step a little closer to the mic so that --

21      THE COURT:  Yes.  Sorry.  Thank you.

22      THE WITNESS:  I'm sorry, what was the number?

23 BY MR. KRISHNAMURTHY:

24 Q.   Page 67.  It should be on your screen.

25 A.   55-67?

1    **Q.**    Correct.

2    **A.**    Okay.

3         (Witness examines document.)  Yes.

4    **Q.**    And is this the type of information that is retained by

5    CCU -- CCU's communications?

6    **A.**    Yes, it is.

7    **Q.**    Thank you.

8         I think we can take this exhibit down.

9         Next, Dr. Tucker, can you please turn to

10   Exhibit Number 56?

11   **A.**    (Witness examines document.)  Okay.

12   **Q.**    Are you familiar with this document?

13   **A.**    Yes.

14   **Q.**    What is it?

15   **A.**    It was a grid that we put together in response to the

16   records subpoena we received.  So it just lists all of the

17   courses that were required for the program and, you know,

18   whether they were met through transfer credit, taken with us

19   with a grade.  It also lists the -- if it was a proctored exam

20   or not -- it says "No proctor required"; or if there was a

21   proctored exam required, we listed who the proctor was.

22         **MR. KRISHNAMURTHY:**  Move to admit and publish

23   Exhibit Number 56.

24         **THE COURT:**  Any objection?

25         **MR. CRUDO:**  No objection, Your Honor.

1      **THE COURT:**  Admitted.

2      (Trial Exhibit 56 received in evidence.)

3  **BY MR. KRISHNAMURTHY:**

4  **Q.**   And you mentioned that this document also shows the

5  proctors if a proctor was required?

6  **A.**   Yes.

7  **Q.**   Thank you.

8         We can take this exhibit down.

9         Next can you please turn to Exhibit Number 51, please?

10 **A.**   (Witness examines document.)  All right.

11 **Q.**   Have you seen this document or set of documents before?

12 **A.**   Yes.  It's another transcript.

13 **Q.**   For which CCU student?

14 **A.**   For Patrick James -- is it Berhan?

15     **MR. KRISHNAMURTHY:**  Your Honor, I move to admit and

16 publish Exhibit Number 51, please.

17     **MR. CRUDO:**  No objection.

18     **THE COURT:**  Admitted.

19     (Trial Exhibit 51 received in evidence.)

20     **THE COURT:**  You may publish.

21     **MR. KRISHNAMURTHY:**  Thank you.

22 **BY MR. KRISHNAMURTHY:**

23 **Q.**   And can we go to 51-002?

24 **A.**   (Witness examines document.)

25 **Q.**   And focusing on the right-hand side of the page, what does

1   it reflect about Mr. Berhan's degree status?

2   **A.**   That he completed a Bachelor of Science in criminal

3   justice on August 22nd, 2019.

4   **Q.**   Thank you.

5         Next can we show the witness Exhibit Number 52,

6   please?

7   **A.**   All right.

8   **Q.**   Are you familiar with this document?

9   **A.**   Yes.  It's a grid, again, for the program completed by

10  Mr. Berhan, of the courses required, listing all of those --

11  what he received transfer credit for, and also proctor, the

12  proctor name, if a proctored exam was required.

13  **Q.**   Thank you.

14        **MR. KRISHNAMURTHY:**  Your Honor, I move to admit and

15  publish Exhibit Number 52.

16        **MR. CRUDO:**  No objection.

17        **THE COURT:**  Admitted.

18     (Trial Exhibit 52 received in evidence.)

19  **BY MR. KRISHNAMURTHY:**

20  **Q.**   And focusing on the column at the far right, for every

21  course that required a proctor, who was Mr. Berhan's proctor?

22  **A.**   Savannah Reed.

23  **Q.**   Thank you.

24        I'd like to hand you another set of documents.

25        **MR. KRISHNAMURTHY:**  Permission to approach?

1        THE COURT:  Yes.

2                (Counsel approaches witness.)

3    BY MR. KRISHNAMURTHY:

4    Q.   Can you please turn to Exhibit Number 305, please?

5    A.   All right.

6    Q.   Are you familiar with this document?

7    A.   (Witness examines document.)  Oh, yes.

8    Q.   What is this document?

9    A.   This was the -- this was the -- I'm sorry -- all of the

10   records of the coursework that was completed, the tests, the

11   records, the diploma's here, faculty evaluations that was

12   completed for Mr. Amiri.

13   Q.   Thank you.

14        MR. KRISHNAMURTHY:  I move to admit and publish

15   Exhibit Number 305, please.

16        MR. CRUDO:  No objection.

17        THE COURT:  Admitted.

18     (Trial Exhibit 305 received in evidence.)

19   BY MR. KRISHNAMURTHY:

20   Q.   And I'd like to just highlight sort of an example of

21   something that CCU retains.

22        Can we go to page 146, please?

23        Earlier, Dr. Tucker, you mentioned essay questions as

24   parts of exams?

25   A.   Yes.

1    Q.    Is this the type of essay question that a student would

2    complete and that CCU then retains records for?

3    A.    Yes, we do.

4    Q.    Thank you.

5          Next could you please turn to Exhibit 306?

6    A.    306?

7    Q.    Correct.

8    A.    Is that in the other book?

9    Q.    Perhaps the other binder.

10   A.    Oh, okay.

11   Q.    Are you familiar with Exhibit 306?

12   A.    These look like records -- or files for a student

13   Savannah Reed.

14         **MR. KRISHNAMURTHY:**  Your Honor, I move to admit and

15   publish Exhibit 306, please.

16         **MR. CRUDO:**  No objection.

17         **THE COURT:**  Admitted.

18      (Trial Exhibit 306 received in evidence.)

19         **THE COURT:**  You may publish.

20         **MR. KRISHNAMURTHY:**  Thank you.

21   BY MR. KRISHNAMURTHY:

22   Q.    And can we please go to page 4 of the exhibit?

23   A.    In Exhibit 306?

24   Q.    Um-hmm.

25   A.    Oh.  Is that the first page?

1    **Q.**    One second.  It should show up on your screen.

2    **A.**    It's a transcript, I think.

3    **Q.**    And what, if anything, does the transcript reflect about

4    Ms. Reed's degree status at CCU?

5    **A.**    This one is a little more difficult to read.

6         So it looks like she did not complete the program,

7    completed a number of courses but did not complete the program.

8    **Q.**    Thank you.

9         **MR. KRISHNAMURTHY:**  Thank you.  No additional

10   questions.

11        **THE COURT:**  Thank you, Counsel.

12        You may cross.

13        Ladies and gentlemen, if you want to take a stretch

14   break, this would be a good opportunity to do that for

15   everybody in the courtroom if you wish.

16        **MR. CRUDO:**  Your Honor, may I ask for a five-minute

17   biology break before examination?  I ask for a quick bathroom

18   break, Your Honor.

19        **THE COURT:**  Yes.  While we're stretching, maybe make

20   it --

21        **MR. CRUDO:**  Okay.  Thank you.

22              (Recess taken at 10:48 a.m.)

23            (Proceedings resumed at 10:50 a.m.)

24        **THE COURT:**  You may proceed, Mr. Crudo.

25   \\\

<u>CROSS-EXAMINATION</u>

**BY MR. CRUDO:**

**Q.** Good morning, Mr. Reed -- I'm sorry, Mr. Tucker. Is it Dr. Tucker? Mr. Tucker?

**A.** Dr. Tucker.

**Q.** Dr. Tucker.

**A.** Anything's fine, though.

**Q.** All right. Well, thanks for indulging me. I've had too much water this morning.

So we've never spoken before; right?

**A.** No, we haven't.

**Q.** Okay. My name's Tim Crudo. I'm counsel for the defendant in the case today.

You haven't talked to or met with any of Mr. Amiri's lawyers, have you?

**A.** No.

**Q.** Okay. And never talked to him?

**A.** No.

**Q.** You've talked -- met a couple times with the Government lawyers; right?

**A.** Yes.

**Q.** Okay. And that was to prepare for your testimony today?

**A.** Yes.

**Q.** All right. You were able to go through all the issues that they wanted to cover with you and ask you some questions

1  and get your answers?

2  **A.**   Yes.

3  **Q.**   Okay.

4          All right.  So CCU, all the courses are online; right?

5  **A.**   Yes.  Yes, they are.

6  **Q.**   But there's a -- is there an office?  Is there a physical

7  building somewhere?

8  **A.**   Yes.  We're in Santa Ana, California.

9  **Q.**   All right.  That's down in Southern California?

10 **A.**   Uh-huh.  Yes.

11 **Q.**   So no offices, no classrooms in the Bay Area?

12 **A.**   No.

13 **Q.**   I wanted to ask you -- you're probably going to use

14 those -- need those binders up there.

15         If you would take a look, please, at Exhibit 50, and

16 that was the course catalog that Mr. Krishnamurthy asked you

17 about.

18         And I'm going to ask you -- and we can go ahead and

19 display that -- I'm going to ask you to take a look, please, at

20 page 75.

21         Okay.  Do you have that in front of you?

22 **A.**   Yes.

23 **Q.**   All right.  And the course catalog sets out the

24 requirements for graduation or to receive a diploma --

25 **A.**   Yes.

**Q.**    -- right?

And so for the Bachelor of Science degree -- again, this is on page 75 -- in criminal justice requires 126 units; right?

**A.**    Yes, it does.

**Q.**    And that's actually the same for all bachelor's degrees at CCU?  They all require 126 units?

**A.**    Yes, they do.

**Q.**    What's a unit?

**A.**    Three units, three semester units, and it's based on 45 hours of study.  So a total of 135 hours for a three-unit course.

**Q.**    Okay.  Let's take a look, if you would, it's got "Coursework Requirements for Graduation" down about two-thirds of the way down.  Let's blow that up.  I just want to ask you a couple questions about that.

So it says -- it first refers to 14 core courses.  Do you see that?

**A.**    Yes.

**Q.**    And what is a core course?

**A.**    So it would be kind of the same as a major course.  So in that -- like in this particular degree, criminal justice, there would be courses related to the major of criminal justice.  So it's 14.

**Q.**    All right.  So everybody who's going to get a Bachelor of

1  Science in criminal justice has to take these same 14 core

2  classes?

3  **A.**    Yes, or transfer them in from another school.

4  **Q.**    Okay.  And they get 42 units for that?

5  **A.**    Yes.

6  **Q.**    All right.  And I won't do the math here, but every course

7  you get three units; right?

8  **A.**    Yes.

9  **Q.**    All right.  And the next line down, it says "14 general

10  education courses."  What are general education courses?

11  **A.**    So our system was originally kind of set up off the

12  Cal State system, just for sort of ease and familiarity.  So

13  general ed usually, in most traditional schools, are some sort

14  of combination of science classes, social studies, social

15  sciences, humanities, fine arts, and then basic subjects.

16          So in our particular case, we have 14 of those spread

17  over those four categories.  So in math class, English class,

18  U.S. government, U.S. history, a psychology class, sociology

19  class, anthropology class.  At this point in time, there's a

20  criminology class required, a life science class, environmental

21  science class, humanities course, an art history class, world

22  religions, and something else -- ethics class.  Ethics is now,

23  but -- those are the 14 core classes.

24  **Q.**    All right.  So everybody who's going to get a Bachelor's

25  of Science in criminal justice has to take 14 general ed

1    courses?

2    A.    Yes.

3    Q.    Lots to choose from, they get to pick the 14 they want?

4    A.    Yes.

5    Q.    Okay.  And is that true as well for any other bachelor's

6    degree -- somebody trying to get a bachelor's degree in some

7    other discipline has to take 14 education courses?

8    A.    General ed.

9    Q.    I'm sorry, general education courses.

10   A.    Yes, exactly the same.

11   Q.    Okay.  And they're picking from the same catalog, same

12   universe of general education courses as everybody else; right?

13   A.    Yes.

14   Q.    All right.  Let me ask you, the next line down refers to

15   elective courses.  And 14 elective courses are required to get

16   a Bachelor's of Science in criminal justice; right?

17   A.    Yes.

18   Q.    And is the same true for any other bachelor's, 14 elective

19   courses?

20   A.    Yes.

21   Q.    What are elective courses?

22   A.    They are set up with a combination of our other major

23   courses, generally, from the other majors.  So like in criminal

24   justice, there's a mixture of business courses, psychology

25   courses, to give them a -- an opportunity to take classes

1    outside the major.

2          Often our students come in -- or our applicants come

3    in with college courses from other schools, so that fills in

4    for electives frequently.  Often in law enforcement, they have

5    POST training, so the special -- that would be specialized

6    training, so that counts toward elective credits.  So some of

7    the electives are met through previous specialized training

8    they've already received.  Military training would fit in that

9    category; different types of training like that fit into the

10   elective category.

11   **Q.**   All right.  So you need 126 units to graduate --

12   **A.**   Yes.

13   **Q.**   -- to get a diploma; right?

14         You don't have to get them all from --

15              (Official Reporter clarification.)

16   **BY MR. CRUDO:**

17   **Q.**   So you need 126 units to graduate; right?

18   **A.**   Yes.

19   **Q.**   You don't have to get them all from CCU; right?

20   **A.**   No.

21   **Q.**   But once you get 126, you can get your diploma?

22   **A.**   126 completing all of those requirements.

23   **Q.**   Okay.  So -- but you don't get -- or even if you've

24   completed 126 units, you don't get your diploma until you've

25   paid up your outstanding balance at the school; right?

1   **A.**   Yes, right.

2   **Q.**   All right.  You can put that away.  Thank you.

3        I'm going to ask you to take a look -- again, I think

4   it's in your binder there -- at Exhibit 55.

5        I think you've testified that that is Morteza Amiri's

6   student file.

7   **A.**   Hold on one second.

8   **Q.**   It's a relatively thick one there.  Number 55.

9   **A.**   (Witness examines document.)  Yes.

10   **Q.**   All right.  And let's go ahead -- and this has been

11   admitted, so let's turn, please, to page 2.

12        And the page numbers, just so we're literally on the

13   same page, that I'm using, there's a little EXH-55-002.  So

14   when I refer to page numbers, that's the number I'm referring

15   to.  I know there are other numbers and page numbers on it, but

16   just so we're on the same page.  Okay?

17   **A.**   Yes.

18   **Q.**   Okay.  Let's enlarge the upper half.

19        I know you went through some of this with

20   Mr. Krishnamurthy, but I want to ask you specifically about a

21   couple things.

22        So at the top there, it says "Transferred Units";

23   right?

24   **A.**   Yes.

25   **Q.**   And I think you testified to this earlier.  Las Positas

1  refers to a community college; right?

2  A.    Yes, it does.

3  Q.    And those units were obtained there; right?

4  A.    Yes, they were.

5  Q.    All right.  And then there's -- under the header under

6  Las Positas, it says -- I can't quite read it out.  It looks

7  like "Spec Ting"?

8  A.    Specialized training.

9  Q.    Specialized training.  And what's that?

10  A.    That's our abbreviation for that.  That's the training

11  that I was referencing, like POST training or military

12  training, where it's not technically college training; but it's

13  some type of professional training, and we then translate it

14  into elective credit.

15  Q.    Okay.  And then down the next section, or the next header

16  there, it says "To CCU course CBT."  And those, I think you

17  testified, were units that were transferred to CCU; right?

18  A.    Yes.

19  Q.    All right.

20  A.    So those are courses that directly matched something we

21  offer go in that category.

22  Q.    Okay.  What does CBT mean?

23  A.    Credit by transfer.

24  Q.    And then in that column under that heading "Las Positas,"

25  all the way down, except it says "Napa Valley College."  Do you

1  see that?

2  A.    Yes.

3  Q.    And those were units that were transferred from Napa

4  Valley College?

5  A.    Yes.

6  Q.    Okay.  Let's go down -- let's back out and then come down.

7  I want to ask you some questions about the next section that

8  has the header "Institution Credit."

9        Actually, before -- before we get there, let me ask

10  you -- and I apologize -- to turn to page 4.

11        And we talked about Las Positas.  This says "Chabot

12  Las Positas Community College District."  Do you see that?

13  A.    Yes.

14  Q.    And are you familiar with Las Positas as a community

15  college here in the Bay Area?

16  A.    Yes, I am.

17  Q.    Okay.  And this is the transcript from Las Positas College

18  for which Mr. Amiri got -- received some credit at CCU; right?

19  A.    Yes.  Yes, he did.

20  Q.    Okay.  Let's go back -- actually, before we do that, let

21  me ask you to turn, please, to page 8 of Exhibit 55.

22        And we talked about Napa Valley College.  This is a

23  transcript from Napa Valley College.  Do you see that?

24  A.    Yes, I do.

25  Q.    All right.  And this reflects the credit that Mr. Amiri

1  received from Napa Valley College?

2  A.   Yes, it does.

3  Q.   Are you familiar with Napa Valley College?

4  A.   It's another California community college.

5  Q.   Okay.  Are you aware that it houses a criminal justice

6  training center?

7  A.   I'm not -- I don't do -- I do some evaluations, but I

8  don't do a lot of those.  I wasn't aware of that specifically.

9  Q.   Okay.  If you take a look at page 12, it says "Napa Valley

10  Training College, Criminal Justice Training Center, Individual

11  Record of Training for Morteza Amiri."  Do you see that?

12  A.   Yes.

13  Q.   And then the next section down, it says "California

14  Commission on Peace Officer Standards and Training, Basic

15  Police Academy."  And then it goes on and then says "880

16  hours."  Do you see that?

17  A.   Yes.

18  Q.   Are you familiar with the California Commission on Peace

19  Officer Standards and Training?

20  A.   Yes.

21  Q.   And do you see that often in your work at CCU?

22  A.   We do.  That's what I was referring to with POST.  We call

23  that POST, but that's the --

24  Q.   Got it.

25  A.   -- POST training.

1  Q.   Okay.  And CCU had a lot of police officers in its

2  enrollment; right?

3  A.   Yes, we do.

4  Q.   All right.  And a lot of them receive similar training --

5  credit for similar -- training similar to what Mr. Amiri has

6  here; right?

7  A.   Yes, they do.

8  Q.   All right.

9       Okay.  Let me turn you back, then, to where we left

10 off, back on page 2 of the transcript, and I just want to

11 understand some of the terms that are being used here.

12      So let's go to page 2, and I'm going to blow up that

13 "Institutional Credit" section there.  Just the bottom half of

14 the page would be great.

15      Okay.  Do you see that there, Dr. Tucker?

16 A.   Yes.

17 Q.   All right.  So institution credits, institution there

18 refers to CCU or does it?  What institution is referred to

19 there?

20 A.   Yes.  Credit -- credit -- our credit that was received

21 from another school.  So credit that was awarded CBT from work

22 that was completed at another school but that corresponded to

23 one of our courses.

24 Q.   Okay.

25 A.   So like BCJ 100 is one of our courses that's required, and

1    Mr. Amiri received credit for that from another school.

2    Q.    Got it.

3          Okay.  And you're one step ahead of me here.

4          So course number there, the course numbers that are

5    listed below that are the CCU course numbers for which he got

6    credit?

7    A.    Yes.

8    Q.    Okay.  Next column over is -- I think that says "Course

9    Title."  Am I reading that right?

10   A.    Course title, yes.

11   Q.    Again, that's the CCU course title; right?

12   A.    Yes.

13   Q.    And then "Credit Code," those are all CBT.  And you told

14   us about that earlier; right?

15   A.    Yes.

16   Q.    And then "Units," that's the units you described earlier?

17   A.    Three units, yes.

18   Q.    Three units per class?

19   A.    Three semester units.

20   Q.    All right.  And then "Grade" would list the grade

21   received; right?

22   A.    There was no grade because it was transferred in.

23   Q.    Okay.  But you go down farther and there are some grades

24   listed below?

25   A.    Yes.

1  Q.   Those are grades that were awarded for classes actually

2  taken; right?

3  A.   Yes.

4  Q.   All right.  And then "Date Completed," what's referred to

5  there?

6  A.   So further down, like the "G Ed 260 Criminology," so the

7  course itself was completed on November 7th, 2017.

8  Q.   And that date is the date that the final exam that you

9  described earlier is received?

10 A.   Yes, graded.  Graded and posted.

11 Q.   Okay.  And by that time, the four quizzes, the four essays

12 have already been done?

13 A.   Yes.

14 Q.   All right.  So if I'm reading this right, Mr. Amiri had

15 87 units transferred into CCU; right?

16 A.   Yes.

17 Q.   And those counted toward his 126 required for a degree;

18 right?

19 A.   Yes.

20 Q.   Okay.  And then below that it says "Fall 2017," and then

21 later on it says "Winter 2020," et cetera.  What's reflected

22 there by "Fall 2017"?

23 A.   Time -- the time period or what was done?

24 Q.   I'm just talking about the reference to "Fall 2017."  What

25 is that a reference to?

1    A.    Oh, those are just time periods.  Fall is October,

2    November, December of the year.  We consider that fall.  And

3    winter is January, February, March.  April, May, June is

4    spring.  July, August, September is summer.

5    Q.    Okay.  And just so I'm clear here, the date completed

6    would fall into -- well, let me just look at the first one

7    here.

8            So it says "Criminology, C" -- is that CBX or CRX?

9    A.    CBX.

10   Q.    And what is CBX?

11   A.    So credit by examination.  So when a student completes a

12   course with us, they get a code of CBX on their transcript.

13   Q.    Okay.  And a grade of A; right?

14   A.    Yes.

15   Q.    And the date completed -- and the date completed, which

16   you described earlier, again, that falls under this Fall 2017

17   period because the final exam is completed in the Fall of 2017;

18   right?

19   A.    Yes.

20   Q.    Even though the course -- the student may have started the

21   course prior to that, the Fall of 2017, you go by the final

22   date; right?

23   A.    Yes.  Yes, we do.

24   Q.    Okay.  Now I want to talk to you a little bit -- and we

25   can take that down -- about the course requirements again.  You

1  described these a little bit earlier.

2          So for each course, a student is required to complete

3  four quizzes, four essays, and one test; right?

4  **A.**   Yes.

5  **Q.**   And that's regardless of what bachelor's degree the

6  student is receiving?

7  **A.**   Right.  Yes.

8  **Q.**   All right.  And the quiz has 25 questions?

9  **A.**   Yes, they do.

10  **Q.**   All multiple choice?

11  **A.**   Yes.

12  **Q.**   All untimed?

13  **A.**   Yes.

14  **Q.**   So you can take as long as you want?

15  **A.**   Yes.

16  **Q.**   And the 25 questions are drawn from a bank of 200

17  questions --

18  **A.**   Yes.

19  **Q.**   -- right?

20          So for any particular quiz, a student will receive one

21  of the 200; right?

22          And that's true for -- you have to answer "yes" or

23  "no."

24  **A.**   I'm sorry.  Yes.  Yes.

25  **Q.**   Okay.  And that's true for any student taking that same

1    course, their quizzes are going to be drawn from the same 200

2    questions; right?

3    A.    Yes.

4    Q.    And no one from the school is supervising the students

5    when they take this exam --

6    A.    No.

7    Q.    -- take the quizzes; right?

8    A.    No.

9    Q.    There's no video, anything like that?

10   A.    No, there's not.

11   Q.    The school doesn't use any software to prevent cheating or

12   other integrity violations; right?

13   A.    No, we don't.

14   Q.    You talked about a proctor earlier.  There's no proctor

15   for any of the quizzes; right?

16   A.    No.  Only the final exam.

17   Q.    Okay.  You mentioned earlier, on direct examination, that

18   there's now a minimum time requirement to pass a course of

19   nine months.

20   A.    Yes.

21   Q.    What did you mean by that?

22   A.    Part of the original enrollment agreement is an enrollment

23   period, and nine months is considered one academic year.  So it

24   would be, like, two semesters at a traditional school.  So from

25   the start of enrollment to the soonest they could complete a

1    degree would be nine months.

2    Q.    So you can't take the final exam until nine months later?

3    A.    They could take a final exam, but they couldn't be awarded

4    the degree until nine months.

5    Q.    Okay.  So you take -- you could be accepted, take the four

6    quizzes the next day, submit two or four essays the following

7    day, take the final the following day, but you wouldn't receive

8    your credit for the course until nine months later?

9    A.    No.  The nine months is for the entire degree.  The --

10    Q.    Okay.

11    A.    For each course, that's its own stand-alone on the time

12    that the person takes.  The courses are based on 135 hours, but

13    they are self-paced and flexible.

14    Q.    Okay.

15           THE COURT:  Excuse me.  Let's have everybody stand

16    because I see at least one juror who's -- would you mind

17    tapping?

18           All right.  Do you need a glass of water, sir,

19    Juror Number 5?

20           Okay.  Thank you very much.

21           All right.  Continue.

22           MR. CRUDO:  Thank you, Your Honor.

23    BY MR. KRISHNAMURTHY:

24    Q.    You mentioned 135 hours.  Does anybody at the school

25    monitor to determine that students are actually spending

1    135 hours on these courses?

2    **A.**    No.  We just have a formula that's based on the amount of

3    pages in the textbook, the size of the study guide, what's

4    involved with the time.  We use research, industry research in

5    education, to come up with that.

6    **Q.**    Okay.  On the essays, the four essays per course, the

7    students are told that the essays are not to exceed 350 page --

8    350 words; right?

9    **A.**    No.  Not that they shouldn't exceed but they're between

10   350 and 500.  They shouldn't be less than 350 words.

11   **Q.**    Okay.  Students get to pick from a selection of the essay

12   topics; right?

13   **A.**    Yes.

14   **Q.**    On the final exam, the students have a hundred

15   questions --

16   **A.**    Yes.

17   **Q.**    -- right?

18          Are those drawn from the same 200-question bank as the

19   quizzes?

20   **A.**    Yes, they are.

21   **Q.**    All right.  Again, those are also untimed exams?

22   **A.**    Yes, they are.

23   **Q.**    So you can take them over several days if you want?

24   **A.**    Uh-huh.  Yes.

25   **Q.**    Also multiple choice?

1  A.   Yes.

2  Q.   Again, the students taking those exams, taking the same

3  course, they're all drawing from the same 200-bank set of

4  questions; right?

5  A.   Yes, they are.

6  Q.   Okay.  No one from the school is supervising those final

7  exams; right?

8  A.   No.  Only the proctor.

9  Q.   All right.  And no video, no software to prevent cheating?

10 A.   No.

11 Q.   You mentioned -- you mentioned a proctor, and I want to

12 understand a little bit more about the proctor process and what

13 they actually do.

14      So the student nominates the proctor that they're

15 going to use for their final; right?

16 A.   Yes.

17 Q.   All right.  And they tell CCU who that person is?

18 A.   Yes.

19 Q.   And they give them an e-mail address?

20 A.   Yes.

21 Q.   And then CCU checks to see if that person is a current or

22 former student?

23 A.   Yes.

24 Q.   They check to see if that person is a relative?

25 A.   Yes.

Q.   They check to see if that person has the same address as the student; right?

A.   Yes.

Q.   Nobody from CCU calls the proctor to verify that information, do they?

A.   No.  We just check that within our system, and to see if it's a former student or graduate.

Q.   Okay.  And then CCU sends the password to the proctor's e-mail; right?

A.   Yes.

Q.   And what's the password used to do?

A.   To unlock the final exam itself.

Q.   And, again, CCU gets that e-mail from the student?

A.   Yes.

Q.   And then the proctor accesses the exam through this e-mail?

A.   Yes.

Q.   And then what does the proctor do?

A.   Arrange to set -- well, first they arrange to set up the time with the person to have them complete the examination, the student, and then open the exam for them.  And then they're signing off; they're verifying the government-issued IDs, that the person is the same person who's supposed to be completing the examination, and they sign off and return that form to us.

Q.   Okay.  The proctor doesn't sit there the whole time while

1  the student's taking the examination?

2  A.   They're supposed to be supervising them.

3  Q.   Okay.  Even if it goes over several days or a week because

4  of time --

5  A.   They can arrange for that time with them.

6           (Admonishment from the Official Reporter.)

7  Q.   I will try to be better.

8  A.   Sorry.

9  Q.   CCU doesn't talk to the proctor to see if they actually

10  did that; right?

11  A.   No, we don't.

12  Q.   Okay.  I'm going to talk to you about police officers.

13        So CCU actively recruits police officers to enroll at

14  the school; right?

15  A.   Yes, we do.

16  Q.   You advertise in publications that are directed towards

17  law enforcement; right?

18  A.   Yes.

19  Q.   And you go to conferences where you know law enforcement

20  personnel will be; right?

21  A.   Yes.

22  Q.   And you pass out materials and encourage people to sign up

23  for CCU; right?

24  A.   Yes.

25  Q.   CCU also gives a tuition discount to police officers?

1    **A.**    Yes, we do.

2    **Q.**    All right.  I'm going to hand you a number of documents

3    here.  The good thing is we're not going to go through them.  I

4    just want to get them into the record.

5          And I'm going to hand you Exhibits 315, 316, 317, 318,

6    319, and 320.  Those aren't in there.

7    **A.**    Oh.  Okay.

8          **MR. CRUDO:**  May I approach?

9          **THE COURT:**  You may.

10          (Counsel approaches witness.)

11   **BY MR. CRUDO:**

12   **Q.**    I'll try and go through this quickly here, Dr. Tucker.

13          So Exhibit -- and they should be in order --

14   Exhibit 315 is a CCU transcript for Savannah Reed; correct?

15   **A.**    Yes, it is.

16   **Q.**    And Exhibit 316 is a CCU transcript for Brauli Rodriguez

17   Jalapa; right?

18   **A.**    Sorry.

19          (Witness examines document.)  Yes, it is.

20   **Q.**    And Exhibit 317 is a CCU transcript for Mr. Mejia-Orozco.

21   Ernesto Mejia-Orozco; correct?

22   **A.**    Yes, it is.

23   **Q.**    And 318 is a transcript for Patrick Berhan?

24   **A.**    Yes, it is.

25   **Q.**    And 319 is a CCU transcript for Amanda Theodosy; correct?

1  **A.**   That's not the name on this.

2  **Q.**   Is it Amanda Nash?

3  **A.**   Yes.

4  **Q.**   Are you aware that Ms. Nash also goes by Ms. Theodosy?

5  **A.**   I don't know that.

6  **Q.**   Okay.  And Exhibit 320 is a CCU transcript for Peterson;

7  correct?

8  **A.**   Yes, it is.

9      **MR. CRUDO:**  Your Honor, we would admit Exhibits 315,

10 316, 317, 318, 319, and 320 into evidence.

11     **THE COURT:**  Any objection?

12     **MR. KRISHNAMURTHY:**  No objection.

13     **THE COURT:**  Admitted.

14   (Trial Exhibits 315, 316, 317, 318, 319, and 320 received

15 in evidence.)

16     **THE COURT:**  And, Mr. Crudo, from my looking at the

17 original exhibits, those were not on there.  Is that because

18 they're solely for cross or --

19     **MR. CRUDO:**  I -- A, solely they're for cross; B, I

20 think they're subsets of larger student files.  So rather than

21 admit the whole thing, we took just a selection.

22     **THE COURT:**  Very well.  Please -- during a break,

23 please have it added to the master.

24     **MR. CRUDO:**  We will.

25     **THE COURT:**  Thank you.

1      **MR. CRUDO:**  And, Your Honor, just so I'm mindful of

2  the time --

3      **THE COURT:**  We're going to take our next break at

4  11:30.

5      **MR. CRUDO:**  Okay.

6  **BY MR. CRUDO:**

7  **Q.**   Okay.  Dr. Tucker, let's go back, if you would, please, to

8  Exhibit 55; and that is Mr. Amiri's student file, and I'm going

9  to ask you to take a look, please, at page 50.

10 **A.**   Is that 55-50?

11 **Q.**   It is -- the exhibit, way down in the lower right-hand

12 corner.  So EXH-055-050.  It's also up on your screen if that's

13 easier.

14      Do you see that?

15 **A.**   (No verbal response.)

16 **Q.**   All right.  Do you have that document in front of you?

17 **A.**   Yes, I do.

18 **Q.**   All right.  This is Mr. Amiri's application for his

19 bachelor's degree; correct?

20 **A.**   Yes.

21 **Q.**   And he applied in June -- June 15th of 2015; correct?

22 **A.**   Yes.

23 **Q.**   And he was actually admitted about a week and a half

24 later, June 26, 2015; right?

25 **A.**   Yes.

Q.   We can take that down.  Thank you.

CCU has a -- let me put it this way:  CCU students are on their own schedule; right?

A.   Yes, they are.

Q.   They start when they want?

A.   Yes.

Q.   They finish when they want?

A.   Yes.

Q.   They go as fast as or as slow as they want; correct?

A.   Yes.

Q.   All right.  So there's no one single semester for a course?

A.   No.  It's self-paced, the programs.

Q.   All right.  Is there a policy that students must complete their bachelor's within a certain time of applying?

A.   We have an enrollment period of five years for a bachelor's degree.  We're flexible with that, where we'll work with students if they have reasons that they need extra time, but we do set that originally.  I think that's a requirement of the State of California, that we have an enrollment term.

Q.   You have that term but it's not a requirement for CCU?

A.   No.  It's flexible but it is set.  You know, that we have -- we do have that in the contract itself.

Q.   Okay.  And the requirement at CCU is that you complete one course every six months?

1    A.   Yes, to remain active.

2    Q.   All right.  You have a lot of working professionals who

3    are students; right?  Correct?

4    A.   Yes, we do.

5    Q.   And so oftentimes even that six-month requirement, CCU is

6    pretty flexible with it?

7    A.   Yes, we are.

8    Q.   So people will ask -- students will ask for exceptions for

9    more time; right?

10   A.   Yes.

11   Q.   And CCU is fairly generous with those?

12   A.   Yes.

13   Q.   All right.  CCU does track the student activity, though;

14   right?

15   A.   Yes, we do.

16   Q.   And it communicates with the student on a regular basis

17   about the student's progress?

18   A.   Yes, we do.

19   Q.   All right.  CCU reaches out when there hasn't been

20   activity in a student's file for a while; right?

21   A.   Yes, we do.

22   Q.   And those are all -- those communications back and forth

23   with the students are all in the student's file --

24   A.   Yes.

25   Q.   -- right?

1    We talked about the pacing and timing for students.

2    Sometimes students who have been inactive for quite a period of

3    time will finish their courses and get their degree kind of in

4    a flurry, all at once; right?

5    **A.**   Yes.

6    **Q.**   Okay.  I'm going to ask you to take a look, please --

7    let's see if I can do this before we take the break -- at --

8    back to Exhibit 55 and ask you to take a look at page 131.

9    **A.**   All right.

10   **Q.**   Do you see that?

11   **A.**   Yes.

12   **Q.**   And this is part of the -- Mr. Amiri's file, where there

13   are communications back and forth between him and CCU; right?

14   **A.**   Yes.

15   **Q.**   All right.  There are quite a bit here, and, trust me, I'm

16   not going to go through all of them, but I do want to ask you

17   about some of them.

18       So take a look; there is an entry about -- up at the

19   top of that page, it says "Request for Coursework Approved."

20   Do you see that?

21   **A.**   Yes.

22   **Q.**   And that -- if you look at the prior page, it has the

23   actual date on there -- is July 14th, 2015; right?

24   **A.**   (Witness examines document.)  Yes, it is.

25   **Q.**   Okay.  And just to refresh, Mr. Amiri had been admitted to

1  CCU the prior month, in June 2015; right?

2  A.    Yes.

3  Q.    So this request for coursework, that comes from the

4  student; right?

5  A.    Yes, it does.

6  Q.    Then there's a reference there, it says (as read):

7        "Your request for BCJ210 Rev 12-2014 coursework

8        in electronic format has been approved."

9        What does it mean there "electronic format"?

10  A.    The majority of our students receive their coursework

11  electronically, so that means the study guide itself was sent

12  through the student portal.  The student can then download it

13  and begin working on it through the portal.

14  Q.    Okay.  I'm going to ask you to take a look, please, at

15  page 127.  Let me know when you're there.

16  A.    (Witness examines document.)

17  Q.    Do you see that?  Are you on that page now?

18  A.    Yes.

19  Q.    All right.  In the middle of the page there, it says (as

20  read):

21        "Keep up the good work.  You have completed all

22        four exam units in BCJ 210, Rev 12-2014."

23        What is BCJ 210?

24  A.    That's one of the courses in the criminal justice program.

25  Q.    Okay.  And then the unit exams are what?  The quizzes --

1    A.    The quizzes --

2    Q.    -- that you described?

3    A.    -- I'm sorry -- yes.

4    Q.    And this was about six months or so after Mr. Amiri had

5    been admitted to CCU; correct?

6    A.    Yes.

7    Q.    Let's take a look, please, at page 126.

8          And way down at the bottom of the page is an entry

9    March 28, 2016.  It says "Academic Reminder"?

10   A.    Yes.

11   Q.    What's an academic reminder?

12   A.    We have automated types of messages that go out.  So you

13   mentioned about reminders, so this is one of those.  So our

14   system is programmed to sort of track if we haven't heard from

15   someone for a while, if they haven't submitted something; they

16   get an e-mail that -- through the portal that's just checking

17   in.  And just, you know, checking on the person, asking them to

18   give us a call if they have questions, need help with

19   something.

20   Q.    Okay.  If you go to the next page, where the actual

21   message is, so that's page 127.

22         Let's pull that up on the screen.

23   A.    Yes.

24   Q.    All right.  At the top, it says (as read):

25         "Our records indicate you have not submitted any

1    coursework within the past few months.  This is

2    perfectly fine.  Perhaps you are working on something

3    or just taking a short break.  However, we just

4    wanted to make sure you were aware that CCU requires

5    all students to complete a minimum of at least one

6    course every six months to remain actively enrolled."

7        Do you see that there?

8  **A.**   Yes.

9  **Q.**   And is that kind of the form message that's automatically

10 sent out to students when they haven't had activity within a

11 certain number of days?

12 **A.**   Yes, it is.

13       **THE COURT:**  Is this a good time to take a break?

14       **MR. CRUDO:**  It is, Your Honor, yes.

15       **THE COURT:**  Okay.  And then let's take our second and

16 last break of the day.  We're going to end at 1:30.

17       Please remember the Court's usual admonitions.  Keep

18 an open mind, don't discuss the case or let anyone discuss it

19 with you.

20       We'll see you in 15 minutes.  Thank you.

21       **THE CLERK:**  All rise.

22            (The jury leaves the courtroom.)

23            (Recess taken at 11:29 a.m.)

24            (Proceedings resumed at 11:48 a.m.)

25            (The jury enters the courtroom.)

1        (Proceedings were heard in the presence of the jury.)

2            **THE CLERK:**  You may be seated.

3            Please remain seated and come to order.  Court is back

4    in session.

5            **THE COURT:**  You may continue.

6            **MR. CRUDO:**  Thank you, Your Honor.

7    BY MR. CRUDO:

8    Q.   Dr. Tucker, I want to take you through just a few more of

9    these here.

10           When we left off, we had looked at an academic

11   reminder -- an automatic academic reminder that was sent to

12   Mr. Amiri on March 28, 2016.  And, again, I'm at Exhibit 55.

13           And CCU sent Mr. Amiri a number of subsequent

14   reminders; right?

15   A.   Do you have a page number?

16   Q.   I'm sorry?

17   A.   Do you have a page number?

18   Q.   So, yes.  The page number -- we were looking at the

19   message from March 28, 2016, and that should be at page --

20   begins at the bottom of page 126, up to 127.

21           And my question is:  After that reminder, CCU sent to

22   Mr. Amiri a number of subsequent reminders; right?

23   A.   Yes.

24   Q.   Okay.  And Mr. Amiri responded with requests for

25   additional time; right?

1    A.    (No verbal response.)

2    Q.    Let me ask you, take a look, please, at page 124, and in

3    the middle of the page there, there is August 25th, 2016.  It

4    says "Follow-up."  Do you see that?

5    A.    Yes, I do.

6    Q.    All right.  It says (as read):

7          "Called student to get him back on track with his

8          coursework.  Granted him a six-month extension until

9          2/24/17.  Student says he got busy and bought a

10         house."

11         Period, then "DC."  Do you see that there?

12   A.    Yes, I do.

13   Q.    And this reflects that there was a conversation with

14   Mr. Amiri, who relayed this information to somebody at CCU;

15   right?

16   A.    Yes, it is.

17   Q.    And this is not an unusual type of request to get an

18   extension?

19   A.    No, it's not.

20   Q.    Okay.  It's normal for students to get busy with work and

21   life events and other things and need more time; right?

22   A.    Yes, it is.

23   Q.    And he was given an extension; right?

24   A.    Yes.

25   Q.    And that extension was consistent with CCU policies?

1   A.   Yes.

2   Q.   All right.  I'm going to ask you to take a look now,

3   please, at page 122.

4   A.   (Witness examines document.)

5   Q.   Up at the top there is a message.  The header for the

6   message is on the prior page, June 16, 2017.  It says (as

7   read):

8           "May I please get an extension?  I have written

9       three exams I am working on before I knock out the

10      final.  This would really help me put quality effort

11      into my schoolwork.  Work has been very demanding

12      lately, which has taken my focus off of school."

13          Do you see that?

14  A.   Yes, I do.

15  Q.   Again, that's an e-mail from Mr. Amiri to CCU?

16  A.   Yes, it is.

17  Q.   Again, not an unusual request that somebody's gotten busy

18  at work; right?

19  A.   Yes.

20  Q.   And CCU granted an extension, further extension?

21  A.   Yes, we did.

22  Q.   Okay.  A couple more here.

23          If you take a look, please, at page 120, down at the

24  bottom there is an e-mail.  The header says "Student

25  7/17/2017."  Do you see that?

1    A.    Yes, I do.

2    Q.    It says (as read):

3          "Hello.  I am currently on academic extension.  I

4    work as a police officer and injured my right arm

5    while arresting a combative suspect, and I am unable

6    to use my arm or hand.  I'm right-handed and unable

7    to complete my writing assignments by the due date

8    because of my injury.  I will gladly provide the

9    police report number or hospital paperwork if

10   needed."

11         Do you see that?

12         **MR. KRISHNAMURTHY:**  Objection.  Hearsay.  Relevance.

13         **THE WITNESS:**  Yes, I do.

14         **THE COURT:**  Just a moment.  There was an objection.

15   Just wait for me to rule on it.

16         **THE WITNESS:**  I'm sorry.

17         **THE COURT:**  Sustained.

18         **MR. CRUDO:**  Okay.

19   BY MR. CRUDO:

20   Q.    Mr. Amiri was granted further extensions; correct?

21   A.    Yes, he was.

22   Q.    And all of those extensions were in accordance with CCU

23   policy; right?

24   A.    Yes.

25   Q.    And in November 2017, he completed his course in

1  criminology; right?

2  A.   (No verbal response.)

3  Q.   Actually, if you look at the first page or the second page

4  of that exhibit, his transcript, that might help.

5  A.   That's not the right one.

6  Q.   Take a look at page 2.  It shows that Mr. Amiri completed

7  a course in criminology on -- in November 2017.  I think that's

8  the 7th, November 7th; correct?

9  A.   Yes, it is.

10  Q.   Okay.

11       All right.  Mr. Amiri was never placed on academic or

12  financial hold by CCU; correct?

13  A.   Not to my knowledge.

14  Q.   All right.  That would be reflected somewhere in the

15  student file if it ever happened; right?

16  A.   Yes.

17  Q.   Okay.  I'm going to ask you -- I'm going to change

18  subjects on you.  We're getting to the end here, so bear with

19  me.

20       Turn to page 60, please.

21  A.   Exhibit 55?

22  Q.   Yes.  Exhibit 55, page 60.

23  A.   (Witness examines document.)  I have it.

24  Q.   Okay.  I'm going to get it so we're both there.

25       All right.  So beginning at page 60 of Exhibit 55,

1  this is Mr. Amiri's student billing history statement; right?

2  A.  Yes, it is.

3  Q.  And what's a student billing history statement?

4  A.  I'm sorry, could you repeat that?

5  Q.  Sure.  What is a student billing history statement?

6  A.  So each student, when they start the program, they receive

7  an account.  They have a student account like this.  It shows

8  what their total tuition was setting up.  It shows the payments

9  they made.  So the original charge on this, $75 was their

10  application fee.  And then it shows the payment that they paid;

11  they paid the 75.  The price for that entire program was

12  $5,265.  And then in the payment column, it shows the various

13  payments that were made with the corresponding dates --

14  Q.  Okay.

15  A.  -- as you see through that, until it reaches -- it looks

16  like on the next page, 61, it gets to zero at the end.

17  Q.  All right.  So, again, you're a couple steps ahead of me.

18         Just so I understand here, at the top it says

19  "Program" in the upper right.  Do you see that?

20  A.  Yes.

21  Q.  And it says "DCJ01."  Do you see that?

22  A.  Yes.

23  Q.  Is that the Bachelor of Science in criminal justice

24  program?

25  A.  Yes, it is.

1   Q.   All right.  And then farther down, on the left, it says

2   "Tuition, $5,850."  That's the tuition for that particular

3   degree; right?

4   A.   Yes.  Well, particular degree specific to Mr. Amiri and

5   his courses, right.

6   Q.   Okay.  And then there's a discount that is provided.  Do

7   you see that?

8   A.   Yes.

9   Q.   And you mentioned that police officers are offered a

10   discount at CCU.  Is that reflected in the discount here?

11   A.   Yes.

12   Q.   All right.  And just very quickly, to go through the

13   caption headings here, the column headings, "Date," that's the

14   date of payment?

15         I'm sorry, the date of the event.  Let me just ask

16   you.  What's indicated under "Date"?

17   A.   Date of payment.

18   Q.   Okay.  How about "Code"?  What does that mean?

19   A.   Actually, the date is whatever corresponds to that line.

20   So it could be a payment.  It could be a charge.

21   Q.   Okay.

22   A.   The code relates to what it is that was happening.  Like

23   APP is the application.  So there's a $75 charge for that --

24   Q.   Okay.

25   A.   -- and a $75 payment related to the application.

1     PGM is the program charge.  So there's a charge of

2  $5,265.

3  **Q.**  And how about ENR?

4  **A.**  Enrollment.  That's part of the contract.  If the person

5  puts down $300, we carry the tuition -- tuition or interest

6  rate, and so they pay $300 and their payment -- minimum payment

7  in the contract is $125.  So that's what the PMT is, a payment

8  of 125.

9  **Q.**  Is that $300 on top of the tuition?

10  **A.**  No.  It's a part of it.

11  **Q.**  Okay.  And then there's a code about six lines down that

12  says "PDF."  What is that?

13  **A.**  I can't remember what that stands for exactly; but if a

14  person misses a payment, they have a payment -- like a

15  $10 charge for missing a payment.

16  **Q.**  All right.  And in the payment column, I think you said

17  this earlier, those are the amounts actually paid; correct?

18  **A.**  Yes.

19  **Q.**  And the balance is what the student owes at that -- as of

20  that date; right?

21  **A.**  Yes.

22  **Q.**  Okay.  I'm going to ask you to take a look at page 18,

23  please, of Exhibit 55.

24  **A.**  (Witness examines document.)  Okay.  I have it.

25  **Q.**  You have that?  Okay.

1          And this is an application that Mr. Amiri made for a

2    Master's of Science in criminal justice program at CCU;

3    correct?

4    A.    Yes.

5    Q.    And this application, he submitted the application

6    April 20th, 2020; right?

7    A.    Yes.

8    Q.    And was accepted for omission -- admission on the 28th of

9    April; right?

10   A.    Yes.

11   Q.    And he enrolled in May of -- May 29th of 2020; right?

12   A.    I'm not sure of that.  Is that --

13   Q.    Let me see if I can help you here.

14          Let me show you -- is Exhibit 58 in your binders

15   there?

16   A.    Yes.

17   Q.    Take a look at Exhibit 58, and if you'd look at page 19,

18   up in the upper left-hand corner there, take a look at that and

19   see if that refreshes your recollection as to when Mr. Amiri

20   enrolled in the master's program.

21   A.    Yes, May 29th, 2020.

22   Q.    Okay.  And any work that he submitted as part of that

23   program would be reflected in his student file?

24   A.    Yes.

25   Q.    Take a look, please, at page 62 of Exhibit 55, and we can

1    pull that up on the screen.

2            Do you have that in front of you, Dr. Tucker?

3    A.   Yes.

4    Q.   All right.  This is another student billing history

5    statement; right?

6    A.   Yes, it is.

7    Q.   For Mr. Amiri?

8    A.   Yes.

9    Q.   And the program referenced there is DCJ02.  Is that the

10   Master of Science in criminal justice program?

11   A.   Yes, it is.

12   Q.   All right.  And it lists tuition here as $8,970; correct?

13   A.   Yes.

14   Q.   And the discount that's reflected, is that, again, the

15   police discount?

16   A.   Yes, it is.

17   Q.   All right.  And the columns here are the same as you had

18   described before in Mr. Amiri's billing history statement for

19   his bachelor's; correct?

20   A.   Yes.

21   Q.   All right.  And, again, the payments reflect the amounts

22   that Mr. Amiri paid towards that program; right?

23   A.   Yes.

24   Q.   Okay.  You can put that aside.

25            I'm going to ask you to take a look, please, at

1    Exhibit 55 -- I'm sorry -- yes, Exhibit 55.  So I don't want

2    you to put that aside.

3    **A.**   Okay.

4    **Q.**   So if you'd look at page 35, please.  Do you have that in

5    front of you?

6           Let's enlarge that a little bit.

7    **A.**   I'm not seeing it.  The student's right to cancel?

8    **Q.**   Yes.

9    **A.**   Okay.

10   **Q.**   It says (as read):

11          "If you cancel this agreement within seven days

12          of enrollment, the University will refund any money

13          that you have paid, less a registration fee of $75,

14          within 30 days after your notice is received.  If you

15          cancel this agreement after seven days of enrollment

16          but prior to submitting any coursework, the

17          University will refund any money that you have paid

18          less any registration fee and enrollment down payment

19          totaling $200 within 30 days after your notice is

20          received."

21          Do you see that?

22   **A.**   Yes.

23   **Q.**   And that was part of CCU's agreement with Mr. Amiri?

24   **A.**   Yes.

25   **Q.**   That was a standard provision in all of its agreements

1   with students?

2   A.   Yes, it is.

3   Q.   So I want to make sure I understand this correctly.

4        A student can get a full refund minus the

5   $75 registration fee if he or she cancels within seven days of

6   enrollment; correct?

7   A.   Yes.

8   Q.   And they get their money back in 30 days?

9   A.   Yes.

10  Q.   All right.  If they -- if it's after seven days, that

11  student can still cancel as long as they haven't submitted any

12  coursework; right?

13  A.   Yes.

14  Q.   And the school, CCU, will refund any money paid less the

15  $75 registration fee and enrollment down payment totaling $200;

16  correct?

17  A.   Yes.

18  Q.   All right.  Is the total amount offset against the refund

19  $275 or just $200?

20  A.   $200.

21  Q.   Okay.  Either way, whether it's before or after the

22  seven days, a student just needs to send a written notice to

23  the school that they want to cancel; right?

24  A.   Yes.

25  Q.   And they can do that in an e-mail?

1  A.   Yes, they can.

2  Q.   And they get their money back in 30 days?

3  A.   Yes.

4  Q.   And if they had sent a request for a refund, that would be

5  reflected in the student file; right?

6  A.   Yes.

7  Q.   Okay.

8       MR. CRUDO:   Thank you, Your Honor.   No further

9  questions at this time.

10      THE COURT:   Thank you, Counsel.

11      Any redirect?

12      MR. KRISHNAMURTHY:   Briefly, thank you.

13      THE COURT:   Yes.

14                  <u>REDIRECT EXAMINATION</u>

15  BY MR. KRISHNAMURTHY:

16  Q.   Dr. Tucker, can you please turn to Exhibit 55, page 2.

17  That's the exhibit we spent some time on this morning.

18  A.   Yes, I have it.

19  Q.   You were asked some questions earlier about the series

20  of -- you were asked some questions earlier about the series of

21  communications that Mr. Amiri had in terms of extensions?

22  A.   Yes.

23  Q.   Focusing on the left-hand side of the transcript, what

24  does the transcript reflect about the number of courses that

25  Mr. Amiri completed before the Winter 2020 term?

1    A.    He completed one course.

2    Q.    Thank you.

3          Next can you please turn to Exhibit 56, please?

4    A.    I have it.

5    Q.    And focus on the proctor on the right-hand side.

6          You were asked some questions earlier today about

7    the -- about the different checks that CCU does for proposed

8    proctors.  Can you remind the jury of what that was?

9    A.    Yes.  So the student provides the names of -- name or

10   names of the proctor they want to use.  We check out, within

11   our system, if it's someone who's been a previous student, a

12   graduate, anyone who lives at the same address, same e-mail

13   address we have had in our system.  I think that's -- generally

14   that's it with it.

15         We've some recommendations that we provide.  You know,

16   that -- it's often a work supervisor.  It could be a local

17   librarian.  If they want to do that -- we have pastors often,

18   people will use.  Somebody that's just a responsible person to

19   verify the identity of the student, is the primary reason for

20   the proctor.

21   Q.    Thank you.

22         And taking this for -- as an example, I see an Emily

23   Azevedo listed as a proctor for many of these courses.  How

24   would CCU check what Ms. Azevedo's address is?

25   A.    Sorry.  Say that again.

1  Q.   How would CCU check the address of the proposed proctor?

2  A.   They send that information, the student does, originally,

3  when they elect a proctor.  There's information they provide to

4  our student services department.

5  Q.   Okay.  Thank you very much.

6       **MR. KRISHNAMURTHY:**  No further questions.

7       **THE COURT:**  Anything further?

8       **MR. CRUDO:**  No further questions, Your Honor.

9       **THE COURT:**  Thank you.

10      You're excused.  Thank you, Doctor.  You can leave

11 everything up there.  We'll take care of it.

12      **THE WITNESS:**  Thank you.

13      **THE COURT:**  Take your time.

14                     (Witness excused.)

15      **THE COURT:**  All right.  You may call your next

16 witness.

17      **MR. CHENG:**  Your Honor, the Government calls Joyce

18 Blalock.

19    (Joyce Blalock steps forward to be sworn.)

20      **THE COURT:**  Please come forward to be sworn by the

21 courtroom deputy.

22      **THE CLERK:**  If you could just step right up here for

23 me.

24      Please raise your right hand.

25 \\\

1       <u>**JOYCE BLALOCK**</u>,

2  called as a witness for the Government, having been duly sworn,

3  testified as follows:

4          **THE WITNESS:**  Yes.

5          **THE CLERK:**  Put your hand down.  Please be seated.

6          If you could speak clearly into the microphone, please

7  state your full name and spell your last name for the record.

8          **THE WITNESS:**  My name is Joyce Blalock.  Last name is

9  spelled B-L-A-L-O-C-K.

10          **THE COURT:**  You may proceed, Counsel.

11          **MR. CHENG:**  Thank you, Your Honor.

12                  <u>**DIRECT EXAMINATION**</u>

13  **BY MR. CHENG:**

14  **Q.**   Good afternoon.

15  **A.**   Good afternoon.

16  **Q.**   Who is your employer?

17  **A.**   I'm employed by the FBI.

18  **Q.**   What's your current role?

19  **A.**   A special agent.

20          **THE COURT:**  Would you, Special Agent, speak right in

21  the microphone?

22          **THE WITNESS:**  Sorry.  Yes.

23          **THE COURT:**  Thank you so much.

24  **BY MR. CHENG:**

25  **Q.**   Do you have a current assignment?

1  A.   Yes.

2  Q.   And what's that --

3  A.   I'm assigned --

4  Q.   Sorry.  Excuse me.

5       And what is that assignment?

6  A.   Cyber investigations.

7  Q.   How long have you worked for the FBI?

8  A.   Since 2018.

9  Q.   In addition to your current assignment, do you hold any

10 other additional certifications or duties as a special agent?

11 A.   Yes.

12 Q.   Can you describe what those are?

13 A.   I'm what we call a DEXT, which is a digital evidence

14 extraction technician.

15 Q.   Can you briefly describe what your training and experience

16 is with respect to DEXT?

17 A.   Essentially learning the proper handling of digital

18 evidence and a means of extracting that evidence from the

19 device in question.

20 Q.   And as someone trained with DEXT, do you sometimes perform

21 initial extraction before additional forensic tools are

22 employed by the FBI?

23 A.   Yes.

24 Q.   Are you familiar with the defendant, Mr. Morteza Amiri?

25 A.   Yes.

1  Q.   Did you do work on an investigation involving the

2  defendant, Mr. Amiri?

3  A.   Yes.

4  Q.   In particular, did you help with the execution of a

5  federal search warrant on March 23rd, 2022?

6  A.   Yes.

7  Q.   Where was this?

8  A.   At the Antioch Police Department.

9  Q.   And did you seize any evidence from the defendant?

10 A.   Yes.

11 Q.   What did you seize?

12 A.   It was a gray iPhone 12 Pro.

13 Q.   And while you were there, did the defendant, Mr. Amiri,

14 provide a passcode for the device?

15 A.   He did.

16 Q.   And what was that?

17 A.   556911.

18 Q.   Did you verify that that successfully unlocked the device?

19 A.   Yes.

20 Q.   And it did?

21 A.   It did, yeah.

22 Q.   Now, upon taking receipt of that cell phone, did you take

23 any steps to change any settings upon receiving the device?

24 A.   I did, yeah.

25 Q.   What did you do?

1  A.    I turned the device on airplane mode and changed autolock

2  to never and then increased the screen brightness.

3  Q.    And why did you perform these couple of initial steps?

4  A.    For the airplane mode, it was to disconnect Internet or

5  cell tower activity to preclude the possibility of any remote

6  access to the device, essentially to preserve the integrity of

7  the device.  And then autolock changed to never to ensure that

8  we would be able to get back into it.  And then screen

9  brightness was to be able to see it better.

10  Q.    Now, other than these steps you just described, did you

11  change any other settings or data on the device?

12  A.    No.

13  Q.    And upon receipt of this device, did you also conduct an

14  initial review of the device?

15  A.    Yes.

16  Q.    And in that initial review, did you see some identifiers

17  for the phone?

18  A.    Yes.

19  Q.    Was it, for example, associated with an Apple iCloud

20  account?

21  A.    Yes.

22  Q.    In brief, what is an Apple iCloud account?

23  A.    That's the account that's associated with the user's --

24  any of the Apple devices that he may own, including the

25  iPhone, in order to set it up.

1  Q.   And was it -- what was the Apple iCloud account that

2  this phone was associated with?

3  A.   The Apple ID name was Morteza Amiri, and then the e-mail

4  address that was associated with the account was

5  morteza.amiri.90@gmail.com.

6  Q.   Were you also able to identify a serial number for the

7  phone?

8  A.   Yes.

9  Q.   And in your experience, is a serial number for a phone

10  unique?

11  A.   Yes.

12  Q.   And do you recall what the last four digits of that serial

13  number was for this phone?

14  A.   0 delta 84.

15  Q.   Did you also take a look at the IMEI number for that

16  phone?

17  A.   Yes.

18  Q.   And in short, what is an IMEI number?

19  A.   It's a specific number that's associated with that

20  particular device.  It is also a unique identifier to that

21  phone.

22  Q.   And in this case, what were the last four digits of that

23  IMEI?

24  A.   1147.

25  Q.   Now, in your initial review, did you also check to see if

1   the phone contained messages, like text messages?

2   **A.**   Yes.

3   **Q.**   And did the phone contain those types of messages?

4   **A.**   Yes, there were.

5   **Q.**   And when you were done with the phone, what did you do

6   with it?

7   **A.**   I turned it over to other FBI personnel to check into

8   evidence.

9   **Q.**   Okay.  Thank you, Agent Blalock.

10          **MR. CHENG:**  The Government has no further questions at

11  this time.

12          **THE COURT:**  Thank you, Counsel.

13          **MR. CRUDO:**  None for the Defense, Your Honor.

14          **THE COURT:**  Thank you, Special Agent Blalock.  You're

15  excused.

16                    (Witness excused.)

17          **THE COURT:**  Call your next witness.

18          **MR. CHENG:**  Your Honor, the Government calls Detective

19  Craig Perry.

20          **THE COURT:**  And I see we have new counsel in the dock

21  here.  Would you mind reidentifying yourself at the microphone?

22          **MS. SUHR:**  Yes, Your Honor.  Rachel Suhr for Morteza

23  Amiri.

24          **THE COURT:**  Thank you very much.

25      (Craig Perry steps forward to be sworn.)

1         **THE CLERK:**  Please raise your right hand.

2                    **CRAIG PERRY**,

3  called as a witness for the Government, having been duly sworn,

4  testified as follows:

5         **THE WITNESS:**  I do.

6         **THE CLERK:**  You can put your hand down.  Please be

7  seated.

8         Please clearly speak into the microphone, state your

9  full name for the record and spell your last name.

10         **THE WITNESS:**  My name is Craig, C-R-A-I-G.  Last name

11  is Perry, P-E-R-R-Y.

12  **BY MR. CHENG:**

13  **Q.**    Good afternoon.

14  **A.**    Good afternoon.

15  **Q.**    How are you employed?

16  **A.**    I'm a detective with the Fremont Police Department.

17  **Q.**    And as a detective with the Fremont Police Department, do

18  you have a special assignment at this time?

19  **A.**    I do.

20  **Q.**    And what's that assignment?

21  **A.**    I'm assigned as a task force officer, which is also a

22  digital forensic expert, to the Silicon Valley Regional

23  Computer Forensic Lab.

24  **Q.**    And in this assignment, are you acting as an FBI task

25  force officer?

1   **A.**   I am.

2   **Q.**   Can you briefly describe what that is?

3   **A.**   As the task force officer assigned as a digital forensic

4   examiner -- do you want me to describe or just the task force

5   officer?

6   **Q.**   The former, please.

7   **A.**   Oh.  So as a digital forensic examiner, I'm assigned there

8   to do -- conduct computer forensic examinations and analysis of

9   computers, laptops, desktop computers, cell phones, and I'm --

10  I generate reports basically documenting my examination and any

11  analysis that I do.

12       And then I also will respond to scenes.  It could

13  either be other agencies or FBI or outside law enforcement, and

14  I assist them with analysis as well and also scene triage of

15  devices.

16  **Q.**   How long have you had this particular assignment?

17  **A.**   About five years.

18  **Q.**   And before this assignment, how were you employed?

19  **A.**   I was a patrol officer with Fremont Police.

20  **Q.**   And before the Fremont Police Department, did you also

21  work for another law enforcement agency?

22  **A.**   I did.

23  **Q.**   And what was that?

24  **A.**   That was a deputy sheriff with Stanislaus County Sheriff's

25  Department.

1  Q.  And focusing on your current assignment as a digital

2  forensic examiner, can you describe your training at the outset

3  of this role?

4  A.  Yes.  So as an assignment with the -- I -- to be with the

5  FBI and assigned to the Silicon Valley RCFL, you have to

6  undergo training, which is through the CART program, and that's

7  the Computer Analysis Response Time, and it's a certification

8  process.  It's about 400 hours of training through the FBI that

9  entails all aspects of computer forensic analysis.

10        And I've also attended Secret Service training as well

11  with the National -- National Computer Forensic Institute,

12  which is also a lot of training and stuff.  That's probably

13  close to about 8- or 900 hours of training with them.

14  Q.  In brief, can you describe -- I think you described -- you

15  identified a Secret Service training.  Can you briefly describe

16  the type of topics that you received training in in that

17  program?

18  A.  Yes.  It can be anything from mobile device training -- it

19  was a -- I was certified as a Cellebrite operator for forensic

20  downloading of cell phones.  We have anything from vehicle

21  forensics we get certification in.  There's advanced mobile

22  device training.  There's drone forensics, basically

23  removing -- doing forensic analysis of drones.

24        We have -- there's also -- the very first class is

25  like a basic five-week course of computer forensics.  There's

1  more advanced levels.  They have drone, advanced drone, just

2  like the cell phone and advanced cell phone training as well.

3  **Q.**  And you described additional training specific to the FBI

4  role called CART.  Can you briefly describe the type of

5  training you received during that program?

6  **A.**  Yeah.  A lot of it's overlapping training.  It's basically

7  the FBI CART programs, their version of Cellebrite training for

8  mobile devices.  It's -- it could be Linux training.  It would

9  be Mac forensic training, as well as basically response for

10  triaging devices and analysis.

11  **Q.**  And in your role today, have you continued to receive

12  professional training to further your training and experience?

13  **A.**  I have.

14  **Q.**  And what kinds of courses and training have you continued

15  to receive?

16  **A.**  I -- every year we have to do a proficiency test with --

17  at the FBI they require -- the CART program requires a yearly

18  proficiency test that we have to maintain, and it's --

19  basically it's analysis and forensic extraction of devices or

20  it could be a report, a -- create anything; basically what

21  we're doing, but they want a proficiency test, so we have to

22  complete the proficiency test yearly to make sure we're up on

23  our -- our training, our level of training.

24  **Q.**  And over the course of your career, can you estimate about

25  how many digital devices you've examined?

1   **A.**   Ooh, probably close to a thousand mobile devices alone and

2   a few hundred laptops.  Anywhere from laptops to desktop

3   computers.

4   **Q.**   Now, just for a little bit more context here, you

5   described your assignment to the SVRCFL; can you describe a

6   little bit more about what the SVRCFL is?

7   **A.**   So it stands for the Silicon Valley Regional Computer

8   Forensic Lab that's controlled by the FBI, and that is an

9   accredited lab that undergoes yearly proficiency tests.

10        It also is -- it goes through -- we have to go through

11   an administrative and technical review process, and we have,

12   like I said earlier, proficiency.  It's basically an accredited

13   laboratory to work out, and they have guidelines that we have

14   to follow and special operating procedures that we have to

15   follow.

16   **Q.**   And while you've been with the SVRCFL, has it maintained

17   the accreditation you've described?

18   **A.**   It has.

19   **Q.**   And have you been subject to the quality assurance program

20   that you described as well?

21   **A.**   I have.

22        **MR. CHENG:**  Your Honor, the Government would like to

23   tender Detective Craig Perry as an expert in digital forensic

24   examination.

25        **THE COURT:**  Any objection?  Any wish to voir dire the

1    witness?

2            **MS. SUHR:**  No objection, Your Honor.

3            **THE COURT:**  Okay.  So it's just -- thank you.

4            Ladies and gentlemen, the Court has agreed to allow

5    this witness to testify as an expert.  Typically, we don't

6    allow witnesses to give their opinions; or just as Sergeant

7    Friday used to say in *Dragnet*, "Just the facts, ma'am."  But

8    with an expert we allow him or her, based upon their training

9    or experience, to give their opinions on their areas of

10   expertise.

11           But I want to instruct you that you're not bound by

12   any opinions of an expert just because they're an expert, and

13   you should evaluate their testimony based upon the bases for

14   that and whatever support is in the record to give that

15   testimony whatever weight you deem to be appropriate.

16           So you may proceed, Counsel.

17           **MR. CHENG:**  Thank you, Your Honor.

18   **BY MR. CHENG:**

19   **Q.**    Detective Perry, you talked about examining and extracting

20   devices.  Can you go into whether there are multiple ways to

21   acquire information from a device?

22   **A.**    As in regards to a cell phone extraction?

23   **Q.**    Let's focus on cell phones.

24   **A.**    Okay.  So there's three -- three main types of extractions

25   we can get from mobile devices.  They are -- it's logical

1   extraction, a file system extraction, and also a physical

2   extraction.  Predominantly with iPhones, especially newer

3   iPhones, they are -- the only extraction we can get is a full

4   file system.

5           Physical extractions are basically, if you think of it

6   as a cloned device.  Like, it's a bit-for-bit copy of that

7   device.  It's -- and it can also recover deleted data.  As I

8   said, it's not something that we can do on iPhones.  What we

9   can do, the best extraction method possible is a full file

10  system, and where that is -- it's getting basically the file

11  structure of the device; it's pulling information from the

12  database files, a lot more information than what a logical

13  extraction -- which is your basic simple extraction if you're

14  looking at your device and you're looking at, like, text

15  messages, call logs, kind of the stuff that you can see very

16  easily on your phone, that is a logical.  And that one's more a

17  basic, just to get the initial stuff that you can get.

18          And some devices, based on what the model, the year of

19  the phone, will determine whether or not we can get a full file

20  system or logical extraction.

21  Q.   Now, to perform those types of extractions, do you use

22  certain tools?

23  A.   We do.

24  Q.   And which are the primary tools that you use?

25  A.   The two main standards are Cellebrite Premium and then

1    also Graykey.

2    **Q.**    And what -- can you describe what those two tools are?

3    **A.**    Yes.  What they are are devices that we connect the cell

4    phone to and what the -- it's proprietary software so I can't

5    explain the ins and outs of the device itself.

6            But what it does is this device will get into the

7    phone and basically allow us to get an extraction in the most

8    forensic way possible to download that data.  It's the same

9    thing with Cellebrite Premium.  It's just another tool that

10   does basically the same thing; but Graykey typically focuses

11   more on iPhones, but Cellebrite Premium can also do iPhones

12   as well.

13   **Q.**    Now, these two tools that you described, are they industry

14   tools routinely used to extract data from cell phones?

15   **A.**    They are.

16   **Q.**    And in your training and experience, do they forensically

17   acquire information from these devices without changing or

18   deleting their substantive contents?

19   **A.**    They do.

20   **Q.**    Okay.  So now I'd like to turn to this particular case.

21           Are you familiar with the defendant, Mr. Morteza

22   Amiri?

23   **A.**    I am.

24   **Q.**    Did you do work on an investigation involving Mr. Amiri

25   back in 2022?

1    **A.**    I did.

2    **Q.**    And in preparation for your testimony today, did you

3    review the reports and notes that you made about that case

4    before testifying?

5    **A.**    I did.

6    **Q.**    Okay.  In brief, can you describe what work you did on

7    this particular case?

8    **A.**    I did the extraction of the mobile device and its internal

9    SIM card.

10    **Q.**    And where did you receive the phone from?

11    **A.**    The phone, it was checked out of our evidence control

12    facility.

13    **Q.**    Okay.  And, Detective Perry, would you recognize that

14    phone if you saw it again?

15    **A.**    I would.

16        **MR. CHENG:**  Your Honor, may I approach?

17        **THE COURT:**  Yes, you may.

18            (Counsel approaches witness.)

19    **BY MR. CHENG:**

20    **Q.**    Detective, I'm approaching you with what's been marked as

21    Exhibit 90.  You can go ahead and open the package and take a

22    look at its contents, please.

23    **A.**    Okay.

24    **Q.**    Detective Perry, do you recognize what's contained in

25    Exhibit 90?

1   A.   I do.

2   Q.   And what is it?

3   A.   It's going to be the cell phone iPhone 12 Pro, our lab

4   plastic bag it was contained in, a case, and the SIM card that

5   was located in the inside of the device.

6        Sorry.  I guess I should have showed that.

7   Q.   And, Detective Perry, do you recognize this as the cell

8   phone you analyzed with respect to the defendant, Mr. Amiri?

9   A.   I do.

10       MR. CHENG:  Your Honor, the Government moves to admit

11  Exhibit 90.

12       THE COURT:  Any objection?

13       MS. SUHR:  No objection.

14       THE COURT:  Admitted.

15   (Trial Exhibit 90 received in evidence.)

16  BY MR. CHENG:

17  Q.   And, Detective Perry, was this particular device assigned

18  an FBI evidence control number?

19  A.   Yes.

20  Q.   And what was that?

21  A.   It SCE063 -- 063475.

22  Q.   And did it also have a 1B evidence control number as well?

23  A.   It was.

24  Q.   And what is that?

25  A.   1B54.

1  Q.   Okay.  So now let's talk about your work with the device

2  itself.

3        Was the device locked when you received it?

4  A.   It was, with the six-digit pin.

5  Q.   And were you able to unlock the device?

6  A.   I was.

7  Q.   Do you recall what the device's passcode was?

8  A.   No.  I just know that it ended in 911.

9  Q.   Okay.  Now, did you then use a tool to begin an extraction

10 of this phone?

11 A.   I did.

12 Q.   And what was that tool?

13 A.   Graykey.

14 Q.   And what type of extraction did you use?

15 A.   Full file system.

16 Q.   And earlier you had described the different types of

17 extractions.  Was the file -- full file system extraction one

18 that contained additional information?

19 A.   Correct.  That one is the best extraction that we can get

20 possible for that phone when it's in an unlocked state.

21 Q.   And why is it the best one?

22 A.   Because it gets the database files, the file system.  And

23 physical, the only typical way to get a physical nowadays is --

24 it is possible, but you have to basically jail break, basically

25 hack the phone, which is something that's not common and it was

1    not -- it was not on this device.  It was not jail broken.

2    Q.    Okay.  Now, when you are describing this full file system

3    extraction as the best one, I think you mentioned it can have

4    additional database data; is that right?

5    A.    Correct.

6    Q.    What types of information might be captured in that

7    database information that a more basic extraction would not

8    capture?

9    A.    It can be anything from additional chat messages from

10   third-party apps; any call logs, if they're using like

11   third-party apps to make phone calls; text messages.  Photos

12   can also be found in these database files.  Sometimes if it is

13   deleted -- I said that typically you're not going to get

14   deleted data in a full file system; but from a third-party app,

15   it is possible and that's basically going through the database

16   files and manually searching through that stuff to try to

17   locate that.

18   Q.    So upon conducting this extraction, were you able to

19   identify some of the key identifiers for the device itself?

20   A.    I was.

21   Q.    Do you recall, for example, what the last four digits of

22   the serial number were?

23   A.    Ooh, no.  That one...

24   Q.    Okay.  How about the IMEI?

25   A.    I think -- without looking at my report, I -- I think it

1   was like 4511 maybe.  I'm...

2   **Q.**   Okay.  And did the device also have a unique device

3   identifier, or UDID?

4   **A.**   It did.

5   **Q.**   Okay.  And, Detective Perry, since you were not quite sure

6   about the IMEI or the serial number, would it help refresh your

7   recollection to take a look at your lab notes?

8   **A.**   Correct, yes, it would.

9           **MR. CHENG:**  Your Honor, may I approach?

10          **THE COURT:**  Yes.

11                  (Counsel approaches witness.)

12  **BY MR. CHENG:**

13  **Q.**   Detective Perry, I'm handing you what's been marked with

14  the Bates Number USCF002114.

15  **A.**   Yes.

16  **Q.**   And, Detective Perry, are these a copy of your case notes

17  from this particular case?

18  **A.**   It is.

19  **Q.**   Okay.  And did that help refresh your recollection on some

20  of the identifiers for this device that you extracted?

21  **A.**   Yes, sir.

22  **Q.**   And do you recall what the last four digits of the serial

23  number for this device were?

24  **A.**   It was 0, D as in David, 84.

25  **Q.**   And what about the last four digits of the IMEI?

1  A.   1147.

2  Q.   Okay.  And can you describe what an IMEI is for a device?

3  A.   Yes.  It's basically -- it's similar to a serial number

4  for the device.  It stands for international mobile equipment

5  identifier; and it identifies that specific device, such as an

6  iPhone, to that network.

7  Q.   Okay.  So after performing this extraction of the cell

8  phone device, what did you do next?

9  A.   After performing the extraction, we then -- or I then

10  processed the extraction in another forensic tool.

11  Q.   And which tool was that?

12  A.   That was Cellebrite Physical Analyzer.

13  Q.   And what did you do with the Cellebrite Physical Analyzer?

14  A.   So with the Physical Analyzer, this data that we extract

15  from the data, you can't really read it in human form, so what

16  the Cellebrite Physical Analyzer software does is it basically

17  processes that data to where it's in a human-readable form.  So

18  it will display the text messages kind of like in a GUI format.

19  So it will say "Call logs," it will allow you to see the

20  photos, pretty much everything, the contents of that phone.

21  Q.   And does it create a particular kind of output?

22  A.   It does.

23  Q.   And what's that?

24  A.   As far -- are you asking me as far as the UFDR, or are you

25  asking about an output of a hashing?

1  Q.   I'm asking about the former.  Let's start with that.

2         THE COURT:  Okay.  So what does "UFDR" stand for?

3         THE WITNESS:  It's Unified Device Report -- Forensic

4  Report.  So it's -- basically it's a proprietary

5  report-writing -- report-generating program that the program

6  creates for the case agent or the investigator to go through

7  and see basically the pictures, the call logs, like I described

8  earlier, and then they can also then generate results, copies

9  from that information that they locate on there.

10 BY MR. CHENG:

11 Q.   Thank you.

12        And you described another step involving hashes.  What

13 is a hash?

14 A.   A hash in this case was a 256-bit hash algorithm, and what

15 that does is it creates -- basically you input from the

16 extraction file.  What the software tool does is it takes that

17 data and then hashes that information, and it's basically like

18 a digital fingerprint or serial number to that data.

19        And what we use that -- we have a series of numbers

20 and letters, and then we -- after our examination, we then

21 check that hash value to make sure that the data integrity

22 remained the same, that there was no change in the data that we

23 were processing during the time, that everything from that

24 physical extraction remained the same, that nothing changed.

25 Q.   And after producing that UFDR and performing the hashing

1  steps you just described, what else did you do?

2  A.    I also performed an extraction of the SIM card and

3  generated -- I then generated the UFDR report.  Then we do a

4  verification hash to verify the integrity to make sure the data

5  didn't change and then create a master copy as well.

6  Q.    And is that master copy checked into evidence?

7  A.    It is.

8  Q.    Do you also create a copy of the master copy?

9  A.    I -- no, not a copy of the master copy.  The working

10  copies.

11  Q.    Can you please explain what the working copy process is?

12  A.    So this -- there's two types of copies we generate.  One

13  is a master copy, which is -- basically contains everything

14  from the case, the original extraction, the working copy as

15  well.  It's basically your best evidence; and we keep that book

16  to where we're not manipulating it in any way, where it's not

17  being touched.

18        The working copy is what we generate for the case

19  agent; and that's typically on another piece of media, such as

20  a thumb drive or an external hard drive, and then we provide

21  that to the case agent, and then they can load the extraction

22  and go through the data and create additional result copy

23  reports that they choose to.

24  Q.    And in this case, did you provide a working copy for the

25  FBI case agents for further review?

1  A.  I did.

2  Q.  Okay.  And that -- I'd now like to show you what's been

3  marked as Exhibit 80.

4  　　　　MR. CHENG:  Your Honor, may I approach?

5  　　　　THE COURT:  Yes, you may.

6  　　　　　　　(Counsel approaches witness.)

7  BY MR. CHENG:

8  Q.  And, Detective Perry, can you please turn to what's been

9  tabbed as Exhibit 80 in that binder?

10  A.  Eight zero?

11  Q.  Eight zero.

12  A.  (Witness examines document.)  Okay.

13  Q.  And, Detective Perry, do you recognize Exhibit 80?

14  A.  I do.

15  Q.  Have you seen Exhibit 80 before?

16  A.  Yes.

17  Q.  And what does it show?

18  A.  This is a UFDR report that the case agent has generated as

19  a -- basically a results copy that they've generated from my

20  initial working copy.

21  Q.  And did you have an opportunity to review the contents of

22  Exhibit 80 as well?

23  A.  I did.

24  Q.  And during that review, were you able to verify that

25  Exhibit 80 contains certain materials that were extracted from

1  the phone you just identified, Exhibit 90?

2  **A.**   I did.

3  **Q.**   And what were some of the things you could do, or you did,

4  to verify that?

5  **A.**   Two of the main things that we -- I was able to do to

6  verify was, through the chat messages, it showed to be the same

7  e-mail address, which was morteza.amiri.90@gmail.com; and a

8  second way of verifying that it came from that was the UDID,

9  which is the unique device identifier that Apple assigns to

10  every device, and it's actually, I think, from iPhone 10s and

11  above.  Since this is an iPhone 12, this is something that

12  they specifically identified that device to their network.  So

13  when you go to the App Store or anything, it's verifying that

14  this phone is legit, that no one is -- it's not a stolen

15  device.  So it's going through an authentication program and

16  uses that unique ID to verify that device with their servers,

17  Apple servers.

18  **Q.**   Now, you mentioned some messages.  Can you also turn to

19  Exhibit 82?

20  **A.**   (Witness examines document.)  Okay.

21  **Q.**   Do you recognize Exhibit 82?

22  **A.**   I do.

23  **Q.**   And what is it?

24  **A.**   It looks like a chat message thread.

25  **Q.**   And have you seen Exhibit 82 before and compared it to the

1　contents of the extraction of the phone in Exhibit 90?

2　A.　I have.

3　Q.　And were you able to confirm that these messages came from

4　that same device, Exhibit 90, that you had previously

5　extracted?

6　A.　I did.

7　　　　MR. CHENG:　Your Honor, the Government moves to admit

8　Exhibit 82.

9　　　　THE COURT:　Any objection?

10　　　　MS. SUHR:　No objection.

11　　　　THE COURT:　It's admitted.

12　　　(Trial Exhibit 82 received in evidence.)

13　　　　MR. CHENG:　May we publish?

14　　　　THE COURT:　Yes.　Are you going to go through the

15　individual entries now?　Okay.　Because I would suggest you do

16　that with the appropriate witness.

17　　　　MR. CHENG:　Yes, Your Honor.

18　　　　THE COURT:　All right.　Go forward.

19　BY MR. CHENG:

20　Q.　And, Detective Perry, earlier you had identified the UDID.

21　Do you see the reference to the UDID on Exhibit 82?

22　A.　I do.

23　Q.　And where is that?

24　A.　That's under the source info tab on the bottom.

25　Q.　And that UDID is -- is it provided throughout for these

1  message?

2  **A.**   It is.

3  **Q.**   Thank you, Detective Perry.

4         **MR. CHENG:**  The Government has no further questions.

5         **THE COURT:**  Thank you, Counsel.

6         Ms. Suhr?

7         **MS. SUHR:**  No questions.

8         **THE COURT:**  All right.  Thank you very much.  You're

9  excused, Detective.

10                    (Witness excused.)

11        **THE COURT:**  Call your next witness, and maybe we can

12  take a standing break if you'd like.  We're going to go until

13  1:30 today.

14                    (Pause in proceedings.)

15        **MS. SARGENT:**  Your Honor, the Government calls

16  Savannah Reed.

17        **THE COURT:**  All right.  Would you mind introducing

18  yourself, Counsel.

19        **MS. SARGENT:**  Yes, Your Honor.

20        **THE COURT:**  Or reintroducing yourself.

21        **MS. SARGENT:**  Alethea Sargent for the Government.

22        **THE COURT:**  Thank you.

23     (Savannah Reed steps forward to be sworn.)

24        **THE CLERK:**  Please step up on the stand.

25        Please raise your right hand.

1                                     **SAVANNAH REED,**

2  called as a witness for the Government, having been duly sworn,

3  testified as follows:

4            **THE WITNESS:**  I affirm.

5            **THE CLERK:**  Please put your hand down.  You may be

6  seated.

7            If you could speak clearly into the microphone, state

8  your full name and spell your last name for the record.

9            **THE WITNESS:**  Savannah Reed, S-A-V-A-N-N-A-H, R-E-E-D.

10                              **DIRECT EXAMINATION**

11  **BY MS. SARGENT:**

12  **Q.**  Good afternoon, Ms. Reed.

13            Let's start with some background.  How old are you?

14  **A.**  I am 28.

15  **Q.**  And where do you live?

16  **A.**  I live outside of the U.S.

17  **Q.**  Okay.  Where did you live prior to moving outside of the

18  United States?

19  **A.**  My parents' house in Contra Costa County.

20  **Q.**  Okay.  What's your educational background?

21  **A.**  I went to LMC and then I also have a bachelor's degree in

22  health and administration.

23  **Q.**  What is LMC?

24  **A.**  LMC is Los Medanos College.

25  **Q.**  And that bachelor's degree, where did you say that's from?

1  **A.**  That is from California Coast University.

2  **Q.**  And when you say you have a bachelor's degree, have you

3  received a diploma from California Coast University?

4  **A.**  I have not.  It's just an unofficial transcript.

5  **Q.**  Okay.  Did you complete all coursework for a degree at

6  California Coast University?

7  **A.**  Yes, I did.

8  **Q.**  Okay.  Are you currently employed?

9  **A.**  Yes.

10  **Q.**  How are you employed?

11  **A.**  I am a recruiter, or headhunter at a recruiting firm.

12  **Q.**  Okay.  Now, Ms. Reed, did you make an agreement to

13  cooperate with the U.S. Government to testify today?

14  **A.**  Yes.

15  **Q.**  Let's talk a little bit about that agreement.

16      In that agreement, did you agree to testify at any

17  hearing or trial the Government asks you to testify in?

18  **A.**  Yes.

19  **Q.**  And in return for your agreement to do that, did the

20  Government agree not to use any statements or other information

21  provided by you, or any information derived directly or

22  indirectly from that, in any prosecution against you?

23  **A.**  Yes.

24  **Q.**  Okay.  You testified that you completed the coursework for

25  a bachelor's degree at California Coast University.  Can we

1   call that University CCU for purposes of this testimony?

2   **A.**   Yes.

3   **Q.**   Okay.  And what did you say that degree was in?

4   **A.**   That was for my -- sorry, for my degree?

5   **Q.**   Yes, for yours.

6   **A.**   Oh.  For health and administration management, I believe

7   it was.

8   **Q.**   Okay.  And you mentioned you didn't receive a diploma from

9   CCU.  Why didn't you receive a diploma?

10  **A.**   So I actually took the courses in order to get into an

11  accelerated program at Samuel Merritt.  I found out right

12  before I applied to nursing school that, unfortunately, they

13  wouldn't accept the bachelor's degree because it's not a

14  nationally accredited college.

15  **Q.**   And so what did you do at that point?

16  **A.**   I no longer paid for the degree and just have the

17  unofficial transcript.

18  **Q.**   Okay.  So in short, you did not complete payments towards

19  your degree?

20  **A.**   Yes.

21  **Q.**   Okay.  Other than your own degree, have you completed

22  other degrees at California Coast University?

23  **A.**   Yes.

24  **Q.**   How many other degrees have you completed at California

25  Coast University?

1    **A.**    I believe about five or six.

2    **Q.**    Okay.  How did you first learn about California Coast

3    University?

4    **A.**    I learned about it through my ex-husband.

5    **Q.**    And who was that?

6    **A.**    Patrick Berhan.

7    **Q.**    Okay.  How did you know Patrick Berhan?

8    **A.**    I went to high school with him; and then after college, we

9    connected.

10   **Q.**    And what happened after that?

11   **A.**    We started dating, and then we got entangled and married

12   and were together for five or six years.

13   **Q.**    And that's the total time including dating and your

14   marriage?

15   **A.**    Yes.

16   **Q.**    Okay.  At what point, roughly speaking, in terms of year

17   did you start dating Mr. Berhan?

18   **A.**    2015, I believe.

19   **Q.**    And what year did you get married?

20   **A.**    2021.

21   **Q.**    What year did you get divorced?

22   **A.**    It was finalized in 2022.

23   **Q.**    Okay.  And at the time you were with Mr. Berhan, how was

24   he employed?

25   **A.**    He was employed through Pittsburg PD.

1  **Q.**   Okay.  And what is PD?

2  **A.**   Sorry.  Pittsburg Police Department.

3  **Q.**   Okay.  At some point during your relationship with

4  Mr. Berhan, did you begin living with him?

5  **A.**   Yes.

6  **Q.**   When about was that?

7  **A.**   In probably 2016, I want to say.

8  **Q.**   Okay.  How long did you ultimately live with him?

9  **A.**   I lived with him up until we split in 2021.

10 **Q.**   And at any time during the time you lived with Mr. Berhan,

11 did you live with anyone else as well?

12 **A.**   Yes.  I lived with two other people.

13 **Q.**   And when was that?

14 **A.**   That was in 2016, when we first had moved in together.

15 **Q.**   And who did you live with?

16 **A.**   I lived with Morteza Amiri and Timothy Williams Manly.

17 **Q.**   Okay.  And where were you living when you lived with

18 Mr. Amiri and Mr. Berhan and your other roommate?

19 **A.**   In Antioch, off of Rockford Drive.

20 **Q.**   Who owned that residence?

21 **A.**   Morteza.

22 **Q.**   How did you and Mr. Berhan know Mr. Amiri?

23 **A.**   Patrick had known Morteza for quite some time.  I believe

24 they had met through work at Target.

25 **Q.**   Okay.  How was Mr. Amiri employed when you lived with him?

1  **A.**  With Brentwood Police Department.

2  **Q.**  Okay.  Was he employed at Brentwood Police Department the

3  entire time you lived with him?

4  **A.**  No.  He had left and went to Antioch Police Department.

5  **Q.**  How were your finances handled when you lived with

6  Mr. Berhan and your other two roommates?

7  **A.**  I had -- only was in charge of, like, my car, some

8  household things, my insurance, my gas, kind of my personal

9  small things that I had, and then Patrick was in charge of the

10  rest.

11  **Q.**  Okay.  Did you work during that period of time?

12  **A.**  Yes, during that period.

13  **Q.**  How were your finances handled during the time -- let me

14  take a step back.

15  At some point, did you stop living with your other two

16  roommates as well?

17  **A.**  Yes.

18  **Q.**  Why was that and what happened?

19  **A.**  Patrick wanted to buy house in Oakley, so he wanted to

20  move out in order to save some extra money before we had moved

21  into that house in 2017.

22  **Q.**  Okay.  How were your finances handled when you lived only

23  with Mr. Berhan?

24  **A.**  He took care of everything, yeah.

25  **Q.**  Did you have your own access to money?

1  A.   I did not.  If I needed money, it was maybe like I

2  would ask my parents, or he would give me money if I needed

3  something.

4  Q.   Can you describe your work trajectory during that time?

5  A.   I was a medical assistant for a clinic for about a year,

6  maybe a year and a half.  I started part-time and then went to

7  full-time; and then after that, I was told that -- that I

8  should quit and go to school and that he --

9  Q.   Can you pause there?

10  A.   Yeah.

11  Q.   Who told you you should quit and go to school?

12  A.   Patrick.

13  Q.   And when about was that?

14  A.   2019.  I think like the beginning.

15  Q.   Okay.  And what happened then in terms of your work?

16  A.   Sorry.  What was that?

17  Q.   In terms of your work trajectory.

18  A.   I stopped working at the clinic, and I started going to

19  school full-time.

20  Q.   Okay.  And when you stopped working and were going to

21  school full-time, did you -- how did you have access to the

22  money you needed?

23  A.   His -- well, his parents took over my car payment.  I

24  think Patrick was paying my insurance.  My cell phone bill was

25  paid through Patrick.  And then I didn't really have money to

1  go and do anything.  So it was kind of like we just bought

2  groceries; and then if I went out and did something, it was

3  always with Patrick; or if I wanted to go out with my friends,

4  I sometimes I would ask my mom for a little bit of money, but I

5  really didn't do much by myself.

6  **Q.**   Did Mr. Berhan ever give you money?

7  **A.**   It was very rarely.

8  **Q.**   Okay.  At this time, in 2019, when you lived with

9  Mr. Berhan, how was Morteza Amiri employed?

10 **A.**   He was employed through Antioch PD.

11 **Q.**   Were you and Mr. Berhan still friends with Mr. Amiri at

12 that point?

13 **A.**   Yes.  We were very close.

14 **Q.**   Can you describe the nature of your relationship at that

15 point?

16 **A.**   I would say he's -- he was like family, almost like an

17 older brother.

18 **Q.**   Okay.  I'd like to talk a little bit about CCU generally.

19      At what point did Mr. Berhan tell you about a college

20 called California Coast University, or CCU?

21 **A.**   He had mentioned that he was going there in 2017, and then

22 brought it back up probably in like 2019.

23 **Q.**   Can you describe the context in which he brought it back

24 up in 2019?

25 **A.**   It was presented to me in a way, when I was no longer

1    working, that I needed to essentially pull my weight in the

2    relationship, that I wasn't working anymore; I needed to go to

3    school and I needed to help out.

4    Q.    Help out how so?  What did Mr. Berhan ask you to do?

5    A.    If I went to school and took the classes, he would get a

6    pay incentive that would help us live in the house and then

7    also be able to get married and engaged and kind of start a

8    family.

9    Q.    I'm sorry --

10         MR. CRUDO:  Can I just ask counsel to get close to the

11   mic so we can hear?

12         THE COURT:  Yes.  I'm having trouble hearing you as

13   well.

14         MS. SARGENT:  I'm sorry.

15         THE COURT:  Okay.  Thank you.

16   BY MS. SARGENT:

17   Q.    I'm sorry, you said if you went to school, he would get a

18   pay incentive, I think.  Can you explain -- break that down and

19   explain what you mean by that.

20   A.    If you get a bachelor's or a master's degree, you get a

21   pay increase at work.

22   Q.    Okay.  So -- and what I'm asking you to clarify is:  Was

23   he suggesting that he was going to take classes, or was he

24   asking you to do something for him?

25   A.    He was saying that if he took the classes, like he had

1   started the one in 2017, he wouldn't get the pay increase soon

2   enough, so he asked if I could take over.

3   **Q.**   Okay.  So what specifically, if you can recall, did he

4   tell you about that pay increase or other money offered by his

5   employer?

6   **A.**   It was a 5 percent, I think, base salary increase for a

7   bachelor's and then like a 7.5 for a master's.

8   **Q.**   Okay.  At that time, did Mr. Berhan have a bachelor's

9   degree?

10  **A.**   No, he did not.

11  **Q.**   What's the first thing you remember hearing from

12  Mr. Berhan or anyone else about educational incentives at the

13  police departments?

14  **A.**   I had -- I hadn't heard anything about it until Patrick

15  had told me.

16  **Q.**   Did you ever hear anything about educational incentives at

17  the police department in the context of any other roommates

18  getting a degree?

19  **A.**   I -- I don't remember that.  I don't recall.

20  **Q.**   Okay.

21  **A.**   I think it was after I had heard it from Patrick first

22  that I had heard it from other people.

23  **Q.**   Okay.  Did any of your other roommates, when you were

24  living together, the four of you, have a bachelor's degree?

25  **A.**   One of them had a bachelor's degree, yes.

1   Q.   Were there any conversations around that that you

2   overheard?

3   A.   Yes, I did overhear one of the other roommates saying that

4   he had a bachelor's degree and he had a pay increase, and he

5   was going to go back to school for his master's in order to get

6   another one.

7   Q.   Who did you hear him tell that to?

8   A.   It was --

9        MR. CRUDO:   I'm sorry.   I didn't hear the question.

10  BY MS. SARGENT:

11  Q.   Who did you hear him tell that to?

12  A.   It was Tim telling Patrick about it.

13  Q.   Okay.   Did Mr. Berhan tell you how he planned to pay for

14  his bachelor's degree at CCU?

15  A.   They gave -- the City would give reimbursements each year.

16  I think it was like $2500.   So he was hoping to split it up

17  into technically two years so that he was able to get those

18  couple of reimbursements, and then I believe his mom helped him

19  out with the rest.

20  Q.   Okay.

21       MR. CRUDO:   Your Honor, I want to object based on some

22  of the Court's pretrial rulings at this point.

23       THE COURT:   All right.   So let's -- would you come to

24  sidebar?

25       I'm going to have one of those rare sidebars.   So if

1    you want to stand while we're talking -- just don't talk but

2    you can stand.  We're going to pipe some static in the jury

3    box, but nothing wrong with you.

4              (The following proceedings were heard at the sidebar:)

5              **THE COURT:**  So since this is the first bench

6    conference.  Does your client waive his right to be here?

7              **MR. CRUDO:**  We can bring him up.

8              **THE COURT:**  All right.  So Mr. Amiri has joined us.

9    Okay.  So what's the --

10             **MR. CRUDO:**  Here's the -- we had a motion --

11             **THE COURT:**  Get closer to her.

12             **MR. CRUDO:**  We had a motion in limine on this issue,

13   about co-conspirator statements.  I understood that

14   Mr. Berhan -- statements by Mr. Berhan were permitted to a

15   certain extent in connection with they indicated with the

16   witness here about CCU and such.  We're now getting into

17   testimony about how Mr. Berhan was going to make money and pay

18   for his education.  That's now getting far afield from just

19   laying the foundation.

20             **THE COURT:**  All right.  What's your offer of proof?

21             **MS. SARGENT:**  Your Honor, she was dating him and

22   married to him and financially connected to him.  She had no

23   reason to do this except that he was the money-maker of the

24   family, and it was his pay, so it goes to why she was doing

25   what she was doing.

1    **THE COURT:**  All right.  But it is an out-of-court

2  statement but not for the truth of the matter.

3    **MS. SARGENT:**  It's not offered --

4    **THE COURT:**  So for that purpose, was -- is it plain

5  that she did --

6    **MS. SARGENT:**  What she believed and what she did --

7    **THE COURT:**  All right.  If you want to fashion an

8  instruction at the appropriate time, I'll consider it.  But I

9  think this is a fair point in terms of what she said, so as far

10  as that, I'm convinced that this line of questioning would go

11  to explain her future conduct, if any, and not for the truth of

12  the matter.

13    **MR. CRUDO:**  Okay.  And if it's not going to be for the

14  truth, I think the jury has to hear that now, that this

15  testimony is not being offered for the truth of the matter

16  asserted.

17    **THE COURT:**  All right.  I will do enough.  Any

18  objection to that?

19    **MS. SARGENT:**  I have no objection to that.

20    **THE COURT:**  All right.  Some of the -- I will then

21  just for the -- to protect the record, I will assume that the

22  objection has been made.  I will overrule the objection.  So

23  you're not conceding the objection by virtue of my giving an

24  instruction.  Is that fair?

25    **MR. CRUDO:**  Very good, Your Honor.

1      **MS. SARGENT:**  Can I be clear that the instruction will

2  be that the hearsay portion of her testimony is not being

3  offered for the truth?  Obviously her other statements --

4      **THE COURT:**  Correct.

5      **MR. CRUDO:**  Okay.  Thank you.

6      **THE COURT:**  Thank you.

7      (The following proceedings were heard in open court:)

8      **THE COURT:**  So I'm going to give you a little -- a

9  little legal instruction for free now because I'm going to give

10  you an instruction, which will probably make no sense to you

11  unless I tell you why I'm giving the instruction.  I promise to

12  be transparent.

13      So we have something that -- in the law, which we call

14  hearsay.  Hearsay is not heresy.  It's hearsay, H-E-A-R-S-A-Y.

15  And what it's saying -- what it is hearsay is an out-of-court

16  statement that's offered for the truth of the matter.  Now,

17  that sounds like legal gibberish as I say it, so I'm going to

18  explain it.

19      So let's say you're in a -- maybe an automobile

20  accident case and there's an issue about what color was the

21  light; and somebody gets up and testifies that, "Oh, the driver

22  told me that the light was red."  So this is a person who's in

23  the car, a passenger, saying that "Joe Driver told me that the

24  light was red," which is an issue in this accident --

25  hypothetical accident case.

1    So if -- that statement that the driver told me that

2 the light was red, generally speaking, that statement is

3 hearsay.  It's an out-of-court statement -- because Joe Driver

4 is not there testifying; the passenger is testifying -- offered

5 for the truth of the matter; that is to say, that the light

6 was, in fact, red.

7    And that's a hearsay statement offered for the truth

8 of the matter and, therefore, we don't allow it for various

9 reasons I won't get into.  But just trust me, going back to our

10 slides, it's deeply rooted in the Anglo-Saxon jurisprudence.

11 I'm just kidding, but it is.

12    Okay.  So is that -- but is that statement that Joe

13 Driver told me that the -- that the light was red, could it

14 come in for any reason?  Yes, it's hearsay; but let's say we're

15 offering it to show that Joe Driver knew that the light was

16 red, not that it's actually red, but he knew it was red because

17 it's important to know that, if he went through the light, that

18 he did so intentionally.

19    So it's not offered for the truth of the matter but to

20 go to the state of mind of Joe Driver and maybe explain his

21 actions later on.

22    So the testimony that Ms. Reed is giving right now,

23 statements, you know, that were out-of-court statements that

24 were made to her, not her testimony but the statements made to

25 her, are -- the Court has ruled that those are hearsay, but

1    we're going -- but they're not offered for the truth of the

2    matter.  That is to say, these statements from Mr. Berhan,

3    Patrick Berhan, and maybe others explains why Ms. Reed took

4    certain actions later on.

5          But you may not consider those statements made to

6    Ms. Reed by Mr. Berhan or others for the truth of the matter

7    but only to show that those statements were made and may or may

8    not explain actions taken by Ms. Reed either at the same time

9    or later.

10         Does everybody understand that?  I know it's a little

11   convoluted, but it's a lot more than any other jury will have

12   gotten.  And when the case is over, you'll forget it, but I'm

13   explaining what -- I'm giving you an instruction about how you

14   may take this testimony.

15         So with that admonition and that instruction, you may

16   continue.

17         **MS. SARGENT:**  Thank you, Your Honor.

18   **BY MS. SARGENT:**

19   **Q.**   Okay.  Going back to Mr. Berhan's experience with CCU, did

20   he ultimately enroll at CCU?

21   **A.**   Yes, he did.

22   **Q.**   Was CCU an entirely online program?

23   **A.**   Yes, it was.

24   **Q.**   Can you briefly explain what that meant, practically

25   speaking, for a student enrolled?

**A.**   You would enroll in the courses, and there would be a section of courses that you were actively taking and a section of courses you could request.  Each course had, I believe, four essays, four quizzes, and then one final.  There was no interaction with your professor except over e-mail.

**Q.**   Did Mr. Berhan enroll in a particular program of study at CCU?

**A.**   Yes.  Criminal justice.

**Q.**   Initially did Mr. Berhan take classes himself?

**A.**   He completed, I believe, one or possibly two.

**Q.**   Was it your understanding, based on your engagement with the online platform, that he had already completed those prior to approaching you about taking courses?

**A.**   Yes.  It was, I believe, right around the time we kind of moved in together that he had started the course.

**Q.**   Okay.  And did -- at some point, did you begin taking courses for Mr. Berhan?

**A.**   Yes.

**Q.**   You've explained a little bit about why that happened. When did that happen, to the best of your recollection?

**A.**   I believe in 2000- -- 2019, beginning, I believe.  I can't remember.

**Q.**   We've also talked a little bit about your work history. Were you working at the time that Mr. Berhan asked you to take courses for him?

1   A.   No, I was not.

2   Q.   Did you agree to take the courses?

3   A.   Yes.

4        **MR. CRUDO:**  I'm sorry, Your Honor.  I can't hear the

5   question.

6        **MS. SARGENT:**  I'm sorry.  I'll move it like this.

7        **THE COURT:**  It's a little artificial here, but if we

8   don't get it through the --

9        **MS. SARGENT:**  It's the podium, Your Honor.  It keeps

10  me a little bit away from the microphone.

11       **THE COURT:**  Okay.  So please stay close to the

12  microphone and repeat what you just said.

13       **MS. SARGENT:**  Yes, Your Honor.

14  **BY MS. SARGENT:**

15  Q.   You just said that you agreed to take courses for him; is

16  that correct?

17  A.   Yes.

18  Q.   Why did you agree?

19  A.   Because I felt like -- how he told me that I needed to

20  pull my weight, I wasn't financially contributing to the

21  relationship, and I felt that this was the only way that we

22  were going to be able to start a family and have a house and be

23  together.

24  Q.   Regarding -- following up on that last point that you

25  made, the only way you could be together, did Mr. Berhan imply

1   to you or state to you that that was the case?

2   **A.**   If I didn't pull my weight in the relationship, we

3   wouldn't have had a future.

4   **Q.**   Okay.  What did Mr. Berhan tell you about the process of

5   completing classes at CCU?

6   **A.**   He just told me that it was the four quizzes, four essays.

7   He told me that the professors seemed to be kind of particular

8   about the way the essay was structured, and then that you had a

9   proctor that had to give you a password for the final exams.

10  **Q.**   Going back to the structuring of essays, what

11  specifically, to the best of your recollection, can you

12  remember about what he said about the structure of essays?

13  **A.**   That it just had to be a -- basically, like a simple

14  five-paragraph essay, just like the intro, three body, and then

15  the conclusion.

16  **Q.**   And what did he tell you about the proctoring system?

17  **A.**   That you just have to have a proctor that can't be like

18  somebody of a romantic relationship and can't be living with

19  you and that they would receive a password for these finals;

20  and once you received the password, you could take the final.

21  **Q.**   For Mr. Berhan, who was his proctor?

22  **A.**   I believe I was.

23  **Q.**   Did you remain Mr. Berhan's proctor -- well, strike that.

24          You just told us that the program required that the

25  proctor not be someone living with you or in a romantic

1   relationship with you, but you were Mr. Berhan's proctor.

2   **A.**   Yes.

3   **Q.**   Did you continue being Mr. Berhan's proctor even after you

4   began to take the courses for him?

5   **A.**   Yes.

6   **Q.**   And so how did that work in practice?

7   **A.**   It was just more efficient for me to be, so I wasn't

8   waiting on him to let me know what the password was for each

9   final exam.

10   **Q.**   So let's take a hypothetical exam.

11         How did it -- when you went into Mr. Berhan's account

12   to take a final exam, what steps did you take as his proctor to

13   receive the information you needed and begin the exam?

14   **A.**   You would have to -- so you would open up the final exam.

15   Once you had all four quizzes done, all essays done, you would

16   open it up and you would have to request to take it.  When you

17   requested to take it, it would send a password to your proctor.

18   **Q.**   And so in this instance, who received that password?

19   **A.**   I would receive the password.

20   **Q.**   Okay.  Go on.

21   **A.**   I would receive the password, I would copy and paste it,

22   go back into the CCU portal, and then copy and paste it into

23   the final for it to be unlocked.

24   **Q.**   Okay.  About how many courses were needed to complete a

25   bachelor's degree at CCU?

**A.**   It was dependent on courses prior that you had completed.

They saw, from the police academy -- the experience that you

had would cover some of the classes that you would have to take

for the bachelor's or master's degree.  So it was just

dependent on how many courses you had completed prior, and then

they would give you a set amount of courses to take.

**Q.**   Okay.  You've talked a little bit about the proctoring

system and how you engaged with that.

Can you walk the jury through what the process of

signing into CCU's portal was to begin with and what the

interface looked like?

**A.**   It was just a little rectangular box on the screen that

had the CCU logos and background, and you would just type in

the username and your password.  I believe, from what I

remember, the username used to be your student ID.

**Q.**   Okay.  And so to get into Mr. Berhan's account, what did

you do?

**A.**   I would use his log-in information and then I would log

into his CCU portal.

**Q.**   Did he provide you his log-in information?

**A.**   Yes.

**Q.**   When you logged into the CCU portal, what information was

presented?

**A.**   When you first go on, there was a bunch of tabs on the

left-hand side, and then it would usually come to the courses

1  that you were actively taking.  There was like an inbox and

2  other things on the side that you could click on if you had to

3  contact the professor.

4  **Q.**   Could you see what courses were remaining in a student's

5  file when you signed in?

6  **A.**   Yes.  So there would be a tab for courses that you were

7  actively taking.  I believe you could only take three at a

8  time.  And then once you've completed a course, you can go

9  under another tab and there were pending classes.  You had to

10  make sure you were up to date with your payment, though, before

11  you could open up certain classes or open up certain finals.

12  **Q.**   Okay.  You've described generally what the process of

13  completing courses was at CCU.  What work -- what types of work

14  did you complete on Mr. Berhan's behalf?

15  **A.**   Sorry.  What do you mean by "types of work"?

16  **Q.**   We've talked about how there were quizzes and how there

17  were essays and how there were final exams.  Did you complete

18  all those categories of assignment for Mr. Berhan?

19  **A.**   Yes.

20  **Q.**   Do you know if CCU had an academic integrity policy?

21  **A.**   Yes, I believe they did.

22  **Q.**   Was this behavior in keeping with CCU's academic integrity

23  policy as you understand it?

24  **A.**   No, it was not.

25  **Q.**   Did Mr. Berhan receive a bachelor's degree in criminal

1   justice after you completed his courses?

2   **A.**   Yes, he did.

3   **Q.**   After you began completing courses for Mr. Berhan, did he

4   do any further coursework on -- towards his CCU degree?

5   **A.**   Himself, no.

6   **Q.**   I am going to show you an exhibit that has been premarked

7   as Exhibit 51.

8           **MR. CRUDO:**  I'm sorry?

9           **MS. SARGENT:**  I'm sorry, which has been admitted as

10  Exhibit 51.

11          **THE COURT:**  Yes, you may approach.

12          **MS. SARGENT:**  Oh, apologies, Your Honor.

13          **THE COURT:**  It's all right.

14          **MS. SARGENT:**  And thank you.  I'll ask next time.

15          **THE COURT:**  Thank you.

16  **BY MS. SARGENT:**

17  **Q.**   Ms. Reed, have you seen Mr. Berhan's final transcript from

18  CCU?

19  **A.**   Yes, I have.

20  **Q.**   If we could go to the second page of this exhibit.

21          I am showing you a page from Exhibit 51.  Do you

22  recognize this page?

23  **A.**   Yes, I do.

24  **Q.**   How do you recognize this page?

25  **A.**   I have seen it and I've taken all of these courses under

1   Spring of 2019 and so on.

2   **Q.**   And so what do you recognize it to be?

3   **A.**   It's Patrick's unofficial transcript for CCU.

4   **Q.**   So if we could zoom into the bottom left-hand side of the

5   page.

6          Ms. Reed, if you could read that, could you state for

7   the jury which of the courses in this left-hand column you

8   completed for Mr. Berhan.

9   **A.**   From starting in Spring 2019, starting with juvenile

10  justice, human body, criminal behavior, criminal investigation,

11  criminal law, terrorism, domestic violence, art history,

12  forensic science, procedure in the justice system, early United

13  States history, Homeland Security, computer forensic and cyber

14  crime, world religion, introductory [sic] to humanities, theory

15  and practices --

16  **Q.**   I'm going to pause you right there.

17         Can we zoom into the right side now, please?

18  **A.**   Sorry.

19  **Q.**   It's okay.

20         I'm sorry.  Can you continue?

21  **A.**   Yeah.  Introduction to humanities, theory and practices of

22  corrections, psychology of adjustment, researching methods in

23  criminal justice and criminology, and instruction to cultural

24  anthropology.

25  **Q.**   Thank you.

1          Did you also take classes for Mr. Berhan toward a

2    master's degree?

3    **A.**   Yes, I did.

4          **THE COURT:**  Counsel?

5          **MS. SARGENT:**  Yes, Your Honor?

6          **THE COURT:**  We're getting close to a break that I need

7    to give the jury.  Would this be a good transition point for

8    you?

9          **MS. SARGENT:**  That's fine, Your Honor, yes.

10         **THE COURT:**  All right.  So we're going to -- you may

11   be excused until tomorrow morning.  Thank you, Ms. Reed.  You

12   can step down.

13         **THE WITNESS:**  Okay.  Thank you.

14              (The jury leaves the courtroom.)

15     (Proceedings were heard out of the presence of the jury.)

16                      (End excerpt.)

17         (Proceedings adjourned at 1:26 p.m.)

18                      ---oOo---

19

20

21

22

23

24

25

<u>**CERTIFICATE OF REPORTER**</u>

        I certify that the foregoing is a correct transcript
from the record of proceedings in the above-entitled matter.


DATE:   Monday, August 5, 2024



_____
     Ruth Levine Ekhaus, RMR, RDR, FCRR, CSR No. 12219
            Official Reporter, U.S. District Court