UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Jeffrey S. White, Judge

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| VS. | ) | NO. CR 23-00264-2 JSW |
| | ) | |
| MORTEZA AMIRI, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

Oakland, California
Wednesday, August 7, 2024

**TRANSCRIPT OF PROCEEDINGS (EXCERPT)**

**APPEARANCES:**
For Plaintiff:
                    ISMAIL RAMSEY
                    United States Attorney
                    1301 Clay Street - Suite 340S
                    Oakland, California  94612
            BY:  **AJAY K. KRISHNAMURTHY**
                 **ALETHEA SARGENT**
                 **ERIC CHENG**
                 **ASSISTANT UNITED STATES ATTORNEYS**


For Defendant Morteza Amiri:
                    COBLENTZ PATCH DUFFY & BASS LLP
                    One Montgomery Street - Suite 3000
                    San Francisco, CA  94104
            BY:  **TIMOTHY P. CRUDO**
                 **OLIVER W. HAMILTON**
                 **RACHEL R. SUHR**
                 **ATTORNEYS AT LAW**

Also Present:        **James Cho, Paralegal**
                     **Jessie Chelsea, Paralegal**


Reported By:  Ruth Levine Ekhaus, CSR No. 12219, RDR, FCRR
              Official Reporter

1   <u>Wednesday - August 7, 2024</u>                    <u>7:49 a.m.</u>

2                        P R O C E E D I N G S

3                          ---o0o---

4                      (Begin Excerpt.)

5        (Savannah Reed steps forward to resume testifying.)

6                      <u>SAVANNAH REED</u>,

7   called as a witness for the Government, having been previously

8   duly sworn, testified further as follows:

9        **THE COURT:**  Good morning, Ms. Reed.

10       **THE WITNESS:**  Hi.

11       **THE COURT:**  And good morning.  Just to remind you that

12  you're still under oath.

13       You may continue with your cross-examination.

14       **MR. CRUDO:**  Thank you, Your Honor.

15                 <u>CROSS-EXAMINATION</u>    (resumed)

16  BY MR. CRUDO:

17  **Q.**   Good morning, Ms. Reed.

18  **A.**   Good morning.

19  **Q.**   Who is Christina Spacco?

20  **A.**   She is one of my best friends.

21  **Q.**   Okay.  She recently flew up to visit you in your new home?

22  **A.**   Yes.

23  **Q.**   Okay.  She is an Emeryville police officer?

24  **A.**   Now she is, yes.

25  **Q.**   All right.  And you used to socialize with Ms. Spacco when

1   you were living in the Bay Area?

2   A.   Not until -- well, we had been friends through high school

3   but not until I moved into the Oakley house.

4   Q.   Okay.  And when did you move into the Oakley house?

5   A.   In 2017.

6   Q.   Okay.  And you used to socialize with Ms. Spacco and

7   Samantha Peterson on occasion together; right?

8   A.   I've never met Samantha Peterson and I've never socialized

9   with her.

10  Q.   Ms. Spacco's -- who is her stepfather?

11  A.   Robert Green.

12  Q.   And that's Sergeant Robert Green?

13  A.   I believe so.

14  Q.   Of the Antioch Police Department?

15  A.   Yes.

16  Q.   You know him pretty well through your friendship with

17  Ms. Spacco?

18  A.   Not towards like the end, until the last, like, couple of

19  years.

20  Q.   Okay.  And you took courses for Sergeant Green at CCU as

21  well, didn't you?

22  A.   No, I did not.

23  Q.   Kyle Dixon, you've heard that name before?

24  A.   I've heard that name, yes.

25  Q.   You know he's a police officer with the Pittsburg Police

1  Department?

2  **A.**   Yes.

3  **Q.**   He also approached you to take CCU courses, didn't he?

4  **A.**   I have never talked to Kyle about taking courses, no.

5  **Q.**   And you may also have taken courses for an

6  Officer Fernandez from the Pittsburg Police Department; right?

7  **A.**   I have never taken courses for Officer Fernandez.  I'm not

8  even quite sure I know who that is.

9  **Q.**   But you told the Government that you might have, didn't

10  you?

11  **A.**   For Officer Fernandez?

12  **Q.**   Yes.

13  **A.**   I don't believe so.  I don't recall that.

14  **Q.**   I'm going to hand you -- I don't think you have it up

15  there -- I'm going to hand you what's marked as Exhibit 212.

16          **MR. CRUDO:**  May I approach, Your Honor?

17          **THE COURT:**  Yes, you may.

18                 (Counsel approaches witness.)

19  BY MR. CRUDO:

20  **Q.**   So you recall -- Ms. Reed, I'm not going to ask you to

21  read this -- this whole thing here.  This is just -- hopefully

22  it will help you remember.

23          **MS. SARGENT:**  Your Honor, objection.

24          **THE COURT:**  Oh, okay.  Hang on one second.

25          **MR. CRUDO:**  I haven't asked a question yet.

1    **THE COURT:**  I know.  Please wait --

2    **MS. SARGENT:**  Based on the document shown.

3    **THE COURT:**  Well, I haven't heard the question yet.

4    So ask the question; and then if there's an objection,

5    I'll entertain it.  Start again, Mr. Crudo.  Thank you.

6    **MR. CRUDO:**  Okay.  Thank you, Your Honor.

7  **BY MR. CRUDO:**

8  **Q.**   Do you remember meeting with the FBI in August of 2022?

9  **A.**   Yes.

10 **Q.**   All right.  I'm going to ask you to take a look at the

11   second -- or I'm sorry -- the third page.  So that's up at the

12   upper right-hand corner it says -- refers to the page number.

13    Do you see that there?

14 **A.**   The third page, yes.

15 **Q.**   Yes, okay.

16    And I don't want you to read this aloud.  I just want

17   you to read it to yourself.  And that first full paragraph

18   there, I want you to just read that to yourself, and let me

19   know when you've done that.

20 **A.**   (Witness examines document.)  Okay.  I've read it.

21 **Q.**   All right.  And does that now refresh your recollection

22   that you told the Government that --

23    **MS. SARGENT:**  Objection, Your Honor.

24    **THE COURT:**  Wait.  I'm going to sustain the objection.

25   You can ask the question -- the question again without

1    reference to the document.

2             MR. CRUDO:  Okay.

3             THE COURT:  And ask if she recalls a certain thing

4    happening, and then you can ask her whether the 302 -- well,

5    you have to lay a proper foundation that she's forgotten.

6             MR. CRUDO:  Okay.  Well, I thought I did that,

7    Your Honor.

8             THE COURT:  Well, I don't think you did.

9             MR. CRUDO:  Let me try.

10            THE COURT:  If she's forgot, and that a FBI report

11   that she didn't author would in some way refresh her

12   recollection.

13            MR. CRUDO:  Okay.

14            THE COURT:  You haven't done that.

15            MR. CRUDO:  Let me try it again.

16            THE COURT:  Okay.

17   BY MR. CRUDO:

18   Q.   Ms. Reed, do you recall telling the FBI that you may have

19   taken CCU courses for an Officer Fernandez?

20   A.   I don't recall this part, no.  I don't really know who

21   Officer Fernandez was.

22   Q.   Okay.  I want you now to take a look back at page 3 here.

23   I want you to read that to yourself; and put that aside when

24   you've done that, and just let me know when you've read that

25   paragraph there.

1   **A.**   (Witness examines document.)  Okay.  I have.

2   **Q.**   Okay.  Now, from your memory, does that help you remember

3   that, in fact, you did tell the FBI that you may have taken

4   courses for an Officer Fernandez?

5   **A.**   I see it written there, but I don't --

6        **THE COURT:**  Well, wait, wait, wait.  This is a

7   little -- I want to -- so when counsel is asking you to refresh

8   your memory -- so the way this works is, it's one of these

9   down-in-the-weeds legal things, he's asking -- so to the extent

10  that you don't recall your interview with the FBI and don't

11  recall what you said, he's not asking you to tell him or tell

12  us what may have been written down by some FBI agent in some

13  report.

14       He's asking you whether seeing the report opens a

15  curtain in your mind -- you say, "Oh, yeah, now I remember

16  tell -- independently," not because it's written in there and

17  the answer to that question is yes or no.  Do you independently

18  recall making that statement to the FBI?

19       **THE WITNESS:**  No, I do not.

20       **THE COURT:**  All right.  Next question.

21  **BY MR. CRUDO:**

22  **Q.**   Thank you, Ms. Reed.

23       And you were approached by another Pittsburg police

24  officer -- and forgive me if I get the name wrong -- Oreja?

25  **A.**   Yes.

1  Q.   Okay.  And she approached you to take classes for her at

2  CCU?

3  A.   Only over text message.  It was just a conversation more

4  of asking, like, about the classes.  Before it got too much

5  into the weeds, I had asked Patrick about it.

6  Q.   Okay.  She reached out to you directly?

7  A.   Yes.

8  Q.   And she was independently -- she was a friend of yours?

9  A.   She was a friend of Patrick's.

10 Q.   All right.  And she heard that you were taking classes --

11 A.   Yes.

12 Q.   -- for others?

13      And she asked you how much you charged?

14 A.   I can't recall the exact messages that were sent back and

15 forth.

16 Q.   Okay.  Ms. Reed, you were aware that it was widely known

17 among police officers that spouses, significant others, and

18 third parties were taking courses for them at CCU and other

19 colleges; right?

20 A.   I -- no, I wouldn't say that.  I knew that other officers

21 were taking CCU courses, but not that necessarily their

22 spouse -- spouses were taking it for them.

23 Q.   Okay.  Ms. Reed, you and Mr. Berhan didn't come up with

24 this plan on your own, did you?

25 A.   What do you mean?

1   Q.   This plan, this idea that you would take courses for other

2   people, you didn't come up with that idea independently, did

3   you?  You knew other people were doing it?

4   A.   I -- no.  I mean, no.  I didn't know other people were

5   necessarily doing this, no.

6   Q.   Okay.  You proctored Mr. Berhan's examinations for him?

7   A.   Yes.

8   Q.   Both his bachelor's and master's?

9   A.   I believe just his bachelor's.  You can't have a proctor

10  twice.

11  Q.   I want to talk about all the people that you -- you've

12  testified that you took classes for.

13          You were able to get credit for only one person at a

14  time; right?

15  A.   Yes.

16  Q.   Okay.  So you completed a course for one of your clients.

17  That coursework didn't apply to the requirements for any of the

18  other clients that you had; right?

19  A.   What do you mean?  Like, when I took -- I didn't -- if

20  you're saying at the same time, no.  Like, whatever I was doing

21  that day applied to that person.

22  Q.   Okay.  So Mr. Amiri didn't get credit for courses, for

23  example, that you were taking for other clients; right?

24  A.   No.

25  Q.   All right.  And they didn't get credit for courses that

1   you were taking for him; right?

2   **A.**   No.

3   **Q.**   All right.  And if one of your clients didn't pay you for

4   your service, you'd still do the work for those who did; right?

5   **A.**   I've never had an issue with somebody not paying me for a

6   class.

7   **Q.**   All right.  But everybody paid for their own classes;

8   right?

9   **A.**   I don't -- like, paid me --

10  **Q.**   Yes.

11  **A.**   -- or paid CCU?

12  **Q.**   Paid you for the work that you were doing.

13  **A.**   Yes.

14  **Q.**   Okay.  I think you testified that you didn't finish the

15  coursework for Mr. Rodriguez before he got to 126 units; right?

16  **A.**   Yes.

17  **Q.**   Okay.  That didn't keep you from completing the courses

18  for anybody else; right?

19  **A.**   Well, I think Mr. Rodriguez, I believe, was the last

20  person that I had started classes for.

21  **Q.**   Okay.  And, again, I think you testified everybody paid

22  for him or herself, for the services that you were doing?

23  **A.**   Yes.

24  **Q.**   Okay.  And they paid you directly?

25  **A.**   Well, some of the cases, yes.

1  Q.   Okay.  But Mr. Berhan never asked you for any of the money

2  that you made; right?

3  A.   No.

4  Q.   Okay.  You kept it?

5  A.   Well, I did use it for household shared items and other

6  things like the boutique, if we would go out on occasion.  So

7  it wasn't just my money.

8  Q.   Okay.  Ms. Reed, you talked yesterday about deleting your

9  iPhone and iCloud accounts.

10       You never told Mr. Amiri to delete any of his cell

11  phone data, did you?

12  A.   I don't recall that.  I know that there was a conversation

13  between me and Patrick, and he told me that I needed to delete

14  and erase everything and that I needed to make sure anybody

15  that I was texting had no record of us texting.

16  Q.   Okay.  Now, you also -- you used a laptop to do all of the

17  CC work -- CCU coursework that you did; right?

18  A.   Yes.

19  Q.   You also wiped all the data from that laptop before you

20  gave it to the FBI; right?

21  A.   It was long before, yes.  I was told that I needed to get

22  rid of everything on the laptop and get rid of the laptop

23  completely.

24  Q.   Okay.  You told the FBI that the reason that you wiped all

25  the data from the laptop was that your dad could use it for

1  work; right?

2  **A.**   I -- instead of going to throw away the laptop, I just had

3  given it to my dad because I know that he likes to use laptops.

4  And he didn't ask what was on it and he had cleaned it up.  I

5  said that it was really slow, so he just cleaned it up and

6  started using it.

7  **Q.**   But you told the FBI that the reason you did that was --

8  the reason that you deleted the data from your computer was

9  because you were going to give it to your dad; right?

10  **A.**   I -- well, yes, I was giving it to my dad.

11  **Q.**   Okay.  And he ended up not needing it after all; right?

12  **A.**   No, he couldn't use it because it was still super slow.

13  It was an older laptop.  He sometimes used it as, like, an

14  extra monitor, but...

15  **Q.**   All right.  We've talked a lot about Mr. Berhan.  You and

16  Mr. Berhan were civilly married in June of 2021; right?

17  **A.**   Yes.

18  **Q.**   Okay.  You wanted an official ceremony, a big wedding

19  instead; right?

20  **A.**   Yes.

21  **Q.**   All right.  And you felt that he pressured you to get

22  married early?

23  **A.**   Yes.

24  **Q.**   And you were very upset with him, I think, fair to say?

25  **A.**   Yes.

1    Q.    Okay.  You felt embarrassed?

2    A.    My entire family didn't know that I got married prior to

3    the wedding that we were supposed to have, yes.

4    Q.    And you felt that he caused you to disappoint your family?

5    A.    Yes.

6    Q.    Okay.  And then you each had separate -- you had a

7    bachelorette party and you -- and he had a bachelor party in

8    September of 2021; right?

9    A.    Yes.

10   Q.    And that was before you were going to do an official, big

11   wedding in October --

12   A.    Yes.

13   Q.    -- right?

14         The day he got back from the bachelor party, he

15   confessed that he had cheated on the trip; right?

16   A.    It was the day after, yes.

17   Q.    Okay.  And I'm sorry to have to go through this, Ms. Reed.

18         You immediately ended the relationship when you

19   learned of that; right?

20   A.    Yes.

21   Q.    All right.  And after you separated, you learned that

22   there were some platforms, some Internet platforms, that had

23   been created using your image and likeness, right, your name?

24   A.    Yes.

25   Q.    And you didn't authorize --

1    A.    No.

2    Q.    -- that to be used?

3          The sites said that they had explicit adult content on

4    them --

5    A.    Yes.

6    Q.    -- right?

7          Even though they didn't; right?

8    A.    Yes.

9    Q.    It caused you a lot of distress?

10   A.    During that time, my aunt had just died as well.  So it

11   was a lot for me.  It was a very emotional time.  She had

12   Stage IV breast cancer and died during her biopsy.  So it was

13   very abrupt for the family and having this come out, and it was

14   just a very hard time.  I was trying to stay strong for my

15   family, and it was just not a good time.

16   Q.    I'm sorry to hear that.  I'm sure it was a very difficult

17   time.

18         It caused you a lot of distress on top of everything?

19   A.    Yes.

20   Q.    Okay.  Fair to say you have pretty strong feelings about

21   Mr. Berhan today, I'll bet?

22   A.    No.  I don't want any -- I don't want any of this.

23   Q.    Uh-huh, okay.

24   A.    It's not a good feeling.

25   Q.    Okay.

1  **A.**   I'm not here willingly.  I'm here because I'm subpoenaed.

2  I don't want to be here.

3  **Q.**   I appreciate that.  I think we're almost done.

4       So you testified that you made a little more than

5  $11,000 taking courses for other people; right?

6  **A.**   I -- I can't remember.  It was somewhere between like 11-

7  to maybe like 12,000.

8  **Q.**   Okay.  And, again, I think you testified some people paid

9  you by cash; right?

10 **A.**   Yeah.  There were a couple, but it wasn't -- it was a

11 couple hundred dollars because those people, like, I only did

12 one or two courses for.

13 **Q.**   And some people paid you by Venmo; right?

14 **A.**   Yes.

15 **Q.**   Okay.  You didn't pay -- well, let me just ask you this:

16      And the Government let you keep all the money that you

17 had made?  They didn't require you pay it back or pay taxes on

18 it or anything like that?

19 **A.**   I -- at that time, no, I didn't pay taxes.  I didn't, no.

20 **Q.**   Okay.  And the Government since hasn't required you to pay

21 it back to anybody?

22 **A.**   It's not something that we have talked about, no.

23 **Q.**   Okay.  Very good.

24      Thank you, Ms. Reed.

25      **THE COURT:**  Any redirect?

1    **MS. SARGENT:**  Very limited, Your Honor.

2                    <u>REDIRECT EXAMINATION</u>

3    **BY MS. SARGENT:**

4    Q.    Are you okay?  Are you ready?  I want to give you time.

5    A.    Yeah.  No, I'm fine.

6    Q.    Ms. Reed, I believe you saw a text message from September

7    of 2018 yesterday that described your and Mr. Berhan having an

8    equal partnership at that time.

9    A.    Yes.

10   Q.    Were you still working at that time?

11   A.    Sorry, what year was it?

12   Q.    That was September 2018.

13   A.    Yes, I was working at that time.  But even when I was

14   working at that clinic, I was not making a lot of money.

15   Q.    It sounded like you had some thoughts yesterday about that

16   phrase "equal partnership."  Do you want to share those now?

17          **MR. CRUDO:**  Objection, Your Honor.

18          **THE COURT:**  Sustained.

19          Please just ask the questions.  Don't assert

20   information.  Thank you.

21   **BY MS. SARGENT:**

22   Q.    Ms. Reed, was your partnership equal at that time?

23   A.    No, it was not.

24   Q.    Can you explain that?

25   A.    During that time, our partnership, I was just -- I wasn't

1  a partner; I wasn't in the know of everything.  I think an

2  equal partner is someone you come home and you talk to.  I was

3  more of somebody who cleaned up the house, went to work, and

4  came home.  Like, it -- there was no equal partnership.  We

5  didn't have -- we didn't talk.  We didn't do anything.  It was

6  just kind of getting by through the day.

7       I don't -- we weren't best friends.  We weren't

8  anything.  I was just a partner that was there, like a live

9  body to kind of take care of the household things and just go

10  to work.  That was it.

11       **MS. SARGENT:**  No further questions, Your Honor.

12       **THE COURT:**  Mr. Crudo?

13       **MR. CRUDO:**  None from the Defense, Your Honor.

14       **THE COURT:**  Ladies and gentlemen, we're going to have

15  a brief -- I'm going to have a brief conference with counsel at

16  the sidebar, so you can stand if you want.  This is one of

17  those rare conferences.

18       Can I have counsel and the court reporter at sidebar?

19       (The following proceedings were heard at the sidebar:)

20       **THE COURT:**  So on the issue of the colloquy we had

21  just before the jury came in, actually I was looking at some

22  cases -- actually, before I called you over, and I won't get

23  into those at this moment because I didn't fully read those,

24  but it strikes me that one thing we could do at this point is

25  to basically just complete the record, to help the Court make a

1  decision on Mr. Crudo's request, is excuse the jury and allow

2  nonleading questions by the Government and even cross by

3  Mr. Crudo or a member of his team, of Ms. Reed with respect to

4  this issue about what caused her to -- because I think there's

5  a little bit of unfairness of both sides by virtue of the way

6  this evolved because I directed the Government to ask leading

7  questions.

8        And, I think, if we just put her on, I could ask her a

9  few questions about it myself and let the parties question her

10 in light of that and see and let you guys develop the record.

11       What I care about is -- one of the things I care about

12 is not just, okay, maybe she said something that was arguably

13 different in the grand jury or misleading here.  I want to get

14 to what her best current recollection is.

15       Because let's assume Mr. Crudo is right and she just

16 lied in the grand jury.  Well, the Government could have her

17 testify and then Mr. Crudo could cross-examine her on that and

18 her testimony would stand and the jury would either agree or

19 disagree or believe or disbelieve her.

20       So my thought is excuse the jury and ask her some

21 questions on my own and then have you guys -- so when I say

22 "guys," that's a pregnant term, but you folks examine her just

23 really to help complete the record.

24       **MR. CRUDO:**  Let me just object because I don't think

25 that's going to fix it.

1    You know, the Government asked those questions based

2  on the record that it had and there's no -- I think you have to

3  look at that record to determine if there was a basis to ask

4  that question, and there's not.

5    Our point is not that she lied in the grand jury.  We

6  think she was led into testimony that is not true based on a

7  leading question here, and so I don't think that's going to --

8  that's going to fix it.  We now have to go back and deal with

9  that mess.

10    So I appreciate the Court's position.  I guess we

11  would object to it, but that's our position.

12    **THE COURT:**  What's the Government's position?

13    **MS. SARGENT:**  Your Honor, if I may, you mentioned

14  inferences earlier versus specific statements within the prior

15  record.  The Government had ample evidence within the prior

16  record to draw an inference that -- this happened because of

17  the leading nature that the Government -- or that the Court

18  instructed the Government.  I was developing questions on the

19  fly.

20    And I do recognize the word "referred" in that

21  Mr. Crudo pointed out it was not directly.  I don't think that

22  that was directly something that has come prior, but the

23  inference was there and she did -- she qualified that second

24  response.  She said, "Yes, vaguely."

25    And so I don't think that -- although the questions

1    were leading at the Court's instruction, Ms. Reed had an

2    opportunity.  She showed in her responses that she was taking

3    them in and thinking about them and responding accordingly.

4          THE COURT:  All right.  So here's where we are now:

5    So we're going to continue with the case.  We'll continue with

6    getting the materials that the Government is going to submit to

7    support the -- give the basis for asking the questions and try

8    to draw a straight line to the questions.

9          MS. SARGENT:  I'm sorry.  Are you withdrawing your

10   suggestion that Ms. Reed testify?

11         THE COURT:  No.  What I --

12         MS. SARGENT:  Because we agree that that is a good

13   idea.

14         THE COURT:  Why?  Don't just say because I said it,

15   because I'm not at fault by any choice.

16         MS. SARGENT:  I do think that although -- I think I've

17   responded to Mr. Crudo's argument about our good faith basis,

18   but I think that it is important that the testimony be truthful

19   and that Ms. Reed not have been led.  So I believe that

20   developing the truth here as to her current recollection is an

21   important step.

22         THE COURT:  Okay.  So I intend to ask her -- if I did

23   this in a nonleading way, that the Court's interested in the

24   antecedent reasons for her destroying or deleting her iCloud

25   account.  And there's been some suggestion that there might be

1    other reasons.  Maybe the only reason was something other than

2    what she said.  So I'd like to really ask her about when she

3    answered that, to some extent the motivation for -- for

4    destroying -- for deleting her account was the CCU scheme was

5    the basis of that.

6          And, I mean, that's -- I mean, that's in a sort of

7    open-ended way.  You still have your point.  I'm still going

8    to ask for the materials, but I think that completes the

9    record.

10         Now, having said that, Mr. Crudo, if you object to it,

11   the record is clear that the Court is willing to try, to some

12   extent, to get to the bottom of this, of what the truth is or

13   whether there was some unfairness by having leading questions.

14         But if you are satisfied with the way the record is

15   now, it will reflect that I offered the opportunity to maybe

16   shed some more light on this.

17         **MR. CRUDO:**  But I think the problem is that idea has

18   now been planted in her head.  Okay?  It wasn't there before

19   the first time she said it, and the Court is going to look at

20   the record.

21         It is now in her head.  It is ringing in her ears from

22   yesterday.  The most recent thing she had is both -- she knows

23   what she said.  She has locked herself into that testimony, and

24   we're going to be here for a long time going through all of the

25   302s, going through the testimony.  She is going to dig in

1    further and further on an idea that was not in her head before

2    the Government put it there with a leading question.

3             And so I don't think -- and I -- I respect that

4    counsel has a different view of that.  The Court will look at

5    the 302s and the transcript of the grand jury and make its own

6    decision.

7             I don't think that's going to cure the problem.  I

8    think the issue was:  Was there a basis to ask that question?

9    And there was not.  So I think that's our position.  If the

10   Court would like to, you know, send the jury out for a while

11   and we can go through it, then obviously we can.

12            THE COURT:  Last word.

13            MS. SARGENT:  Your Honor, I would also just point out,

14   in cross-examination now, Mr. Crudo asked Ms. Reed about that

15   laptop.  The only thing anyone has ever heard about the

16   contents of that laptop is that it contained essays or exams --

17   or essays in particular about CCU.  And Ms. -- Ms. Reed

18   testified that Mr. Berhan instructed her to delete the contents

19   she kept on that basis.

20            THE COURT:  All right.  Well, in light of the

21   objection, I'm not going to ask her any more questions.  I

22   think the record stands as it does.  Both sides are either

23   stuck with it or blessed by it, depending on their position.

24            I will certainly look at the information presented by

25   the parties, but -- and I will take into account the fact of

1   how we got there, which is that the Defense was rightly

2   concerned about something coming out about the other case, the

3   alleged steroids issue, and we had to do it this way; and when

4   we asked the witness leading questions, she answered the

5   questions you asked.

6         So I'm going to take all that into account.  I'm also

7   going to take into account the concern and the objection by the

8   Defense with respect to trying to clear this up outside the

9   presence of the jury only on the issue of, you know, truth, but

10   I'm willing to leave it at that.

11         All right.  Thank you very much.

12         **MR. CRUDO:**  I appreciate it.

13         (The following proceedings were heard in open court:)

14         **THE COURT:**  All right.

15         **MS. SARGENT:**  Your Honor, with the Court's permission,

16   the Government excuses Ms. Reed.

17         **THE COURT:**  I'm sorry, the Government what?

18         **MS. SARGENT:**  The Government excuses Ms. Reed.

19         **THE COURT:**  All right.  You're excused, Ms. Reed.

20   Thank you very much.

21                 (Witness excused.)

22         **THE COURT:**  Next witness, please.

23         **MR. CHENG:**  Your Honor, the Government would now like

24   to read a stipulation of facts by the parties.

25         **THE COURT:**  Okay.  Toward that end, just one moment.

1  All right.  So, ladies and gentlemen, I told you at

2  one point -- at various points in the trial, when I was

3  instructing you that the statements of counsel are not evidence

4  because they were not witnesses to the events -- or using a

5  *Hamilton* analogy, "They were not in the room where it

6  happened," for those of you who saw *Hamilton*.  But there's an

7  exception.

8  Counsel is going to read a stipulation.  The

9  parties -- what a stipulation is, is that the parties, both

10  sides, have agreed to certain facts that will be stated to you

11  in the stipulation.  Please -- those facts in that stipulation

12  will now -- will then be conclusively proved.

13  So you may proceed.

14  **THE CLERK:**  Thank you, Your Honor.

15  It is hereby stipulated and agreed between the United

16  States of America and Defendant Morteza Amiri that the

17  following facts are true:

18  Morteza Amiri began employment with the City of

19  Antioch, Antioch Police Department, in or about 2017, and he

20  was employed as a police officer through at least on or about

21  August 18th, 2023.

22  Amanda Theodosy, a/k/a Nash, began employment with the

23  City of Pittsburg, Pittsburg Police Department, in or about

24  2015, and she was employed as a police officer through on or

25  about March 19th, 2022.

1    Amanda Theodosy, a/k/a Nash, was also employed at an

2  hourly rate by the City of Santa Clara, Santa Clara Police

3  Department, as an as-needed, per diem police officer for

4  special events between on or about October 5th, 2019, and on or

5  about March 18th, 2022.

6    And Amanda Theodosy, a/k/a Nash, began salaried

7  employment with the City of Santa Clara, Santa Clara Police

8  Department, as a police department -- excuse me -- as a police

9  officer lateral on or about March 21st, 2022, and she was

10  employed in this role through on or about September 13th, 2022.

11    Patrick Berhan began employment with the City of

12  Pittsburg, Pittsburg Police Department, in or about 2015 and he

13  was employed as a police officer through on or about June 28,

14  2022.

15    Samantha Peterson began employment with the City of

16  Antioch, Antioch Police Department, prior to 2017, and she was

17  employed as a community services officer through on or about

18  August 17th, 2023.

19    Ernesto Juan Mejia-Orozco began employment with the

20  City of Pittsburg, Pittsburg Police Department, in or about

21  2014, and he was employed as a police officer through on or

22  about June 20th, 2022.

23    **THE COURT:**  All right.  Next witness.

24    **MS. SARGENT:**  The Government calls Ruth Aracely

25  Rodriguez Azevedo.

1    (Ruth Aracely Rodriguez Azevedo steps forward to be

2    sworn.)

3                **RUTH ARACELY RODRIGUEZ AZEVEDO**,

4    called as a witness for the Government, having been duly sworn,

5    testified as follows:

6              **THE WITNESS:**  Yes.

7              **THE CLERK:**  Please be seated.

8              Please speak clearly into the microphone.

9              **THE WITNESS:**  Okay.

10              **THE CLERK:**  State your full name and spell your last

11    name for the record.

12              **THE WITNESS:**  Okay.  First name is Aracely, last name

13    A-Z-E-V-E-D-O.

14                          **DIRECT EXAMINATION**

15    BY MS. SARGENT:

16    **Q.**   Good morning.

17    **A.**   Good morning.

18    **Q.**   Ms. Azevedo, who is your employer?

19    **A.**   City of Santa Clara.

20    **Q.**   And what is your division within the City of Santa Clara?

21    **A.**   So I'm in the human resources department.

22    **Q.**   What's your title in the human resources department?

23    **A.**   I'm the director of human resources.

24    **Q.**   How long have you been employed at the City of Santa

25    Clara?

1    **A.**    Approximately five and a half years.

2    **Q.**    And as the director of human resources?

3    **A.**    Correct.

4    **Q.**    That entire time?

5    **A.**    Oh, no.  I apologize.  Assistant director for about a year

6    and a half and then promoted to director.

7    **Q.**    Okay.  What are your responsibilities as the director of

8    human resources?

9    **A.**    So I'm responsible for overseeing the functions of

10   Workers' Comp, safety, employee and labor relations -- we have

11   10 bargaining groups -- the recruiting and benefits and the

12   human resource information system.

13   **Q.**    So "recruiting," does that include hiring?

14   **A.**    Yes.

15   **Q.**    Okay.  In your capacity as the director of human resources

16   for the City of Santa Clara, did you locate and provide to the

17   Government certain hiring documents related to the Santa Clara

18   Police Department?

19   **A.**    I did, yes.

20   **Q.**    Specifically, did those records include two job

21   applications from Amanda Nash, also known as Amanda Theodosy,

22   and related job posting details?

23   **A.**    Yes.

24         **MS. SARGENT:**  I'd like to show the witness an exhibit

25   that has been marked, but not previously admitted, as

1    Exhibit 303.

2              THE COURT:  All right.

3              MS. SARGENT:  Can we scroll through the pages of this

4    document for the witness, please?

5              And then back to the beginning, please.

6    BY MS. SARGENT:

7    Q.   Ms. Azevedo, do you recognize this document?

8    A.   I do, yes.

9    Q.   What do you recognize it to be?

10   A.   So this is a job announcement for the position of

11   as-needed per diem police officer for special events.

12   Q.   And does this document, as we were scrolling through --

13   did it also include the application for Amanda Nash Theodosy

14   that you supplied to the Government?

15   A.   Yes.

16             MS. SARGENT:  Move to admit.

17             THE COURT:  Any objection?

18             MR. CRUDO:  No additional objections, Your Honor.

19             THE COURT:  Okay.  Subject to previous objections,

20   it's admitted.

21        (Trial Exhibit 303 received in evidence.)

22             MS. SARGENT:  Permission to publish.

23             THE COURT:  Yes, you may.

24   BY MS. SARGENT:

25   Q.   Let's turn to the second page of this document.

1          Ms. Azevedo, does this document contain certain

2    qualifications for per diem officers?

3    **A.**    Yes.

4    **Q.**    Are there any educational requirements?

5    **A.**    (Witness examines document.)  So there are none.

6    **Q.**    Okay.  Let's turn to page 5.

7          And for the record, Ms. Azevedo, is this the first

8    page of the job application?

9    **A.**    Yes.

10   **Q.**    Do you recognize this to be a typical job application

11   format?

12   **A.**    Yes.

13   **Q.**    Okay.  I see a faint number at the top, 4-20-16, next to

14   the words "as needed per diem police officer special events."

15          Does this application correspond to the job

16   description we just saw?

17   **A.**    Yes.

18   **Q.**    Now, shifting down the application, are the answers here,

19   in terms of your experience with Santa Clara job applications,

20   manually input by an applicant?

21   **A.**    Yes, they are.

22   **Q.**    Does that include the educational section?

23   **A.**    Yes.

24   **Q.**    How does Ms. Theodosy -- how did Ms. Theodosy here respond

25   to the question asking her for her highest level of education?

1    A.    So highest level of education would be high school, as far

2    as completion, but then she did list some college/university

3    coursework.  But when -- there is a question specifically "Did

4    you graduate," and she specified "No."

5    Q.    Okay.  And if we can get out of that box.

6          And specifically do you see under, "Personal

7    Information," that question, "What is your highest level of

8    education?"

9    A.    Yes.  She said "Yes" for high school.

10                         (Pause in proceedings.)

11   BY MS. SARGENT:

12   Q.    Do you see a response there?

13   A.    Oh, yeah.  Sorry.  I was looking at completion.

14   Q.    That's okay.

15         What's the response?

16   A.    "Some college."

17   Q.    Okay.  And going back out, does Ms. Theodosy also mention

18   California Coast University on this application?

19   A.    Yes, at the very top.

20   Q.    And what does she respond to the question "Did you

21   graduate?"

22   A.    "No."

23   Q.    Okay.

24         MS. SARGENT:  I now want to show the witness a

25   document that has been marked as Exhibit 40.

1    Can we page through this document so the witness can

2   see its contents?

3        **THE COURT:**  Yes.

4        **MS. SARGENT:**  Can we move back to the first page?

5   **BY MS. SARGENT:**

6   **Q.**   Ms. Azevedo, do you recognize this document?

7   **A.**   Yes.

8   **Q.**   What do you recognize it to be?

9   **A.**   So this is the job announcement for the position of police

10  officer lateral.  So it's a full-time budgeted position.

11  **Q.**   Was the first part of this document, this application for

12  lateral police officers, the same application that the

13  defendant in this case, Amanda Nash Theodosy, applied under?

14  **A.**   No.  She submitted a separate application for this

15  position.

16  **Q.**   I'm sorry.  Does this -- does this position, though,

17  correspond to that application?

18  **A.**   Oh.  So, yes.  Sorry.

19  **Q.**   Okay.  But that's not -- but that application is not in

20  this document; is that what you were saying?

21  **A.**   Correct.

22  **Q.**   Okay.

23  **A.**   Yes.

24       **MS. SARGENT:**  Move to admit.

25       **THE COURT:**  Objection?

1      MR. CRUDO:  No additional objections, Your Honor.

2      THE COURT:  Subject to previous objections, it's

3  admitted.

4      (Trial Exhibit 40 received in evidence.)

5      MS. SARGENT:  Permission to publish.

6      THE COURT:  Yes, you may.

7  BY MS. SARGENT:

8  Q.   Ms. Azevedo, can you read for the record the annual salary

9  of this position?

10  A.   So, yes.  It's $142,699.44 to $182,110.55.  It's a step

11  structure, so it's that range.

12  Q.   Okay.  Turning to the second page of the document, does

13  this document contain the qualifications for lateral police

14  officers?

15  A.   So, yes, under the minimum qualifications, there's an

16  education and experience section.

17  Q.   And what is the minimum educational experience

18  requirement?

19  A.   There's -- completion of 60 semester units or 90 quarter

20  units of academic-level coursework at an accredited college or

21  university with no experience required.

22  Q.   Okay.  So to be clear, is a bachelor's degree required for

23  this position?

24  A.   No.

25  Q.   Okay.  Turning to the fourth page of the lateral police

1    officer job requirements, I see a series of multiple choice

2    questions.  Can you read the first question for the record,

3    please?

4    A.    Yes.  (as read):

5              "Please indicate the highest level of education

6         that you have attained from an accredited college or

7         university."

8              And then the application would have had a drop-down

9    menu, and there's various options that the candidate can select

10   from.  And the options are:  Master's degree or higher,

11   bachelor's degree, associate's degree, at least 60 semester or

12   90 quarter units, at least 30 semester or 45 quarter units,

13   high school diploma, or GED, or the last option is none.

14   Q.    Okay.

15         MS. SARGENT:  Turning to a new document, I'd like to

16   show the witness a document that has been marked as Exhibit 41.

17         THE COURT:  All right.

18         MS. SARGENT:  And can we please page through it so the

19   witness can see the full document?

20         Back to the first page, please.

21   BY MS. SARGENT:

22   Q.    Ms. Azevedo, do you recognize this document?

23   A.    Yes.

24   Q.    What do you recognize it to be?

25   A.    This is the application that Amanda Nash submitted.

1        MS. SARGENT:  Okay.  Move to admit.

2        MR. CRUDO:  No additional objections, Your Honor.

3        THE COURT:  Subject to the previous objection, it's

4   admitted.

5        (Trial Exhibit 41 received in evidence.)

6        MS. SARGENT:  Okay.  Permission to publish.

7        THE COURT:  Yes.

8   BY MS. SARGENT:

9   Q.   The date at the top left, Ms. Azevedo, what does that

10  signify?

11  A.   So that was a date that it was submitted into the

12  applicant tracking system.  So NEOGOV is the platform we use

13  for applicants to apply.

14  Q.   Okay.  And as with the last application, are each of the

15  responses on this form generated by the applicant?

16  A.   Yes.

17  Q.   Okay.  How are the educational details input?

18  A.   So the applicant has to make the selection; and in this

19  case, she has to enter the information for each college or

20  university that she attended.

21  Q.   Okay.  On the first page, where we were looking at before,

22  under "Personal Information," what does Ms. Nash respond to the

23  question "What is your highest level of education?"

24  A.   "Bachelor's degree."

25  Q.   Okay.  Below that, can you read for the record the topmost

1  entry under "Education"?

2  **A.**   So, yes.  For college and university, she entered

3  "California Coast University from the period of 6/2018 to

4  6/2020, which is located in Santa Ana."

5      She specified that she obtained -- did graduate with a

6  degree in criminal justice, and she completed 27 semester units

7  and obtained a bachelor's degree.

8  **Q.**   Okay.  Thank you.

9      Now let's look at page 4.

10     At the bottom I see a section called "Supplemental

11 Questions."  Ms. Azevedo, does Question 1 correspond to the

12 question in the application that we discussed previously?

13 **A.**   So, yes, she would have had to enter this information as

14 well.

15 **Q.**   Okay.  And is that via that drop-down you discussed?

16 **A.**   Correct.

17 **Q.**   And for the record, what was Ms. Nash Theodosy's response

18 to this question?

19 **A.**   So bachelor's degree for Question 1.

20     **MS. SARGENT:**  No further questions for this witness.

21     **THE COURT:**  Thank you.

22     **MR. CRUDO:**  Nothing from the Defense, Your Honor.

23     **THE COURT:**  Thank you.

24     You are excused.  Thank you very much.

25          (Witness excused.)

1          THE COURT:  Call your next witness, please.

2          MR. KRISHNAMURTHY:  The Government calls Tim Jung.

3       (Tim Jung steps forward to be sworn.)

4          THE CLERK:  Sir, if you could please step on the stand

5    for me.

6          Please raise your right hand.

7                          TIM JUNG,

8    called as a witness for the Government, having been duly sworn,

9    testified as follows:

10         THE WITNESS:  I do.

11         THE CLERK:  Please put your hand down and take a seat.

12         If you could please state your full name and spell

13   your last name for the record.

14         THE WITNESS:  Tim Jung, J-U-N-G.

15         THE COURT:  Before we get started, I need to take a

16   phone call, so we're going to need to take a short recess, like

17   10 minutes.  So take 10-minute break, bio-break, whatever, and

18   we'll come back in 10 minutes so I can do this call, which is

19   important, and we'll continue.  Thank you.

20                  (The jury leaves the courtroom.)

21                  (Recess taken at 9:03 a.m.)

22                  (Proceedings resumed at 9:14 a.m.)

23         THE CLERK:  All rise.

24                  (The jury enters the courtroom.)

25       (Proceedings were heard in the presence of the jury.)

1    THE CLERK:  Please be seated.

2              (Pause in proceedings.)

3    THE CLERK:  Please remain seated.  Come to order.

4  Court is back in session.

5    THE COURT:  You may proceed.  Thank you for your

6  forbearance, ladies and gentlemen.

7    Go ahead.

8                    **DIRECT EXAMINATION**

9  BY MR. KRISHNAMURTHY:

10  Q.   Good morning, Mr. Jung.

11  A.   Good morning.

12  Q.   How are you currently employed?

13  A.   I am a senior inspector with the Contra Costa District

14  Attorney's Office.

15  Q.   How long have you held that position?

16  A.   Since 2012.

17  Q.   What are your current responsibilities?

18  A.   Cellular phone extractions.  I'm in charge of our wiretap

19  program for your county and for the task force that I work at.

20  And I have a bunch of other administrative duties as well.

21  Q.   You mentioned cellular phone extraction?

22  A.   Yes.

23  Q.   Can you explain what that entails?

24  A.   I basically have forensic tools where I can hook a cell

25  phone up to which extracts data, converts it into user-friendly

1  reports for investigative purposes.

2  Q.  Through the course of your work, have you become familiar

3  with some of those forensic extraction tools that you just

4  mentioned?

5  A.  Yes.

6  Q.  Can you name the tools that you are familiar with?

7  A.  There's a bunch.  I use Cellebrite, Graykey.  There are

8  some other data analysis programs that are out there.  There's

9  actually tons of them out there.

10  Q.  So you mentioned both Cellebrite and Graykey?

11  A.  Yes.

12  Q.  Do you routinely use both programs?

13  A.  Yes.

14  Q.  Have you received any certifications for either of these

15  tools?

16  A.  Yes.  Back in 2014, I took a -- I think it's a 36- or

17  38-hour class put on through Cellebrite.  It's a basic course.

18  It teaches you how to use their equipment.

19  Q.  Turning your attention to March 23rd, 2022, were you

20  involved in the execution of a search warrant?

21  A.  Yes.

22  Q.  Where?

23  A.  Down in San Jose.

24  Q.  And through the execution of that search warrant, were you

25  involved in seizing a cellular phone?

1    A.    Yes.

2    Q.    Did you personally seize the cellular phone?

3    A.    Yes.

4    Q.    From who?

5    A.    Ernesto Mejia.

6    Q.    Do you recall what kind of device you seized?

7    A.    I believe it was an iPhone.

8    Q.    And did Mr. Mejia provide you with a password?

9    A.    Yes.

10   Q.    I'm going to hand you what's previously been marked as

11   Exhibit 91.

12         **MR. KRISHNAMURTHY:**  Permission to approach.

13         **THE COURT:**  Yes, you may.

14              (Counsel approaches witness.)

15   BY MR. KRISHNAMURTHY:

16   Q.    And, Mr. Jung, I'll ask you to take a look at the label on

17   the top of that envelope.

18   A.    (Witness examines envelope.)

19   Q.    Do you recognize this?

20   A.    Yes.

21   Q.    What is it?

22   A.    It's a manila envelope.  It's got an evidence label on the

23   front.  It has my writing on it, which I filled out when I

24   packaged this phone up.

25   Q.    And you say this is the phone that you seized from

1    Mr. Mejia?

2    **A.**    Yes.

3    **Q.**    Okay.  Can you please open the envelope?

4    **A.**    Do you mind where I cut it?  Does it matter?

5            **THE COURT:**  You may.

6    **BY MR. KRISHNAMURTHY:**

7    **Q.**    Do you recognize this as the cellular phone that you

8    seized?

9    **A.**    Yes.

10           **MR. KRISHNAMURTHY:**  Your Honor, I move to admit

11   Exhibit 91.

12           **THE COURT:**  Any objection?

13           **MR. HAMILTON:**  Oliver Hamilton on behalf of the

14   defendant.

15           No additional objections, Your Honor.

16           **THE COURT:**  Thank you very much.  Thanks for

17   reintroducing yourself.

18           It's admitted.

19       (Trial Exhibit 91 received in evidence.)

20   **BY MR. KRISHNAMURTHY:**

21   **Q.**    Mr. Jung, did you play any further role in executing the

22   search warrant?

23   **A.**    I did the physical extraction of the data from the

24   handset.

25   **Q.**    Can you explain what that means?

1  A.   So I basically took this cellular phone, hooked it up to a

2  Graykey machine, Which extracts the raw data from -- from the

3  handset.   And then from there, I took that raw data, put it

4  into a Cellebrite program, which parses out the data, puts it

5  into a user-friendly report that can be accessed and viewed by

6  an investigator.

7  Q.   When you performed the extraction, did Graykey and

8  Cellebrite extract device identifying information such as the

9  owner of the device?

10  A.   Yes.

11  Q.   Do you recall what the owner of the device was?

12  A.   Neto Orozco.   I think that's what it was labeled.

13  Q.   Did -- when you also did the extraction, did Graykey also

14  subtract a UDID, or a unique device identifier?

15  A.   Yes.

16  Q.   I'd like to show you what's been marked but not previously

17  admitted as Exhibit 84.

18        Permission to approach.

19        THE COURT:  Yes, you may.

20              (Counsel approaches witness.)

21  BY MR. KRISHNAMURTHY:

22  Q.   Mr. Jung, have you seen this document before?

23  A.   Yes.

24  Q.   What is it?

25  A.   It looks like a printout of text messages.

1  Q.    Are you familiar with the tool that generated this

2  excerpt?

3  A.    Yes.

4  Q.    Does the excerpt identify the owner of the device from

5  which it came?

6  A.    Yes.

7  Q.    And what is the owner of the device?

8  A.    It looks like neto_orozco@yahoo.com.

9  Q.    Is that the same owner you referenced earlier?

10 A.    Yes.

11 Q.    And does each message include a unique device identifier

12 at the bottom?

13 A.    Yes.

14 Q.    And in anticipation of your testimony, have you compared

15 the unique device identifier for each of these messages to the

16 unique device identifier that was generated at the time of your

17 extraction?

18 A.    Yes.

19 Q.    Are the device identifiers the same?

20 A.    Yes.

21        MR. KRISHNAMURTHY:  Your Honor, I move to admit and

22 briefly publish Exhibit 84.

23        THE COURT:  Subject to the previous objection, any

24 further objection?

25        MR. HAMILTON:  No additional objections.

1    THE COURT:  All right.  Admitted.

2        (Trial Exhibit 84 received in evidence.)

3        MR. KRISHNAMURTHY:  And permission to publish.

4        THE COURT:  Yes, you may.

5        MR. KRISHNAMURTHY:  Could we just highlight the top,

6    under "Participants," please.

7    BY MR. KRISHNAMURTHY:

8    Q.   And can you please read for the record the participants in

9    this excerpt?

10   A.   Read the what?

11   Q.   The participants.  So who's listed?

12   A.   Well, myberhan and neto orozco with some other dollar sign

13   stuff underneath that.

14   Q.   Thank you very much.

15       And if we could highlight both the messages at the

16   bottom.

17       Do the messages show who the participants in the

18   conversation are?

19   A.   Neto Orozco and Berhan.

20   Q.   Thank you very much.

21       MR. KRISHNAMURTHY:  No additional questions.

22       THE COURT:  All right.  Thank you.

23       MR. HAMILTON:  Nothing from the Defense, Your Honor.

24       THE COURT:  Thank you very much.

25       You're excused, sir.  Thank you very much.  You may

1  leave the exhibits there and we'll take care of them.  Thank

2  you.

3            THE WITNESS:  Thank you.

4                      (Witness excused.)

5            THE COURT:  Next witness, please.

6            MR. CHENG:  Your Honor, the Government has additional

7  factual stipulations to read into the record.

8            THE COURT:  Okay.  Please do.  Just let the witness

9  clear out.

10                     (Pause in proceedings.)

11           MR. CHENG:  Your Honor, may I proceed with the factual

12  stipulations?

13           THE COURT:  Yes, you may.  Thank you.

14           MR. CHENG:  Thank you, Your Honor.

15           It is hereby stipulated and agreed by the

16  United States of America and Defendant Morteza Amiri that each

17  of the following transactions involved a wire communication

18  transmitted in interstate commerce as defined by Title 18 of

19  the United States Code, Section 1343, and further, that each

20  wire communication involved a communication between the

21  Northern District of California and another state; and,

22  therefore, each constitutes an interstate communication that

23  traveled in interstate commerce:

24           Regarding Patrick James Berhan, on December 22nd,

25  2020, a wire of $2,400 payment to California Coast University

**PROCEEDINGS**

1    using Capital One Visa Signature card ending in 8234.

2           Regarding Morteza Amiri, on February 18th, 2020, a

3    wire of $250 payment to Savannah Reed using Venmo.

4           Regarding Amanda Theodosy, a/k/a Nash, on May 27th,

5    2020, a wire of $230 payment to Savannah Reed using Venmo.

6           Regarding Samantha Peterson, on December 17th, 2020, a

7    wire of $275 payment to Savannah Reed using Venmo.

8           Regarding Ernesto Mejia-Orozco, on January 13th, 2022,

9    a wire of a $100 payment to California Coast University using

10   Bank of America Visa card ending in 3015.

11          And regarding Brauli Rodriguez Jalapa, on May 8th,

12   2021, a wire of $12,130 payment to California Coast University

13   using Capital One Visa card ending in 0215.

14          **THE COURT:**  All right.  Next witness, please.

15          **MR. CHENG:**  Your Honor, the Government calls Special

16   Agent Thuy Zoback.

17          **THE COURT:**  All right.

18      (Thuy Zoback steps forward to be sworn.)

19          **THE CLERK:**  Please raise your right hand.

20                       **THUY ZOBACK**,

21   called as a witness for the Government, having been duly sworn,

22   testified as follows:

23          **THE WITNESS:**  I do.

24          **THE CLERK:**  Please be seated.

25          State your full name for the record and spell your

1  last name.

2          **THE WITNESS:**  My name is Thuy Zoback.  Excuse me.

3  Last name is spelled Z-O-B-A-C-K.

4          **THE COURT:**  Proceed.

5          **MR. CHENG:**  Thank you, Your Honor.

6                      **DIRECT EXAMINATION**

7  BY THE CLERK:

8  **Q.**  Good morning, Agent Zoback.

9  **A.**  Good morning.

10  **Q.**  How are you employed?

11  **A.**  I am a special agent with the FBI out of the San Francisco

12  division.

13  **Q.**  Do you have a current assignment with the San Francisco

14  division?

15  **A.**  Yes.  I work on a squad that investigates narcotics

16  trafficking, gun-related crimes, gang-related crimes, and major

17  violence offenses that rise to the level of federal offenses in

18  the Contra Costa County area.

19  **Q.**  Is there a type of work that you're particularly assigned

20  to focus on?

21  **A.**  Yes.  Within that squad, I work on a federal task force

22  called the Transnational Organized Crime Task Force, and pretty

23  much for my whole career I've worked on local task forces that

24  dealt with narcotics trafficking in the Contra Costa County

25  area.

1    Q.   Can you briefly describe what a task force is?

2    A.   Yes.  A task force is a group of local or state officers

3    and/or federal agents, or a combination of some of those, that

4    come together as a team to investigate specific crimes that may

5    be plaguing the area.

6    Q.   And when you reference "local law enforcement," do you

7    mean agencies like city police departments?

8    A.   Yes, police officers, detectives, deputies.

9    Q.   How long have you held this particular assignment?

10   A.   Over a dozen years.

11   Q.   How were you employed before you joined the FBI?

12   A.   Well, after my schooling, I worked for the Department of

13   Defense in a forensic toxicology laboratory, I worked for a

14   pharmaceutical company, and I worked for -- as a police officer

15   for the Santa Clara Police Department.

16   Q.   How long were you employed by the Santa Clara Police

17   Department?

18   A.   Under two years.

19   Q.   And what was your role there?

20   A.   Police officer.

21   Q.   You also mentioned schooling.  Can you briefly describe

22   what your educational background is?

23   A.   I have a Bachelor's of Science degree in biochemistry and

24   a master's degree in forensic toxicology.

25   Q.   Are you familiar with the defendant, Mr. Morteza Amiri?

1    A.    Yes, I am.

2    Q.    Have you been working on an investigation involving the

3    defendant?

4    A.    Yes.

5    Q.    And what has been your role in the investigation?

6    A.    I am one of the case agents in the investigation.

7    Q.    Can you briefly describe what a case agent is?

8    A.    A case agent is a special agent who kind of runs the case,

9    is in charge of the case.  There's sometimes more than one.

10   Q.    And have you been working on this case for a couple of

11   years?

12   A.    Yes.

13   Q.    Have you been reviewing financial, business, and other

14   types of records as part of this investigation?

15   A.    Yes.

16   Q.    Let's talk about some of those records.

17         So, first, I'd like to show you what's been previously

18   admitted as Exhibit 100.

19         Now, Agent Zoback, you've been present during the

20   testimony of other witnesses in this trial; correct?

21   A.    Yes, I have.

22   Q.    You were in the courtroom during the testimony of

23   Ms. Savannah Reed?

24   A.    Yes.

25   Q.    And do you recall her testimony about printouts that she

1   captured from her Venmo account?

2   A.   Yes.

3   Q.   You can take that down.

4        Now, did you separately request and receive records

5   directly for Venmo as part of this investigation?

6   A.   Yes.

7   Q.   And can you briefly describe, what is Venmo?

8   A.   Venmo is a payment app where you can send and receive

9   money using your bank account.

10  Q.   And did the financial records from Venmo come from another

11  company?

12  A.   Yes.

13  Q.   And what was that?

14  A.   PayPal.

15  Q.   And what's your understanding of how PayPal is related to

16  Venmo?

17  A.   I believe Venmo was acquired by PayPal at some point.

18  Q.   So now I'd like to show you what's been previously marked

19  but not yet admitted, Exhibit 104.

20       MR. CHENG:   May I approach, Your Honor?

21       THE COURT:   Yes, you may.

22            (Counsel approaches witness.)

23  BY MR. CHENG:

24  Q.   Agent Zoback, did you receive financial records for the

25  defendant, Mr. Amiri's, account from PayPal?

1    **A.**    Yes.

2    **Q.**    Please turn to what's been marked as Exhibit 104 in the

3    binder in front of you.  It's also available on the screen

4    before you.

5          Do you recognize this spreadsheet?

6    **A.**    Yes.

7    **Q.**    What is it?

8    **A.**    It's a spreadsheet provided by PayPal regarding

9    Mr. Amiri's Venmo account.

10   **Q.**    And if you page through the first few pages, does it

11   provide identifiers for the defendant?

12   **A.**    Yes.

13   **Q.**    What kinds of identifiers?

14   **A.**    Name, date of birth, phone number, e-mail.

15   **Q.**    Do those items that you just described -- do they match

16   identifiers you've confirmed for the defendant, Mr. Amiri, over

17   the course of this investigation?

18   **A.**    Yes.

19         **MR. CHENG:**  Your Honor, the Government moves to admit

20   Exhibit 104.

21         **THE COURT:**  Any objection?

22         **MR. CRUDO:**  No further objections, Your Honor.

23         **THE COURT:**  Subject to the previous objections, which

24   are overruled, it's admitted.

25         (Trial Exhibit 104 received in evidence.)

1        **MR. CHENG:**  May we publish?

2        **THE COURT:**  Yes, you may.

3   BY MR. CHENG:

4   Q.   I'd like to turn your attention to page 16.

5        Can you briefly describe what we're seeing, beginning

6   on page 16?

7   A.   It's a list of Venmo transactions from Mr. Amiri's

8   account.

9   Q.   Have you compared these Venmo records produced by PayPal

10  to those printouts that we just looked at as provided by

11  Ms. Reed?

12  A.   Yes.

13  Q.   And did the information contained in those printouts --

14  were those also reflected in these Venmo records?

15  A.   Yes, they were.

16  Q.   Now, did you also receive financial records for

17  Ms. Savannah Reed from PayPal as part of this investigation?

18  A.   Yes.

19  Q.   Can you please -- and we can take down Exhibit 104.

20       Can you please turn to Exhibit 105 in your binder,

21  which is previously marked but not yet admitted?

22       Do you recognize Exhibit 105, the spreadsheet?

23  A.   Yes.

24  Q.   What is it?

25  A.   It's the Venmo transactions and account information for

1  Savannah Reed.

2  **Q.**   Can you please page through the first seven or so pages?

3  **A.**   (Witness examines document.)

4       **MR. CHENG:**  Before this exhibit is admitted, can we

5  take it off publishing, please?

6       **THE CLERK:**  Yeah.

7       **MR. CHENG:**  Thank you.

8  **BY MR. CHENG:**

9  **Q.**   Agent Zoback, in the first few pages, does this also

10  provide identifiers for Savannah Reed's Venmo account?

11  **A.**   Yes.

12  **Q.**   And what opportunities of identifiers are those?

13  **A.**   Her name, phone number, e-mail address.

14  **Q.**   Do those match identifiers you have confirmed for Ms. Reed

15  over the course of this investigation?

16  **A.**   Yes.

17       **MR. CHENG:**  Your Honor, the Government moves to admit

18  Exhibit Number 105.

19       **MR. CRUDO:**  No additional objections, Your Honor.

20       **THE COURT:**  Subject to the previous objections, which

21  are overruled, it's admitted.

22       (Trial Exhibit 105 received in evidence.)

23       **MR. CHENG:**  May we publish?

24       **THE COURT:**  Yes, you may.

25  \\\

BY MR. CHENG:

Q.    Can you please now turn to page 14?

         Again, can you briefly describe what we're looking at,

beginning on page 14?

A.    Sure.  These are Venmo transactions for Ms. Reed.

Q.    And have you likewise compared these Venmo records

produced by PayPal to the Venmo printouts that were provided by

Ms. Savannah Reed?

A.    Yes.

Q.    Did the information contained in those printouts -- did

they match up with these Venmo financial records?

A.    Yes.

Q.    Let's go through an example.  If we could please turn back

to previously admitted Exhibit 100, the Venmo printouts from

Ms. Reed.

         Can you identify for us what's shown on pages 1 and 2

of Exhibit 100?

A.    It appears to be three Venmo transactions between

Mr. Amiri and Ms. Reed on -- from January 16th, 2020.

Q.    What are the amounts of those transactions?

A.    One amount is $250, one is $100, and the last is $150.

Q.    Okay.  And what were the memos provided for those three

transactions?

A.    There's a memo on the first page that says "School."

Q.    I'm sorry.  What is provided under the notation for each

1    transaction?

2    A.    The one for $250 has a bag with a money sign icon, same

3    for the one for $100, and the memo for the $150 transaction

4    says "Discounted rate."

5    Q.    Okay.  So now let's turn back to Exhibit 105 and page 14.

6          Now, were you able to review these Venmo records and

7    identify where those transactions that we just identified in

8    Exhibit 100 -- where they fall in these Venmo records?

9    A.    Yes.

10   Q.    And just for clarification of what we're looking at here,

11   does a single transaction span multiple pages of this

12   spreadsheet as printed?

13   A.    Yes.

14   Q.    Please turn to page 71.

15         Can you identify the transactions you previously

16   testified about in this printout?

17   A.    Yes.

18   Q.    Can you point them out for the jury, please?

19   A.    If you look in the first column, there's a bunch of

20   numbers.  So the three transactions are Number 261, 262, and

21   263.

22   Q.    And for these transactions, can you just point out what is

23   specified under the "Notes" column and what's under the

24   "Counterparty" column?

25   A.    Under the "Notes" column, in orders, a bag -- a bag with

1    the dollar sign on it, the words "Discounted rate," and another

2    bag with the money sign on it, and all three, under

3    "Counterparty Name" it says "Morteza Amiri."

4    Q.    What's your understanding of what "counterparty" is in

5    reference to?

6    A.    Counterparty is the other end of the transaction -- the

7    person on the other end of the transaction with Ms. Reed.

8    Q.    Okay.  Now, on this page, are the amounts of these

9    transactions provided?

10   A.    Yes.

11   Q.    I'm sorry, on this exact page.

12   A.    No, not on this page.

13   Q.    Okay.  And is that elsewhere in the spreadsheet as

14   printed?

15   A.    Yes.

16   Q.    Can you flip now to page 19?

17   A.    (Witness examines document.)

18   Q.    Are you there?

19   A.    Yes.

20   Q.    Can you again identify the continuation of these

21   transactions on this page?

22   A.    Yes.  It's hard to read; but if you look at the first

23   column again, columns 261, 262, and 263 show the amounts $250,

24   $150, and 100 U.S. dollars.

25   Q.    And just so it's clear for the jury, what columns are you

1  referring to for those data points?

2  **A.**    Column O.

3  **Q.**    And does it also provide the date and time for these

4  transactions?

5  **A.**    Yes.  They're all on 1/16/2020.

6  **Q.**    And that's under Column I?

7  **A.**    Yes.

8  **Q.**    Okay.  Approximately how many transactions are included on

9  this spreadsheet?

10  **A.**    Total?

11  **Q.**    Yes.

12  **A.**    Over a thousand.

13  **Q.**    So now I'd like to show you what's been marked but not

14  previously admitted as Exhibit 110.

15  **A.**    (Witness examines document.)

16  **Q.**    Are you there?

17  **A.**    Yes.

18  **Q.**    Okay.  So, Agent Zoback, during the course of this

19  investigation, did you narrow Ms. Reed's transactions in these

20  Venmo records to those between her and certain officers?

21  **A.**    Yes.

22  **Q.**    And who were those officers?

23  **A.**    It was Morteza Amiri, Amanda Theodosy, and Samantha

24  Peterson.

25  **Q.**    Okay.  And I saw you flipping in the document.  Can you

1  turn to page 4?

2  A.   Yup.

3  Q.   Okay.  We're there.

4       Does this also narrow the number of columns for the

5  transactions so they fit on one page?

6  A.   Yes.

7  Q.   And does Exhibit 110 provide an accurate summary of

8  Ms. Reed's Venmo transactions with Mr. Amiri, Ms. Theodosy

9  Nash, and Ms. Peterson in about one page?

10 A.   Yes.

11      MR. CHENG:  Your Honor, the Government moves to admit

12 Exhibit 110.

13      MR. CRUDO:  No additional objections, Your Honor.

14      THE COURT:  All right.  Subject to the previous

15 objections, which are overruled, it's admitted.

16      (Trial Exhibit 110 received in evidence.)

17      MR. CHENG:  May we publish?

18      THE COURT:  Yes.

19 BY MR. CHENG:

20 Q.   And, Agent Zoback, what we're looking at right now on

21 page 4, this is the one pager you were just referring to; is

22 that right?

23 A.   That's correct.

24 Q.   Can we enlarge the bottom half of the page or so?

25      Now, when do a number of Venmo transactions occur

1    between Ms. Reed and Ms. Theodosy?

2    **A.**    They begin around May of 2020.

3    **Q.**    And when do they continue through?

4    **A.**    So the majority of the transactions run from May 5th,

5    2020, until June 17th, 2020.

6    **Q.**    And during that time period, how many transactions are

7    there?

8    **A.**    Nine.

9    **Q.**    So let's talk further about Ms. Theodosy Nash.

10            Were you here during the testimony of former Pittsburg

11   Police Department Captain Patrick Wentz?

12   **A.**    Yes.

13   **Q.**    And do you recall his testimony about personnel action

14   forms at PPD?

15   **A.**    Yes.

16   **Q.**    In the course of this verification, did you receive

17   additional records from the Pittsburg Police Department

18   regarding Ms. Theodosy Nash?

19   **A.**    Yes.

20   **Q.**    So we can take this down for a moment.

21            I'd like to show you what's previously been marked but

22   not admitted, Exhibit 17.

23            **MR. CHENG:**  May I approach, Your Honor?

24            **THE COURT:**  Yes.

25   \\\

1    BY MR. CHENG:

2    Q.    Please turn to what's been marked as Exhibit 17,

3    Agent Zoback.

4    A.    (Witness examines document.)  All right.

5    Q.    Do you recognize this document?

6    A.    Yes.

7    Q.    What is it?

8    A.    It's a personnel action for Amanda Nash.

9    Q.    And what agency is it provided by?

10   A.    The Pittsburg Police Department.

11          MR. CHENG:  Your Honor, the Government moves to admit

12   Exhibit 17.

13          THE COURT:  Objections?

14          MR. CRUDO:  No additional objections, Your Honor.

15          THE COURT:  All right.  Subject to the previous

16   objections, which are overruled, it's admitted.

17      (Trial Exhibit 17 received in evidence.)

18          MR. CHENG:  May I publish?

19          THE COURT:  Yes.

20   BY MR. CHENG:

21   Q.    Agent Zoback, are -- what type of document are we looking

22   at here?

23   A.    It's an incentive, change in salary due to an incentive.

24   Q.    And it's labeled as a personnel action form; is that

25   right?

1   A.   Yes.

2   Q.   Does it provide a signature by a department head?

3   A.   Yes.

4   Q.   And when was the date of that?

5   A.   The date of the signature was July 2nd, 2020.  Effective

6   date for this form is June 28th, 2020.

7   Q.   And does the form provide certain remarks about the

8   action?

9   A.   Yes.

10   Q.   And what are those remarks?

11   A.   It's the start of an additional 5 percent of the base pay

12   for a bachelor's degree.

13   Q.   And, again, effective when?

14   A.   Effective June 28th, 2020.

15   Q.   Now, does the form refer to attachments?

16   A.   Yes.

17   Q.   Let's turn to page 2.

18        Do you recognize what's attached as page 2?

19   A.   Yes.

20   Q.   What is this?

21   A.   It is a California Coast University transcript for Amanda

22   Carmella Nash.

23   Q.   And when was the degree awarded?

24   A.   June 17th, 2020.

25   Q.   And can you see when the last course was completed as

1   well?

2   **A.**   Yes.  Same day, June 17th, 2020.

3   **Q.**   Is that about two weeks of this personnel action form on

4   the previous page being signed?

5   **A.**   Yes.

6   **Q.**   And if you remain on page 2, does it show how many classes

7   were marked completed between that May to June 2020 time frame

8   that we just discussed?

9   **A.**   Nine.

10  **Q.**   Is that the same number as the number of Venmo

11  transactions you just identified from Exhibit 110?

12  **A.**   Yes.

13  **Q.**   And let's briefly turn back to Exhibit 110, which is

14  previously admitted, to page 4.

15          And could we blow up the transactions in that bottom

16  half of the page again?

17          Agent Zoback, what was the last -- what was the date

18  of the last of those nine Venmo transactions?

19  **A.**   June 17th, 2020.

20  **Q.**   And is that the same date that Ms. Theodosy Nash was

21  awarded the degree?

22  **A.**   Yes.

23  **Q.**   How much was that transaction for?

24  **A.**   It was for $300 and there was a note with a champagne

25  bottle icon.

1  **Q.**   Now we can set that aside.

2       Did you receive additional records from California

3  Coast University regarding Ms. Theodosy Nash?

4  **A.**   Yes.

5  **Q.**   I'd like to turn your attention to what's marked as

6  Exhibit 60.

7          **MR. CHENG:**  May I approach, Your Honor?

8          **THE COURT:**  Yes, you may.

9  BY MR. CHENG:

10 **Q.**   Agent Zoback, do you recognize Exhibit 60?

11 **A.**   Yes.

12 **Q.**   What is it?

13 **A.**   It is a list of courses that Amanda Nash took, including

14 the completion dates and a proctor name if a proctor was

15 required.

16         **MR. CHENG:**  Your Honor, the Government moves to admit

17 Exhibit 60.

18         **MR. CRUDO:**  No additional objections, Your Honor.

19         **THE COURT:**  All right.  Subject to the previous

20 objections, which are overruled, it's admitted.

21     (Trial Exhibit 60 received in evidence.)

22         **MR. CHENG:**  May we publish?

23         **THE COURT:**  Yes, you may.

24 BY MR. CHENG:

25 **Q.**   Now, Agent Zoback, does this document identify a proctor

1    for Ms. Theodosy Nash for those courses we just discussed

2    between May and June of 2020?

3    A.    Yes.

4    Q.    And who is identified as the proctor?

5    A.    Tricia DiLorenzo.

6    Q.    And during the testimony of Ms. Reed, was who --

7    Ms. DiLorenzo identified?

8    A.    She was a neighbor at one point of Ms. Reed's, and she was

9    the wife of Pittsburg Police Officer Jonathan Elmore.

10   Q.    Turning now to additional materials from the Pittsburg

11   Police Department, did you also receive other personnel files

12   from Pittsburg regarding Ms. Theodosy Nash?

13   A.    Yes.

14   Q.    Can you turn to what's been marked as Exhibit 18, please?

15   A.    (Witness examines document.)

16   Q.    Do you recognize Exhibit 18?

17   A.    Yes.

18   Q.    And what is it?

19   A.    It's a list of tuition reimbursements received from

20   Amanda Nash.  This was provided by the Pittsburg Police

21   Department.

22         MR. CHENG:  Your Honor, the Government moves to admit

23   Exhibit 18.

24         MR. CRUDO:  No additional objections, Your Honor.

25         THE COURT:  Subject to the previous objection, which

1    is overruled, it's admitted.

2        (Trial Exhibit 18 received in evidence.)

3            **MR. CHENG:**  Your Honor, may we publish?

4            **THE COURT:**  Yes, you may.

5    **BY MR. CHENG:**

6    **Q.**   And, Agent Zoback, can you just briefly walk us through

7    what we're looking at in Exhibit 18?

8    **A.**   It's three lines, three different dates, with

9    Amanda Nash's name, Cal -- CA Coast, and a list of some college

10   courses and the amounts.

11   **Q.**   And you understand that those amounts are reimbursements

12   to Ms. Theodosy Nash based on what Pittsburg provided?

13   **A.**   Yes.

14   **Q.**   Now, you mentioned courses.  Do you recognize some of

15   these course codes?

16   **A.**   Yeah.  Yes.

17   **Q.**   So, for example, BCJ351, is that a class that was also

18   provided on Ms. Theodosy Nash's CCU transcript?

19   **A.**   Yes.

20   **Q.**   So turning back to previously admitted Exhibit 17, page 2,

21   can we just enlarge the Spring 2020?

22            Do you recognize that BCJ351 as one of the courses on

23   the transcript?

24   **A.**   Yes.  It's listed as forensic science.

25   **Q.**   We can set that exhibit aside.

1        So in addition to the records you testified about, did

2   you also receive additional personnel action forms from the

3   Pittsburg Police Department?

4   A.   Yes.

5   Q.   Can you turn to what's been marked as Exhibit 16?

6   A.   (Witness examines document.)

7   Q.   Do you recognize this series of documents?

8   A.   Yes.

9   Q.   And what is it?

10  A.   It's a series of personnel action forms for Amanda Nash.

11  Q.   And is that -- what agency are they for?

12  A.   For Pittsburg Police Department.

13       MR. CHENG:   Your Honor, the Government moves to admit

14  Exhibit 16.

15       MR. CRUDO:   No additional objections, Your Honor.

16       THE COURT:   All right.   Same ruling as before.   It's

17  admitted.

18       (Trial Exhibit 16 received in evidence.)

19       MR. CHENG:   May we publish?

20       THE COURT:   Yes.

21  BY MR. CHENG:

22  Q.   Can we please turn to page 4?

23  A.   (Witness examines document.)

24  Q.   Okay.   Agent Zoback, can you describe what we're looking

25  at in this particular personnel action form?

1  A.     Yes.  It's an incentive increase in pay effective

2  November 14th, 2021.

3  Q.     And what's provided under the remarks for the reason for

4  the action?

5  A.     Start POST advance to 5 percent effective 11/14/2021.

6  Q.     What's your understanding of what POST refers to?

7  A.     It's a certification with different levels of -- I guess,

8  there's basic, intermediate, and advanced and above for police

9  officers.

10 Q.     And at the bottom, is it signed by a department head?

11 A.     Yes.

12 Q.     And what's the date of that?

13 A.     It is signed December 2nd, 2021.

14 Q.     Now, does this form -- does it refer to attachments as

15 well?

16 A.     Yes.

17 Q.     Can you now turn to Exhibit 19, which is marked but not

18 admitted?

19 A.     (Witness examines document.)

20 Q.     Do you recognize this series of documents?

21 A.     Yes.

22 Q.     Are these additional materials that were received from the

23 Pittsburg Police Department?

24 A.     Yes.

25 Q.     And what are we looking at on the first page here?

1   A.    It's a POST advance certificate awarded to Amanda Nash on

2   September 16th, 2021.

3           MR. CHENG:   The Government moves to admit Exhibit 19.

4           THE COURT:   Same objection?

5           MR. CRUDO:   No additional objections.

6           THE COURT:   All right.  Same ruling.  Admitted.

7        (Trial Exhibit 19 received in evidence.)

8           MR. CHENG:   May we publish?

9           THE COURT:   Yes.

10  BY MR. CHENG:

11  Q.    Agent Zoback, what type of certificate are we looking at

12  here?

13  A.    Commission on Peace Officer Standards and Training

14  advanced certificate to Amanda Nash.

15  Q.    And is it given a particular date?

16  A.    Yes.  November 16th, 2021.

17  Q.    And is this also within a couple of weeks of that last

18  form we looked at, Exhibit 16, being signed?

19  A.    Yes.

20  Q.    So turning back to Exhibit 16, can you direct your

21  attention to page 2?

22  A.    (Witness examines document.)

23  Q.    This is another personnel action form for Ms. Theodosy

24  Nash?

25  A.    Yes.

1  Q.   And what's the effective date of this form?

2  A.   March 6th, 2022.

3  Q.   And does it provide for a salary change on this form?

4  A.   Yes.

5  Q.   And what's that salary?

6  A.   It's changed from 8,731 to 9,168.

7  Q.   And what's your understanding of what that $9,168 -- what

8  intervals that's pertaining to?

9  A.   I believe it's monthly.

10 Q.   And, Agent Zoback, I hate to ask you to do some math on

11 the fly, but approximately how much is that annually?

12 A.   Over a hundred thousand, maybe 110 -- 110,000, 109,000.

13 Q.   About $110,000?

14 A.   Yes.

15 Q.   So that same month, did Ms. Theodosy Nash leave the

16 Pittsburg Police Department?

17 A.   I believe so.

18 Q.   And what type of position did she leave for?

19 A.   She was a lateral police officer for Santa Clara.

20 Q.   I'd like to show you what's been previously admitted as

21 Exhibit 40.

22 A.   (Witness examines document.)

23 Q.   Were you here for the testimony of the Santa Clara

24 representative?

25 A.   Yes.

1  Q.   Now, if you could please expand the salary portion of this

2  document.

3       What was the salary range provided for that lateral --

4  excuse me.

5       Are we looking at a job posting for the City of Santa

6  Clara police officer lateral?

7  A.   Yes.

8  Q.   And what is the salary range provided for that lateral

9  position at Santa Clara?

10  A.   Around 142,000 to 182,000 annually.

11  Q.   And is that a higher amount than the approximately

12  $110,000 in annual salary that she was receiving at Pittsburg?

13  A.   Yes.

14  Q.   We can set that aside.

15       So over the course of this investigation, did you also

16  receive additional records from the Antioch Police Department?

17  A.   Yes.

18  Q.   And you were here during the testimony of Antioch Police

19  Department Captain -- or former Captain Trevor Schnitzius;

20  correct?

21  A.   Yes, correct.

22  Q.   And were some of those records pertaining to a Samantha

23  Peterson?

24  A.   Yes.

25  Q.   Can you please turn to what has been marked, but not

1   admitted, Exhibit 4?

2   **A.**   (Witness examines document.)

3   **Q.**   Do you recognize this document?

4   **A.**   Yes.

5   **Q.**   What is it?

6   **A.**   It's a personnel action form from the City of Antioch for

7   Samantha Peterson.

8          **MR. CHENG:**  Your Honor, the Government moves to admit

9   Exhibit 4.

10         **MR. CRUDO:**  No additional objections, Your Honor.

11         **THE COURT:**  All right.  Same ruling.  Admitted.

12     (Trial Exhibit 4 received in evidence.)

13  BY MR. CHENG:

14  **Q.**   Agent Zoback, is an effective date provided for this form?

15  **A.**   Yes.  January 30th, 2021.

16  **Q.**   And what's provided for in this particular form?

17  **A.**   It's an increase in pay due to an education incentive.

18  **Q.**   And how much is the change in salary status?

19  **A.**   The change in salary is increased by $105 a month.

20  **Q.**   Did this form provide for any attachments?

21  **A.**   Yes.

22  **Q.**   Turning now to page 2, what's provided on page 2?

23  **A.**   An official transcript from the California Coast

24  University for Samantha Peterson.

25  **Q.**   And just directing your attention to the last two academic

1  quarters there, Fall 2020 and Winter 2021, how many courses

2  were completed during this time?

3  A.   Nine.

4  Q.   What's the date range that those were completed, by month?

5  A.   November 2020 through January 2021.

6  Q.   So now let's turn back to previously admitted Exhibit 110,

7  that summary of Venmo records.

8       Can we turn to page 4, please?  And can we please

9  enlarge the bottom third of the screen?

10      Agent Zoback, when do the transactions between

11 Ms. Reed and Ms. Peterson occur?

12 A.   Between November 2020 and January 2021.

13 Q.   Is that the same approximate time range as the completion

14 of CCU courses we just looked at?

15 A.   Yes.

16 Q.   And how many transactions are provided here?

17 A.   10.

18 Q.   10.

19      And that's one more than the nine classes you just

20 counted; is that right?

21 A.   That's correct.

22 Q.   Now, in one of these transactions, does one stand out as

23 different than some of the others?

24 A.   One is smaller than the others, $39.

25 Q.   And what's provided for in the annotation?

1  A.    In the notes section, it's a book emoji.

2  Q.    So minus the transaction with the book emoji, is it nine

3  total transactions?

4  A.    Correct.

5  Q.    And looking at the nine remaining transactions, did

6  anything else stand out to you about the notations for them?

7  A.    Yes.  Instead of some icons, some of the notes show

8  letters and numbers.

9  Q.    And what, if anything, did you observe about the

10  annotations and numbers?

11  A.    They seem to correlate with some of the classes that

12  Ms. Peterson took.

13  Q.    Would it be possible to now put side to side Exhibit 4,

14  page 2, enlarging the Fall 2020 and Winter 2021 section?

15        Agent Zoback, you mentioned some of those transactions

16  and their annotations.  What was one of the annotations that

17  stood out to you?

18  A.    One was just the letter T in November of '22.

19  Q.    And what, if anything, did -- occurred to you in relation

20  to the CCU transcript?

21  A.    There is -- I'm sorry.  I meant 11 of 2020.

22        There was a terrorism class that was completed at the

23  beginning of December 2020.

24  Q.    And is the first letter of terrorism T?

25  A.    Yes.

1    Q.    What else did you observe from the transactions?

2    A.    The next one has -- in the notes section are the letters

3    FS.  At the end of November 2020, on the transcripts, a course

4    was completed the beginning of 2020 called forensic science.

5         There was another transaction at the very beginning of

6    December 2020 called D450; and there's a class that was

7    completed in December of 2020 called BCJ450, domestic violence.

8    Q.    And that 450 was the same number?

9    A.    Yes.  Same as D450.

10        And there's another payment of $275 with the letters

11   RM from December 2020, and there was also a class completed in

12   December 2020 called research methods in criminal justice and

13   criminology.

14   Q.    And the first two letters of that class are also R and M?

15   A.    RM, yes.

16   Q.    We can set that exhibit aside.

17        THE COURT:  Let's take a stretch break while we're

18   waiting for counsel.

19        We're going to take another ten-minute break, because

20   I've broken it up, at 10:35 just for your own edification, and

21   then we'll take a final one sometime later, later.

22              (Pause in proceedings.)

23        THE COURT:  All right.  You may be seated and you may

24   continue when you're ready, Counsel.

25        MR. CHENG:  Thank you, Your Honor.

1  BY MR. CHENG:

2  Q.    Agent Zoback, now let's change gears and talk about

3  someone named Ernesto Mejia or Ernesto Mejia-Orozco.  Are you

4  familiar with that man?

5  A.    Yes.

6  Q.    Did you receive records from California Coast University

7  about Mr. Mejia-Orozco?

8  A.    Yes.

9  Q.    Can you turn to what's been marked as Exhibit 65, not

10  admitted?

11        MR. CHENG:  Your Honor, may I approach?

12        THE COURT:  Yes, you may.

13  BY MR. CHENG:

14  Q.    Can you please turn to page 2?

15  A.    (Witness examines document.)

16  Q.    Do you recognize this series of documents?

17  A.    Yes.

18  Q.    And what is it?

19  A.    These are records from California Coast University

20  pertaining to Ernesto Mejia-Orozco.

21        MR. CHENG:  Your Honor, the Government moves to admit

22  Exhibit 65.

23        MR. CRUDO:  No additional objections.

24        THE COURT:  All right.  Same ruling.  Admitted.

25        (Trial Exhibit 65 received in evidence.)

1          MR. CHENG:  May we publish?

2          THE COURT:  Yes, you may.

3          MR. CHENG:  So if we could blow -- enlarge the last

4    academic quarter on the transcript, please.

5    BY MR. CHENG:

6    Q.   Okay.  And what's the last academic quarter listed on this

7    transcript?

8    A.   Winter 2021.

9    Q.   How many courses were completed during this time?

10   A.   Seven.

11   Q.   And what's the date range that these classes were

12   completed?

13   A.   From January 2021 to March 2021.

14   Q.   And you were just here during the testimony of Tim Jung;

15   correct?

16   A.   Correct.

17   Q.   And do you recall his testimony about executing a search

18   warrant on a cell phone?

19   A.   Yes.

20   Q.   And that was the cell phone of Mr. Mejia-Orozco; correct?

21   A.   Yes.

22   Q.   During this investigation, did you review text messages

23   from Mr. Mejia-Orozco's cell phone?

24   A.   Yes.

25   Q.   And did those text messages include text messages between

1  Mr. Mejia-Orozco and Mr. Patrick Berhan?

2  **A.**   Yes.

3  **Q.**   Let's turn to what's been admitted as Exhibit 84, and

4  let's move to page 2.

5       Page 2, please.

6  **A.**   (Witness examines document.)

7  **Q.**   Agent Zoback, do you recognize what we're looking at here?

8  **A.**   Yes.

9  **Q.**   Are these examples of text messages that you reviewed as

10  part of Mr. Mejia-Orozco's cell phone?

11  **A.**   Yes.

12  **Q.**   And who is the author of the green text messages?

13  **A.**   Mr. Mejia.

14  **Q.**   And who is the author of the blue text messages?

15  **A.**   Mr. Berhan.

16  **Q.**   Can you read the text messages beginning on page 2 to

17  page 3?

18  **A.**   On December 10th, 2020, Mr. Mejia writes (as read):

19       "Yo, your girl still up for banging out some

20       classes?"

21       Mr. Berhan replies (as read):

22       "Yee."

23       Mr. Mejia writes (as read):

24       "Can she do four for 1K cash right now?  LOL."

25       Mr. Berhan types (as read):

1          "bachelor's and in criminal justice?"

2          Mr. Mejia says (as read):

3          "Yes.  I got seven left I think."

4     **Q.**   Agent Zoback, earlier, when you reviewed Mr. Mejia's CCU

5     transcript, how many courses were completed during that last

6     quarter?

7     **A.**   Seven.

8     **Q.**   And that was during a time period after these text

9     messages; correct?

10    **A.**   Correct.

11    **Q.**   Can you continue on to page 4 and read the messages

12    between pages 4 and 7?

13    **A.**   On the same day, December 10th, 2020, Mr. Berhan says (as

14    read):

15         "Yeah, she said she'll do it."

16         And Mr. Mejia replies (as read):

17         "Okay.  When she want the $?"

18         Mr. Berhan writes (as read):

19         "She won't get to your classes until towards the

20    end of the month, so no rush.  Sometime in the next

21    month is fine.  Which classes you want her to do?"

22         Mr. Berhan follows up with (as read):

23         "And send the log-in info."

24         Mr. Mejia writes (as read):

25         "Any class she wants to choose.  I'll bang out

1      the one I already have open."

2          Mr. Berhan writes (as read):

3          "For sure just four or you want her to do the

4      rest of them?"

5          Mr. Mejia writes (as read):

6          "four for now.  I'll check out the cash flow

7      after and see where I'm at.  If I can, then I'll have

8      her do the rest.  Coo?"

9          Mr. Berhan replies (as read):

10         "Yeah.  All good."

11         Mr. Mejia sends the numbers 75288 and 062088.

12  **Q.**   And, Agent Zoback, there was a number that you just read

13  out there.  I'd like to direct your attention back to

14  Exhibit 17.  Excuse me, not 17 -- page 60 -- Exhibit 65,

15  page 2.

16         And can you expand the top-left corner of that

17  document?

18         What's the student ID provided for Ernesto

19  Mejia-Orozco?

20  **A.**   75288.

21  **Q.**   Okay.  Let's please return to Exhibit 84 and continue with

22  the reading of messages on page 7.

23  **A.**   Same day, December 10th, 2020, Mr. Berhan writes (as

24  read):

25         "Fo sho."

1          Then Mr. Mejia writes (as read):

2          "Thanks, bro."

3          And that's a message that Mr. Berhan liked.

4  Q.   Okay.  So now let's turn to page 10.

5          Can you read the messages between pages 10 and 11,

6  please?

7  A.   On January 8th, 2021, Mr. Berhan writes (as read):

8          "My girl needs a password for one of the classes,

9      homey."

10          Mr. Mejia writes (as read):

11          "For the final?"

12          Mr. Berhan writes (as read):

13          "Yeah."

14          Mr. Mejia writes (as read):

15          "Cool.  On it.  Finna get it in a bit when he

16      gets home."

17          Mr. Berhan writes (as read):

18          "For sure."

19  Q.   Now, there was a discussion regarding a password for a

20  final.  What's your understanding of what a password for a

21  final is in reference to?

22  A.   I think it's in reference to the password that a proctor

23  gets that unlocks the test in order for the person to take the

24  final exam.

25  Q.   Okay.  And now let's turn to what's been marked as

1    page 14.

2            Can you read that through page 15, please?

3    A.   January 16th, 2021, Mr. Mejia writes (as read):

4            "Hey, when your girl bangs out these classes,

5        I'll only have three left.  She want to just do those

6        too?  If so, how much?"

7            Mr. Berhan replies (as read):

8            "Yeah, she'll do them.  700."

9            Mr. Mejia replies (as read):

10            "Okay, I'll get you the $ Monday?"

11            Mr. Berhan replies (as read):

12            "For sure."

13            Mr. Mejia writes (as read):

14            "Cool.  Thanks."

15   Q.   Now, can you turn to page 20 and read pages 20 through 23?

16   A.   This is February 1st, 2021.  Mr. Berhan writes (as read):

17            "Send the passcode when you can.  NP.  Send that

18        next code."

19            Mr. Mejia writes (as read):

20            "Fo sho."

21            Mr. Berhan also writes (as read):

22            "Fo sho."

23            Mr. Mejia writes (as read):

24            "Can I put you or your lady down to make it

25        easier?  Need a full name/e-mail."

1    Apologize for any foul language.  Mr. Berhan writes

2    (as read):

3        "Shit.  IDK if that will send red flags, though.

4    What about your lady?"

5    **Q.**   And, Agent Zoback, in your experience, what does "IDK"

6    refer to?

7    **A.**   I believe it stands for "I don't know."

8    **Q.**   Please continue.

9    **A.**   Mr. Mejia writes (as read):

10       "Ha ha.  I'll put my chick down."

11       Mr. Berhan replies (as read):

12       "LOL.  Fo sho."

13       And Mr. Mejia writes (as read):

14       "I put Davis down."

15   **Q.**   So, Agent Zoback, again, there's some discussion about a

16   code.  What's your reference -- what's your understanding of

17   what the code is in reference to?

18   **A.**   I think the code means the proctor password that is

19   required to finish a final -- or to start a final exam.

20       **MR. CRUDO:**  Objection, Your Honor.  Speculation.

21       **THE COURT:**  Sustained.  Let's stick to what the agent

22   knows, please.

23       **MR. CRUDO:**  Move to strike, Your Honor.

24       **THE COURT:**  Granted.

25   \\\

1  BY MR. CHENG:

2  Q.   Agent Zoback, why don't we turn to what's been marked as

3  Exhibit 66, not admitted.

4  A.   (Witness examines document.)

5  Q.   Do you recognize what's been marked as Exhibit 66?

6  A.   Yes.  It's a list of, looks like, college courses taken by

7  Ernesto Mejia-Orozco.

8         MR. CHENG:  Your Honor, the Government moves to admit

9  Exhibit 66.

10         MR. CRUDO:  No further objections -- additional

11  objections, Your Honor.

12         THE COURT:  Thank you.  Same ruling, and it's

13  admitted.

14      (Trial Exhibit 66 received in evidence.)

15         MR. CHENG:  Your Honor, may we publish?

16         THE COURT:  You may.

17  BY MR. CHENG:

18  Q.   Agent Zoback, are there proctors listed on this particular

19  record from CCU for Mr. Mejia-Orozco?

20  A.   Yes.

21  Q.   And we've been discussing courses completed in the early

22  2021 time frame; is that right?

23  A.   That's correct.

24  Q.   And who is listed as the proctor for those courses?

25  A.   There are two, Ryan Davis and Arturo Fernandez.

1  Q.   Before we turn to this exhibit, we were looking at some

2  text messages; a name was listed in response -- in reference to

3  code.  What name was that in Exhibit 84?

4  A.   Davis.

5  Q.   Do you know who Arturo Fernandez and Ryan Davis are?

6  A.   I know them to be police officers at the Pittsburg Police

7  Department.

8  Q.   Both of them?

9  A.   Correct.

10 Q.   Okay.  So now let's turn back to Exhibit 84, pages 24

11 through 25, please.

12      Could you please read the pages 24 and 25?

13 A.   Yes.  This is still on February 8th, 2021; Mr. Berhan

14 writes (as read):

15      "Fo sho.  All right.  Another one sent."

16 Mr. Mejia replies (as read):

17      "Okay."

18      Mr. Berhan writes (as read):

19      "Thanks."

20      And Mr. Mejia writes (as read):

21      "Yup."

22      Mr. Berhan writes (as read):

23      "Send me that code when you can.  No rush."

24 Q.   Now let's go ahead to page 28.

25      Can you read the messages on page 28, please?

A.    This is from March 1st, 2021, Mr. Mejia writes --
apologies for any language -- Mr. Mejia writes (as read):

        "Dude, last professor is a fucking bitch.  LOL."

        Mr. Berhan writes (as read):

        "LOL.  She keeps failing you or what?"

        Mr. Mejia writes (as read):

        "Yeah, for stupid ass shit on the written exams.

    I feel bad that your chick has to keep redoing them"

    with a little laughing and crying emoji.

Q.    And if we could please go to Exhibit 65, previously
admitted, page 2.  And please expand Winter 2021 again.

        So there was a reference to a last professor.  What is
the last course completed on this transcript?

A.    It's GED215, psychology of adjustment.

Q.    And did you review Mr. Mejia-Orozco's detailed student
record for what was happening in March of 2021?

A.    Yes.

Q.    Can we please move ahead, in this exhibit, to page 64?

        I'm directing your attention to the bottom of page 64,
through 65.

        What are we looking at here?

A.    These are transcription logs from California Coast
University, and on the bottom it says, for GED215 (as read):

        "Written assignment failed."

Q.    And going on to page 65?

1    A.    It continues (as read):

2          "Written assignment GED215-SG revised 1/2020.

3          Score is failed.  Please rewrite and resubmit this

4          assignment."

5    Q.    And now turning to page 63 of the same document, is there

6    additional annotations regarding this particular course?

7    A.    Yes.

8    Q.    And what happened on March 9th, 2021, at 9:42 a.m.?

9    A.    It's another note from California Coast University

10   regarding GED215, and it says (as read):

11         "Written assignment failed.  Please rewrite and

12         resubmit this assignment."

13   Q.    And GED215, was that the last course we looked at on

14   Mr. Mejia's transcript?

15   A.    Yes.

16   Q.    So if we could please now turn back to Exhibit 84, the

17   text messages, page 29.

18   A.    (Witness examines document.)

19   Q.    Agent Zoback, could you please continue reading the

20   messages beginning on page 29?

21   A.    Yes.  Still March 1st, 2021, Mr. Berhan writes (as read):

22         "LOL.  It's all good.  Some of the teachers are

23         bitches.  She's used to it."

24         Mr. Mejia writes (as read):

25         "Ha ha.  All right.  Cool."

1    On March 3rd, 2021, Mr. Berhan rights (as read):

2    "Nice.  Congrats, bro," with a laughing crying

3 emoji.

4    Mr. Mejia writes (as read):

5    "Just need that last essay exam done again."

6 Laughing crying emoji and I think it's like the

7 rolling around laughing emoji face

8    Mr. Berhan writes (as read):

9    "Sheesh, that teacher is a straight bitch.  LOL."

10    To which Mr. Mejia laughed at.

11    Mr. Mejia writes (as read):

12    "Happy birthday too.  Ha ha."

13    And Mr. Berhan writes (as read):

14    "Thanks, bro."

15    On March 8th, Mr. Mejia writes (as read):

16    "Hey big dawg, if your old lady has time, can she

17 bang out that last essay?  LOL.  Trying to get paid."

18    Mr. Berhan writes (as read):

19    "Yeah.  She'll do it today when she's home from

20 work."

21    Mr. Mejia writes (as read):

22    "Fo sho."

23    Mr. Berhan, on March 9th, 2021, writes (as read):

24    "Last essay is done.  LMK if she fails it again."

25    Mr. Mejia writes (as read):

1          "Hell, yeah.  Fo sho.  will do.  Thanks, bro."

2          And Mr. Berhan writes (as read):

3          "No prob."

4          On March 9th, 2021, Mr. Mejia writes (as read):

5          "That was quick.  Failed, bro."

6          Mr. Berhan responds (as read):

7          "Serious?  Jesus."

8          And then a head-slapping emoji and some other emojis I

9    can't really decipher.

10   **Q.**   Agent Zoback, the date of these texts you just read was

11   March 9th?

12   **A.**   Yes.

13   **Q.**   Do you recall, what was the date of the additional written

14   exam failure that we reviewed from CCU's detailed student

15   record?

16   **A.**   Same day, March 9th.

17   **Q.**   All right.  Please continue.

18   **A.**   Mr. Mejia writes (as read):

19          "Bro, I just read the teacher's stupid ass

20          feedback.  Has your old lady read them?"  Laughing

21          crying emoji.

22          Mr. Berhan writes (as read):

23          "I don't think so.  She went to work.  What she

24          say?"

25          And then he writes, there's some sort of emoji (as

1  read):

2          "Bitch, just pass the damn essay already."

3          Mr. Mejia writes (as read):

4          "That's WTF I'm saying dude.  LOL.  Teacher just

5      needs to click pass and move on."

6          Mr. Berhan writes (as read):

7          "Exactly.  This teacher has always been like this

8      too.  Fucking annoying."

9          Mr. Mejia writes (as read):

10         "Really?  LOL."

11         Mr. Berhan writes (as read):

12         "Yeah.  Taking it too seriously.  LOL."

13         On March 15th, 2021, Mr. Berhan writes (as read):

14         "Everything should be completed, homey."

15         And Mr. Mejia writes (as read):

16         "Right on big dawg.  Thanks again."

17         And Mr. Berhan writes (as read):

18         "No problem."

19  **Q.**   Okay.  And the date of those messages was March 15th,

20  2021?

21  **A.**   Yes.

22         **THE COURT:**  All right.  Counsel, I want to take a

23  break at this point.  I want to discuss something with counsel,

24  so I'll give the jury a ten-minute break.  Sorry for the short

25  break, but we want to move along and we'll give you another

1    break later.

2         Please remember the Court's admonitions, and we'll see

3    you in 10 minutes.  It may be a little longer because I want to

4    talk to counsel.

5         You can step down, Agent.

6              (The jury leaves the courtroom.)

7      (Proceedings were heard out of the presence of the jury.)

8         **THE COURT:**  You may be seated.

9         I know you're all in court here and you can't

10   multitask when you're in court, but I was wondering how you-all

11   are coming on the 302s that you agreed to submit so the Court

12   can make a ruling at the appropriate time.

13        **MS. SARGENT:**  Your Honor, I am trying to multitask and

14   I'm going through those 302s and just marking pin cites

15   essentially.

16        **THE COURT:**  All right.  So as soon as you do that,

17   would you notify my clerk so you can hand it up and a copy to

18   Mr. Crudo's team?

19        **MS. SARGENT:**  Yes, Your Honor.  I'm including pin

20   cites with parentheticals summarizing.  Should we provide

21   printouts of the 302 so Your Honor can refer directly or would

22   you prefer quoted language?

23        **THE COURT:**  Well, the annotated version is fine --

24        **MS. SARGENT:**  Okay.

25        **THE COURT:**  -- at this point.  And then just give it

1    to Mr. Crudo.  He already has the -- the full 302s, but I need

2    to see the Government's position and the annotations.

3              **MS. SARGENT:**  Okay.

4              **THE COURT:**  All right?

5              **MS. SARGENT:**  Thank you.

6              **THE COURT:**  Take 10 minutes, Counsel.

7              **MR. CHENG:**  Thank you, Your Honor.

8                      (Recess taken at 10:30 a.m.)

9                 (Proceedings resumed at 10:43 a.m.)

10             **THE CLERK:**  All rise.

11                   (The jury enters the courtroom.)

12        (Proceedings were heard in the presence of the jury.)

13             **THE CLERK:**  You may be seated.

14             Please remain seated.  Court is back in session.

15             **THE COURT:**  You may continue, Counsel.  Thank you.

16             Welcome back, ladies and gentlemen.

17             **MR. CHENG:**  Thank you, Your Honor.

18   **BY MR. CHENG:**

19   **Q.**   Agent Zoback, before the break, we left off on text

20   messages at page 38.

21             Can we return to Exhibit 84, at page 38?

22             And, Agent Zoback, when were these messages exchanged?

23   **A.**   March 15th, 2021.

24   **Q.**   And that's the "Everything should be completed, homey,"

25   including that text?

1  A.   Correct.

2  Q.   Okay.  So let's go back to Exhibit 65, page 2, and again

3  expand the Winter 2021.

4       When, again, was the last course completed on

5  Mr. Mejia's transcript?

6  A.   March 11th, 2021.

7  Q.   And is that within just a few days of the text message we

8  just read?

9  A.   Yes.

10 Q.   So during the course of this investigation, did you also

11 receive additional records from the Pittsburg Police Department

12 regarding Mr. Mejia?

13 A.   Yes.

14 Q.   Let's turn to what's been marked as Exhibit 23, not yet --

15 not admitted.

16 A.   (Witness examines document.)

17 Q.   Do you recognize Exhibit 23?

18 A.   Yes.

19 Q.   What is it?

20 A.   It's a document provided by the Pittsburg Police

21 Department regarding some tuition reimbursements for

22 Mr. Ernesto Mejia.

23       MR. CHENG:  Your Honor, the Government moves to admit

24 Exhibit 23.

25       MR. CRUDO:  No additional objections, Your Honor.

1      **THE COURT:**  Same ruling and admitted subject to the

2  objection.

3      (Trial Exhibit 23 received in evidence.)

4      **MR. CHENG:**  May we publish?

5      **THE WITNESS:**  Yes, you may.

6  BY MR. CHENG:

7  **Q.**   And, Agent Zoback, can you briefly walk us through what

8  we're looking at in Exhibit 23?

9  **A.**   Yes.  It's for invoices for ED reimbursement, education

10  reimbursement, for four different dates between 2019 and 2021,

11  with four different amounts that Mr. Mejia received as tuition

12  reimbursement.

13  **Q.**   And when you're referring to the amounts and Mr. Mejia, is

14  that on page 2?

15  **A.**   Yes, it is.

16  **Q.**   Can we please turn there, please?

17      Okay.  And when you're referencing amounts of

18  reimbursement and the recipient being Mr. Mejia, is that what's

19  reflected here?

20  **A.**   Yes.

21  **Q.**   Did you also receive additional personnel action forms

22  from the Pittsburg Police Department for Mr. Mejia?

23  **A.**   Yes.

24  **Q.**   Can you please turn to what's been marked as Exhibit 21,

25  not admitted?

1    A.   (Witness examines document.)

2    Q.   Agent Zoback, do you recognize the series of forms

3    provided in Exhibit 21?

4    A.   Yes.

5    Q.   And what are they?

6    A.   They're several personnel action forms from the police --

7    Pittsburg Police Department for Mr. Mejia-Orozco.

8         MR. CHENG:  Your Honor, the Government moves to admit

9    Exhibit 21.

10        MR. CRUDO:  No additional objections, Your Honor.

11        THE COURT:  All right.  Same ruling.  It's admitted.

12    (Trial Exhibit 21 received in evidence.)

13        MR. CHENG:  May we publish?

14        THE COURT:  Yes, you may.

15   BY MR. CHENG:

16   Q.   Could you please turn to page 6?

17        And, Agent Zoback, can you describe the form that

18   we're looking at on page 6?

19   A.   Yes.  It's a personnel action form for Mr. Mejia.  It's an

20   incentive showing an increase in base pay of 5 percent for

21   receiving a bachelor's degree.

22   Q.   And is it signed by a department head?

23   A.   Yes.

24   Q.   And when is it signed?

25   A.   March 12, 2021.

1    Q.    And does it refer to some attachments?

2    A.    Yes.

3    Q.    Can you now turn to what's been marked as Exhibit 20, not

4    yet admitted?

5    A.    (Witness examines document.)

6    Q.    Do you recognize what's been provided in Exhibit 20?

7    A.    Yes.

8    Q.    And what is it?

9    A.    It's a memo from Mr. Mejia to the Pittsburg Police

10   Department informing them that he successfully completed his

11   Bachelor of Science degree in criminal justice.

12   Q.    And according -- does it provide some attachments?

13   A.    Yes.

14   Q.    What are those attachments?

15   A.    One is a letter from California Coast University to

16   Mr. Mejia stating that he has successfully completed all the

17   coursework for his bachelor's degree, and there's an official

18   transcript included.

19         MR. CHENG:  Your Honor, the Government moves to admit

20   Exhibit 20.

21         MR. CRUDO:  No additional objections, Your Honor.

22         THE COURT:  All right.  Same ruling.  It's admitted.

23      (Trial Exhibit 20 received in evidence.)

24         MR. CHENG:  May we publish?

25         THE COURT:  You may.

1  BY MR. CHENG:

2  Q.   And, Agent Zoback, what is the date of this document?

3  A.   The transcript?

4  Q.   I'm sorry.  We're on page 1 right now.

5  A.   Oh, sorry.

6         (Witness examines document.)  It is dated March 11th,

7  2021.

8  Q.   And according to the attachment on page 2, when was the

9  degree awarded?

10  A.   It was awarded on March 11th, 2021.

11  Q.   Was the memo provided to the Pittsburg Police Department

12  on the same day he was awarded the degree?

13  A.   Yes.

14  Q.   And I think, as you already testified -- is there also a

15  transcript for Mr. Mejia attached to this document?

16  A.   Yes.

17  Q.   That's on page 3?

18  A.   Yes.

19  Q.   Finally, can you turn to what's been marked as Exhibit 28,

20  not admitted?

21         THE CLERK:  Counsel, what exhibit number was that

22  again?

23         MR. CHENG:  28.

24         THE CLERK:  Thank you.

25  \\\

1    BY MR. CHENG:

2    Q.   Do you recognize this as additional -- additional

3    documentation provided by the Pittsburg Police Department?

4    A.   Yes.

5    Q.   And briefly, what does it identify?

6    A.   It's a document stating personnel action form information

7    for Mr. Mejia, and it shows his base pay broken down into his

8    hourly wages for July of 2020.  Then it shows his hourly wages

9    with a 5 percent increase for having the bachelor's degree in

10   March of 2021.

11          And then in July of 2021, it shows his hourly base pay

12   plus an increase of 2.5 percent.  I think that was just a step

13   increase in addition to his 5 percent increase for his

14   bachelor's degree.

15          MR. CHENG:  Your Honor, the Government moves to admit

16   Exhibit 28.

17          MR. CRUDO:  No additional objections, Your Honor.

18          THE COURT:  All right.  Same ruling.  Admitted.

19      (Trial Exhibit 28 received in evidence.)

20          MR. CHENG:  May we publish?

21          THE COURT:  Yes, you may.

22   BY MR. CHENG:

23   Q.   Agent Zoback, I believe you referenced that there was a

24   calculation here for Mr. Mejia's salary; is that right?

25   A.   That's correct.

1  Q.    And what does it provide as his salary in July of 2020?

2  A.    $8,944 monthly.

3  Q.    And what does that come out to per hour?

4  A.    $51.60.

5  Q.    Does it then provide an additional number in March of

6  2021?

7  A.    Yes.  It looks like it includes the 5 percent increase for

8  the bachelor's degree; then it works out to the new hourly pay.

9  Q.    And then you mentioned a third calculation in July of

10  2021?

11  A.    Yes.

12  Q.    Is the increase identified in July of 2021 -- is that

13  stacked on top of the 5 percent referenced earlier?

14  A.    Yes.  They're added together.

15  Q.    Agent Zoback, we have no further questions at this time.

16       THE COURT:  Thank you, Counsel.

17       You may cross.

18       MR. CRUDO:  None from Mr. Amiri, Your Honor.

19       THE COURT:  Thank you very much.

20       Thank you, Agent.  You're excused.

21            (Witness excused.)

22       THE COURT:  We'll take care of that.  Thank you,

23  Agent.

24       Next witness, please.

25       MR. CHENG:  Your Honor, may I approach?

1    THE COURT:  Yeah, sure.

2    MR. KRISHNAMURTHY:  The Government calls Ken Tam.

3    (Ken Tam steps forward to be sworn.)

4    THE CLERK:  Would you step on the stand, please raise

5  your right hand.

6                    **KEN TAM**,

7  called as a witness for the Government, having been duly sworn,

8  testified as follows:

9    THE WITNESS:  I do.

10    THE CLERK:  Please be seated.

11    Please speak clearly into the microphone and state

12  your full name and spell your last name for the record.

13    THE WITNESS:  Ken Tam, T-A-M.

14    THE COURT:  Proceed.

15                  **DIRECT EXAMINATION**

16  BY MR. KRISHNAMURTHY:

17  Q.  Good morning, Mr. Tam.

18    How are you currently employed?

19  A.  I'm currently employed as a forensic accountant by the

20  Contra Costa County District Attorney's Office.

21  Q.  How long have you been employed as a forensic accountant?

22  A.  Approximately eight years.

23  Q.  What did you do before that?

24  A.  Before that, I was employed by the City of Manteca as a

25  city accountant/financial planner.  Prior to that, by the

1    Federal Bureau of Investigation as a special agent, and then

2    the U.S. Air Force.

3    Q.   Have you received any formal education relevant to your

4    job?

5    A.   Yes.  I have a Bachelor's of Science degree in business

6    administration with an emphasis in accounting and finance from

7    the University of California Berkeley.  I also have a Master's

8    of Science in accounting from the University of Nevada

9    Las Vegas.

10   Q.   Are you a certified public accountant?

11   A.   Yes.  I'm a certified public accountant, a certified fraud

12   examiner, and I am also an adjunct professor of accounting at

13   Cal State Stanislaus and Modesto Junior College.  I also

14   operate a certified public accounting business.

15   Q.   I'd like to take a couple of those in turn.

16        You mentioned that you have a CPA license?

17   A.   Yes.

18   Q.   What -- what does that entail?

19   A.   That entails passing a fairly long test and job experience

20   as an accountant and taking 80 hours of continuing professional

21   education every two years.

22   Q.   You mentioned that you were a professor, an adjunct

23   professor?

24   A.   Yes, at Cal State Stanislaus and Modesto Junior College.

25   I teach in the accounting department.  I teach accounting,

1   income tax, audit, and other accounting courses.

2   Q.   And then you also mentioned that you operate your own

3   accountancy?

4   A.   Yes.  I have a business that, among the services provided,

5   includes putting together the financial records of companies,

6   calculating payroll, calculating payroll taxes, calculating

7   benefits.

8   Q.   Through the course of your job responsibilities as a

9   forensic accountant and an accountant in your own capacity, do

10  you regularly examine financial data and documents?

11  A.   Yes.

12  Q.   What kinds of documents?

13  A.   Generally it would be bank statements, other bank records,

14  other evidence obtained via search warrants, personnel records,

15  and I would look through them to aid in investigations.

16  Q.   And you mentioned payroll work that you do?

17  A.   Yes.

18  Q.   So do you also look at salary information in those

19  personnel records?

20  A.   Yes.  From those records, I calculate the appropriate

21  amounts of payroll, calculate the appropriate amount of payroll

22  taxes.  Some of the investigations that I've done previously

23  would be income tax evasion and payroll tax evasion.

24  Q.   Through your work, have you become familiar with industry

25  standard methods for projecting future earnings?

1   **A.**   Yes.

2   **Q.**   What is the methodology used to do that?

3   **A.**   Generally, to project earnings that a person would earn

4   over their lifetime, they would usually take their last salary

5   and then go forward to their first potential retirement date.

6   **Q.**   Does the methodology that you use depend in any way on the

7   data that you're given?

8   **A.**   Yes.

9   **Q.**   How so?

10   **A.**   I would be given -- if I am given the records of their pay

11   generally, I -- in those records I would see, from their past,

12   if their pay has changed.  So I calculate their appropriate

13   pay, their appropriate benefits for different time periods

14   according to the different rates of pay and different

15   percentage in those time periods.

16   **Q.**   You also mentioned, in projecting future earnings, you

17   look at retirement dates?

18   **A.**   Yes.

19   **Q.**   Are those assumptions that you make?

20   **A.**   Yes.  Those are assumptions because for people -- people

21   will work to their first eligible retirement date; some people

22   will work after, past their first eligible retirement date, and

23   some people work less than that.  So as a midpoint assumption,

24   I use the first eligible retirement date.

25   **Q.**   And the other thing that you mentioned is sometimes you

1    look at different salaries that people have been paid?

2    A.    Yes.

3    Q.    Are there also assumptions that go into that in terms of

4    projecting future earnings?

5    A.    Yes.  Generally speaking, most people get a cost of living

6    increase or a step increase or a promotion through the years

7    that they are working; but to be conservative in these lifetime

8    earnings, the assumptions that I use is that the people's

9    salaries are fixed as of their projection date, like the date

10   when they leave or whatever the date to go forward from, fixed

11   from that time to their first eligible retirement date.  And in

12   those cases, generally the projections are going to be

13   conservative as to the amounts.

14   Q.    So just to be clear, you're given salary information as of

15   a certain date?

16   A.    Yes.

17   Q.    And your projection says their salary doesn't go up or

18   down after that date?

19   A.    That is correct.

20   Q.    In your job responsibilities, do you also sometimes have

21   to track the sum of money paid to a specific person over a

22   period of time?

23   A.    Yes.

24   Q.    Is there an industry standard methodology for that type of

25   calculation?

1   A.   You look at the person's either hourly rate or monthly

2   rate, and then you just multiply that base amount by the number

3   of days that they have worked in those positions.

4   Q.   So turning your attention to this case, were you provided

5   a set of personnel action forms that showed educational

6   incentives and the salary progression for an Antioch Police

7   Department officer by the name of Morteza Amiri?

8   A.   I was.

9   Q.   Did you examine those records?

10  A.   Yes.

11  Q.   So, first, with respect to the salary of Mr. Amiri, did

12  that salary change over time?

13  A.   Yes, it did.

14  Q.   And then also with respect to Mr. Amiri, did the forms

15  that -- the data that you were given also reflect any

16  educational-based financial incentives?

17  A.   Yes, they did.

18  Q.   What did they reflect?

19  A.   I'd have to review those records in front of me to refresh

20  myself to see; but in the people that I examined, there was

21  both an education incentive for having a bachelor's degree and

22  also, for some people, an incentive for having an advanced POST

23  certificate, which was contingent on having a bachelor's

24  degree.

25  Q.   Okay.  We'll come back to that specific document in a

1    minute.

2          In addition to those documents, are you also aware of

3    the parties' stipulation that Mr. Amiri was employed until at

4    least August 18th, 2023?

5    A.    Yes.

6    Q.    Okay.  Given that data, were you asked to calculate

7    certain aspects of Mr. Amiri's salary over time, specifically

8    the value of the educational incentive over time?

9    A.    Yes.  I was asked to calculate the amount of incentives

10   that he claimed.

11   Q.    And were you also asked to project the value of the

12   educational incentives to a projected retirement date?

13   A.    Yes.

14   Q.    What did you use for the retirement date?

15   A.    I used his first eligible retirement date at his

16   57th birthday.

17   Q.    In making those calculations, did you follow industry

18   standard methodologies?

19   A.    Yes.

20   Q.    So specifically, without getting into actual numbers for

21   the time being, how did you calculate the value of the

22   educational incentive paid to Mr. Amiri during his employment

23   with the Antioch Police Department?

24   A.    For the relevant time periods, looked at the salary that

25   he had for the dates in range and then multiplied it by the

1    incentive amounts as his salary changed, then used his new

2    salary, multiplied that by the number of days he had worked in

3    that time frame with that salary, and then multiplied that by

4    the education incentive.

5    **Q.**    So just to summarize, it's the percentage-based

6    educational incentive times the salary for the period that

7    Mr. Amiri made that salary?

8    **A.**    Yes.

9    **Q.**    And then when the salary increased, it was the educational

10   incentive for the new salary for the time period that Mr. Amiri

11   made that new salary?

12   **A.**    Yes.

13        **MR. KRISHNAMURTHY:**  At this time, I tender Mr. Tam as

14   an expert in forensic accountancy, including with respect to

15   payroll information.

16        **THE COURT:**  Any objection?

17        **MS. SUHR:**  Rachel Suhr for Morteza Amiri.

18        No objection, Your Honor.

19        **THE COURT:**  All right.  Thank you.

20        Let me again give you the instruction on expert

21   testimony.

22        So you are about to hear the testimony from Mr. Tam,

23   who will testify about his opinions and the reasons for those

24   opinions.  The opinion testimony -- this opinion testimony is

25   allowed because of the specialized knowledge, skill,

1    experience, training, or education of the witness.

2         Such opinion testimony should be judged like any other

3    testimony.  You may accept it or reject it and give it as much

4    weight as you think it deserves, considering the witness's

5    knowledge, skill, experience, training, or education, the

6    reasons given for the opinion, and all the other evidence in

7    the case.

8         With that, you may proceed.

9         MR. KRISHNAMURTHY:  Thank you, Your Honor.

10   BY MR. CHENG:

11   Q.   Mr. Tam, I'd like to hand you what's been previously

12   admitted as Exhibit Number 2.

13        MR. KRISHNAMURTHY:  Your Honor, permission to

14   approach.

15        THE COURT:  Yes.

16             (Counsel approaches witness.)

17   BY MR. KRISHNAMURTHY:

18   Q.   Mr. Tam, have you seen this document before?

19   A.   Yes.

20   Q.   What is it?

21   A.   These are the personnel forms from the City of Antioch in

22   reference to the salary of Mr. Morteza Amiri.

23   Q.   And did you use this document in your calculations with

24   respect to Mr. Amiri?

25   A.   Yes.

1  Q.   So where does it say what Mr. -- so, first of all, does

2  this have an effective date?

3  A.   Yes, it does.

4  Q.   And so where in this document does it say what Mr. Amiri's

5  salary was as of this effective date?

6  A.   Yes, so the effective date, at least for this one, was on

7  4/17/2020.  He's now eligible to receive a 5 percent of base

8  pay per month for having a bachelor's degree.  And then the

9  pages afterwards list the effective dates of different salary

10 that he was earning.

11 Q.   Can we go to the next page, please?

12      And so what salaries did Mr. Amiri earn during the

13 relevant time periods?

14 A.   For one, it was 10,056 per month.  Then from another date,

15 it was $10,307 per month.  And then after another date, it was

16 $10,719 per month.

17 Q.   Can we go to the next page, please?

18      Great.  Thank you.

19      And if we go back to the first page, you mentioned

20 that there was a 5 percent educational incentive?

21 A.   Yes.

22 Q.   So was there a -- was there a previous percentage-based

23 incentive before that?

24 A.   Yes.  It was 2 and a half percent.

25 Q.   Okay.  So this is a 2 and a half percent financial

1   incentive effective April 17th, 2020?

2   **A.**   Yes.  It would be an additional 2 and a half percent to

3   get the bachelor's degree.  He was receiving a 2 and a half

4   percent benefit, I believe, for having an associate's degree.

5   **Q.**   So using this data, did you calculate the value of the

6   educational incentive for each of those salary steps that we

7   previously described?

8   **A.**   Yes.

9   **Q.**   Did you also use this data to calculate the projected

10  value of the educational incentive in the future?

11  **A.**   Yes.

12  **Q.**   And what salary did you use for that?

13  **A.**   His last effective salary as of the date of his last date

14  of employment, which would have been $10,719 per month.

15  **Q.**   And, again, can you remind us of what assumptions you made

16  in terms of that projection?

17  **A.**   Yes.  I assumed he was not going to have any further step

18  increases or promotions or any cost of living adjustments from

19  that date.

20  **Q.**   So you've described a number of different calculations,

21  the projection that we just talked about, as well as the

22  incentives through three different salary ranges?

23  **A.**   Yes.

24  **Q.**   Would it -- would it aid your testimony to show all of

25  those calculations in one chart?

1   A.   That would be very helpful.

2   Q.   All right.

3          MR. KRISHNAMURTHY:  I'd like to show just the witness

4   what has previously been marked as Exhibit 204.

5          THE COURT:  Very well.

6   BY MR. KRISHNAMURTHY:

7   Q.   Mr. Tam, have you seen this chart before?

8   A.   Yes.

9   Q.   And does it fairly and accurately set forth the

10  calculations you made with respect to Mr. Amiri?

11  A.   Yes.  It lists the different dates that he earned various

12  base monthly pays; the additional educational incentive that he

13  received, which was 2 and a half percent; and then the total

14  education incentive, in total that he received, which would

15  have been $10,526; and then the projection toward his first

16  eligible retirement date of an additional $78,366.

17         MR. KRISHNAMURTHY:  Your Honor, permission to publish

18  204 for demonstrative purposes only.

19         THE COURT:  Yes.  I'm sorry?

20         MS. SUHR:  I'm sorry, Your Honor.  To publish to the

21  jury?

22         THE COURT:  Yes.

23         MS. SUHR:  We object to that because we understood

24  this --

25         THE COURT:  Just come to the microphone, please,

1    Ms. Suhr.  Thank you.

2         **MS. SUHR:**  We object.  We understood that the

3    demonstrative was just to help Mr. Tam with his testimony and

4    not going to be admitted into evidence.

5         **THE COURT:**  Well, I don't think counsel is offering it

6    as evidence.  He was simply going to show it for demonstrative

7    purposes only.  It will not be admitted in evidence and will

8    not go to the jury.

9         **MS. SUHR:**  Understood, Your Honor.

10        **THE COURT:**  No, you don't have to apologize.  That's a

11   good objection.

12        **MS. SUHR:**  Okay.

13        **THE COURT:**  Is that okay?

14        **MS. SUHR:**  Yes.  Thank you.

15        **THE COURT:**  All right.  Very well.

16        So this is, again, one of those in-the-weeds legal

17   things; but because what Mr. Tam is about to show you is not,

18   in and of itself evidence, it is simply a way of helping you,

19   it's a summary of materials that are already in evidence or

20   something that you may consider during your deliberations.

21   Because it's not evidence in and of itself, it doesn't come

22   into evidence, and you don't get to take it with you in your

23   deliberations like the other exhibits, but you're allowed to

24   see it so that Mr. Tam can explain his testimony.

25        So with that, you may use it for demonstrative

1    purposes only, and then it will not be further used by the

2    jury.

3              **MR. KRISHNAMURTHY:**  Thank you.

4              Can we zoom in on everything but the title of that?

5              Thank you.

6    **BY MR. KRISHNAMURTHY:**

7    **Q.**   So, Mr. Tam, I think you were just explaining this, but

8    could you explain what this chart shows?

9    **A.**   Yes.  This shows the additional education incentive for

10   having a bachelor's degree, the amounts that he had claimed,

11   which totaled $10,526, and the potential claim from his last

12   date of employment to his first eligible retirement date, which

13   totaled $78,366.

14   **Q.**   Thank you very much.

15             And we can take that down.

16             So, Mr. Tam, did you also go through a similar

17   exercise with respect to Patrick Berhan?

18   **A.**   Yes.

19   **Q.**   If you wouldn't mind flipping to what's already been

20   admitted as Exhibit 27.

21             Have you seen this document before?

22   **A.**   Yes.  These are personnel forms regarding Mr. Patrick

23   Berhan that list his salaries for certain dates and when his

24   salary changed, those dates were changed; and also the

25   education incentive and the POST incentive that he received.

1  Q.   Did you rely on this document in creating these

2  calculations for Mr. Berhan?

3  A.   Yes.

4  Q.   So, first, which educational incentives did Mr. Berhan

5  receive?

6  A.   He received a 5 percent education incentive for having a

7  bachelor's degree, and then he also received a 5 percent

8  incentive for having a POST advanced certificate.

9  Q.   And did the POST advanced certificate -- was there a

10  previous incentive before that?

11  A.   Yes.  There was an intermediate, which would have been

12  2 and a half percent and -- yes.

13  Q.   Okay.  So it's 5 percent incentive and then an additional

14  2 and a half percent?

15  A.   Yes.  So the additional amount that he claimed would have

16  been an additional 2 and a half percent.

17  Q.   Do these documents also reflect that Mr. Berhan's salary

18  changed over time?

19  A.   Yes, it does.

20  Q.   Did you take the same steps as described before in

21  calculating the value of the bachelor's degree in advanced POST

22  financial incentives for the period of time that Mr. Berhan was

23  employed at the Pittsburg Police Department?

24  A.   Yes.

25  Q.   And did you also use this data to calculate the projected

1  value of the bachelor's degree and advanced POST financial

2  incentives for the future?

3  A.   Yes, using the same methodology.

4  Q.   I'd like to show you what has previously been admitted as

5  Exhibit 13.  It should be on the screen and also in front of

6  you.

7       Have you seen this document before?

8  A.   Yes.  In addition to the education incentives, he had also

9  requested reimbursement for the college courses that he had

10 taken.

11 Q.   So in terms of these different buckets of information --

12 the reimbursements, the educational incentives for the time

13 period that Mr. Berhan was employed, as well as the educational

14 incentives for the future -- would it, again, aid your

15 testimony to show these various calculations in one chart?

16 A.   Yes, it would.

17 Q.   I'd like to show you what has previously been marked as

18 Exhibit 206, but not yet -- but not admitted.

19      Have you seen this chart before?

20 A.   It's not on my screen.

21 Q.   Oh.

22      THE CLERK:  Hold on.  I have to verify.

23           (Pause in proceedings.)

24      THE CLERK:  Go ahead.

25      THE WITNESS:  Okay.  Now I see it, yes.

1   BY MR. KRISHNAMURTHY:

2   Q.   Okay.  And does this fairly and accurately set forth the

3   calculations you made with respect to Mr. Berhan?

4   A.   Yes.  It shows the incentives that he received for having

5   a bachelor's degree and the incentives he received for having a

6   POST advanced certificate and the amount of tuition

7   reimbursements that he claimed and a projection of the

8   education incentives from a certain date to his first eligible

9   retirement date.

10        MR. KRISHNAMURTHY:  Your Honor, permission to publish

11   to the jury for demonstrative purposes only.

12        THE COURT:  Yes, you may do so for that reason only.

13        MR. KRISHNAMURTHY:  And, again, can we zoom in on

14   everything but the title, please?

15   BY MR. KRISHNAMURTHY:

16   Q.   Mr. Tam, can you walk us through what this chart shows?

17   A.   Yes.  What this shows is the dates that he received the

18   different education incentives and his base monthly pay, in

19   those dates.

20        And then, at the right-hand side, it's the total

21   amount of education incentives that he received, which was

22   $16,138.  The total amount of tuition reimbursements that he

23   received, $5,142; and a projection of those education

24   incentives to his first full retirement date, which would have

25   been his birthday at age 57, and that's an additional potential

1  $228,547.

2  Q.   Great.  Thank you very much.

3       And we can take that down.  Thank you.

4       Next I'd like to turn to an individual by the name of

5  Amanda Nash or Amanda Theodosy.

6       Have you reviewed personnel action forms showing

7  Ms. Theodosy's salary over time at the Pittsburg Police

8  Department, including the initiation of educational financial

9  incentives?

10  A.   Yes, I did.  I used the same methodology to calculate the

11  amount of education incentives that she received.

12  Q.   And, again, would it aid your testimony to display all

13  those calculations in one chart?

14  A.   Yes.

15       MR. KRISHNAMURTHY:  I'd like to show just the witness

16  Exhibit 205.

17       THE COURT:  All right.

18  BY MR. KRISHNAMURTHY:

19  Q.   And, Mr. Tam, does this fairly and accurately set forth

20  your calculations with respect to Ms. Theodosy?

21  A.   Yes, it does.

22       MR. KRISHNAMURTHY:  Permission to publish for

23  demonstrative purposes only.

24       THE COURT:  Yes.

25       MR. KRISHNAMURTHY:  And can we zoom in on everything

1    but the title?

2    BY MR. KRISHNAMURTHY:

3    Q.   Mr. Tam, can you walk us through what this chart shows?

4    A.   Yes.  Using the same methodology, I looked at when she

5    received these education incentives and her base monthly pay at

6    those periods, calculated a total education incentive of

7    $9,608 that she received, tuition reimbursements of $2700, and

8    total of $12,308.  This is from the personnel records.

9    Q.   And I notice that this chart does not have any projected

10   future earnings.  Is that because you were informed that

11   Ms. Theodosy, in fact, got a new job?

12   A.   That is correct, yes.

13   Q.   Okay.  Thank you.

14        We can take that down.

15        Next I'd like to turn to Ernesto Mejia-Orozco.  Have

16   you, once again, reviewed personnel action forms showing

17   Mr. Mejia-Orozco's salary over time, including the initiation

18   of financial educational incentives?

19   A.   Yes, and I used the same methodology to calculate the

20   numbers.

21   Q.   And, again, would it aid your testimony to display all of

22   your calculations in one chart?

23   A.   Yes.

24        MR. KRISHNAMURTHY:  I'd like to show just the witness

25   Exhibit 207.

1    THE COURT:  Very well.

2    BY MR. KRISHNAMURTHY:

3    Q.   And, Mr. Tam, does this chart accurately set forth your

4    calculations with respect to Mr. Mejia?

5    A.   Yes.

6         MR. KRISHNAMURTHY:  Permission to publish for

7    demonstrative purposes only?

8         THE COURT:  Permission granted.

9         MR. KRISHNAMURTHY:  And, once again, can we zoom in

10   on -- great.  Thank you.

11   BY MR. KRISHNAMURTHY:

12   Q.   Mr. Tam, can you walk us through what this chart shows?

13   A.   Yes.  This shows the education incentive that he received,

14   the time periods that he received them, the base monthly pay

15   during those times periods, and the total education incentive

16   that he received, which is $6,835, tuition reimbursements of

17   $4,643, and potential education incentives of $126,594.

18        MR. KRISHNAMURTHY:  Thank you.  We can take that down.

19   BY MR. KRISHNAMURTHY:

20   Q.   Finally I'd like to turn to Samantha Peterson.  Have you

21   also reviewed personnel action forms showing Ms. Peterson's

22   salary over time --

23   A.   Yes.

24   Q.   -- including the initiation of educational financial

25   incentives?

1    A.    Yes.

2    Q.    Was there anything different about Ms. Peterson's

3    educational incentives?

4    A.    Yes.  In her job description, her education incentive was

5    a fixed amount per month, not a percentage of base salary.

6    Q.    And so did you go through the same exercise of calculating

7    the value of that incentive during her employment?

8    A.    Yes, I did.  Same methodology.

9    Q.    And, once again, would it aid your testimony to display

10   all of your calculations in one chart?

11   A.    Yes.

12          MR. KRISHNAMURTHY:  I'd like to show just the witness

13   what's been marked as Exhibit 208.

14          THE COURT:  All right.

15   BY MR. KRISHNAMURTHY:

16   Q.    Mr. Tam, does this fairly and accurately set forth your

17   calculations with respect to Ms. Peterson?

18   A.    Yes.

19          MR. KRISHNAMURTHY:  Permission to publish for

20   demonstrative purposes only.

21          THE COURT:  Yes.

22   BY MR. KRISHNAMURTHY:

23   Q.    Okay.  Mr. Tam, can you walk us through this chart?

24   A.    Yes.  It showed the time period that she received the

25   education incentive of $105 per month.  So she received a total

1    education incentive of $3,207; she received tuition

2    reimbursements of $800; and the projected education incentive

3    from a certain date to her first potential retirement date,

4    full retirement date, is $32,470.

5            MR. KRISHNAMURTHY:  Thank you.  No additional

6    questions.

7            THE COURT:  Ms. Suhr?

8                    CROSS-EXAMINATION

9    BY MS. SUHR:

10   Q.    Good morning, Mr. Tam.

11   A.    Good morning.

12   Q.    This is our first time meeting each other; right?

13   A.    Yes.

14   Q.    And you've never met my colleagues, Tim Crudo or Oliver

15   Hamilton, at counsel table?

16   A.    Never.

17   Q.    What about our client, Mr. Amiri?  Have you spoken with

18   him before?

19   A.    Never.

20   Q.    But you have spoken with the Government's attorneys

21   before?

22   A.    Yes.

23   Q.    You've spoken with them on at least two occasions before

24   today?

25   A.    Yes.

1  Q.   Okay.  You met with them as recently as July 15th of this

2  year?

3  A.   I don't recall the exact date, but I recall meeting

4  them --

5  Q.   Ballpark.

6  A.   -- yes.

7  Q.   Okay.  I think, with respect to Amiri, you just offered

8  two opinions on direct, and I'm going to those one at a time.

9         So around November of 2022, you were asked to

10 determine the amount of education incentive pay that was

11 actually received by several employees, including Mr. Amiri; is

12 that right?

13 A.   That is correct.

14 Q.   And you were told that those employees fraudulently

15 claimed that they were entitled to that education incentive

16 pay; right?

17 A.   That was the basis of the allegations in the

18 investigation, yes.

19 Q.   You weren't asked to determine whether Mr. Amiri or anyone

20 else actually committed fraud; correct?

21 A.   That is correct.

22 Q.   Okay.  And in November of 2022, you completed an initial

23 written report; right?

24 A.   Yes.

25 Q.   At the time you were asked to complete that report,

1    Mr. Amiri had not been charged with a crime yet; right?

2    A.    That is correct.

3    Q.    You were aware that law enforcement authorities were going

4    to consult your calculations in deciding whether to charge

5    Mr. Amiri; correct?

6    A.    I was asked to do these calculations.  I was not told or

7    advised what was going to be done with those calculations.

8    Q.    Okay.  So as you testified on direct, in making your

9    determinations, you examined Mr. Amiri's personnel and pay

10   records, including what was up on the screen as Exhibit 2, his

11   personnel action forms; correct?

12   A.    Yes.

13   Q.    But you didn't interview anyone from the Antioch Police

14   Department or the City of Antioch about those records; right?

15   A.    I did not interview anyone at either of those cities.

16   Q.    You titled your written report "Forensic Accountant's

17   Report"; right?

18   A.    Yes.

19   Q.    And in preparing your forensic accountant's report, you

20   assumed that, as a result of receiving a bachelor's degree,

21   Mr. Amiri's monthly pay increased by a full 5 percent; right?

22   A.    I'd have to refresh my recollection on the report.  In

23   that one, I would say, if I wrote 5 percent in the report,

24   then, from what I knew at that time, it was 5 percent.

25   Q.    Okay.  Let me see if I can help you out.

1          **MS. SUHR:**  Your Honor, I would like to provide the

2    witness with what has been previously marked as Exhibit 309.

3          **THE COURT:**  You may.  And that's in evidence?

4          **MS. SUHR:**  It's not.  Previously marked but not in

5    evidence.

6          **THE COURT:**  Okay.  Very well.  You may approach and

7    show it to the witness.

8          **MS. SUHR:**  Thank you.

9          Would you like a copy?

10         **THE COURT:**  No, it's fine.  I'll get it when you

11   publish it.  Thank you.

12   **BY MS. SUHR:**

13   **Q.**   Okay.  Mr. Tam, I'm going to let you flip through that,

14   and just let me know when you're done.

15   **A.**   (Witness examines document.)  Okay.

16   **Q.**   Do you recognize this report?

17   **A.**   Yes.  I wrote it.

18   **Q.**   Okay.  You wrote it.  Okay.  Great.

19         Does this report refresh your recollection as to

20   whether you assumed Mr. Amiri received a 5 percent pay increase

21   as a result of receiving a bachelor's degree?

22   **A.**   Yes.  At that time that I wrote the report, the

23   information I had was that he received a 5 percent incentive,

24   yes.

25   **Q.**   Okay.  At the time you authored this report, you had his

1    personnel action form; correct?

2    **A.**    Yes.

3    **Q.**    Okay.  And that personnel action form that

4    Mr. Krishnamurthy showed you on direct examination showed that

5    Mr. Amiri's pay went from a 2.5 percent increase to a 5 percent

6    increase --

7    **A.**    Yes.

8    **Q.**    -- is that right?

9    **A.**    Yes.

10   **Q.**    Okay.

11         Okay.  So over one year after you authored this

12   report, you learned that Mr. Amiri's pay for a bachelor's

13   degree was, in fact, only -- he only received a 2 and a half

14   percent bump; is that right?

15   **A.**    What I had learned after I made this report was he was

16   already receiving a 2 and a half percent for having an

17   associate's degree.  Then he received an additional 2 and a

18   half percent to make it 5 percent total.  So the, I'm going to

19   use this word, loss, or the amount claimed was the 2 and a half

20   percent and not the 5 percent that I put in my original report.

21   **Q.**    Okay.  So just to summarize, the 5 percent you used in the

22   original report was double what you should have used when you

23   calculated Mr. Amiri's education incentive pay; is that right?

24   **A.**    Yes.

25   **Q.**    Okay.  And you didn't catch this error yourself, did you?

1    **A.**    I went with the information that I had, and it was only

2    afterwards that I got new information that showed me what --

3    the correct amount of incentive that he should have been

4    receiving.

5    **Q.**    And is it right that the Government's attorneys told you

6    that Mr. Amiri's pay went up by just an additional 2 and a half

7    percent instead of 5 percent?

8    **A.**    Yes.  They provided additional information to show me what

9    the actual amount was, yes.

10   **Q.**    But they didn't provide you additional documentation

11   because you already had the personnel action form; correct?

12   **A.**    I had some of the forms, but the U.S. Attorney's Office

13   later provided me more forms.  So I don't recall the initial

14   forms that I had looked at.

15   **Q.**    Okay.  So it wasn't until April of this year that you

16   learned your initial calculation for Mr. Amiri was incorrect?

17   **A.**    That's correct.

18   **Q.**    Okay.  And that was nearly one and a half years after you

19   prepared your initial forensic accountant's report?

20   **A.**    Yes.

21   **Q.**    Did the Government's attorneys happen to tell you that it

22   was Mr. Crudo who brought that error to their attention?

23           **MR. KRISHNAMURTHY:**  Objection.  Relevance.

24           **THE COURT:**  Overruled.

25           **THE WITNESS:**  No.

1   BY MS. SUHR:

2   Q.   So on direct, Mr. Tam, you testified about the actual

3   education incentive pay that officers from other departments,

4   namely, the Pittsburg Police Department, received; is that

5   right?

6   A.   Yes.

7   Q.   Okay.  And the Pittsburg Police Department has different

8   education incentive policies than Antioch does; right?

9   A.   Yes.

10  Q.   And only the Antioch rules apply to Mr. Amiri; correct?

11  A.   Yes.

12  Q.   All right.  So -- and you can put down your initial

13  report.

14       Let's turn to your second opinion about the education

15  incentive pay that Mr. Amiri could have received if he had

16  stayed with the Antioch Police Department until 2047.

17       So I believe it was your testimony that Mr. Amiri

18  could have received another $78,366 in education incentive pay?

19  A.   That sounds right, yes.

20  Q.   That would have been over the course of an additional

21  24 years with Antioch?

22  A.   I didn't calculate the number of years, but that seems

23  about right, yes.

24  Q.   Okay.  And to be clear, this particular opinion is about

25  an amount of money that Mr. Amiri never got?

1   A.    Yes.

2   Q.    It's about future income that you assumed he'd make?

3   A.    Yes.

4   Q.    Okay.  And you've never interviewed or questioned

5   Mr. Amiri about his career plans; right?

6   A.    I did not.

7   Q.    You've never reviewed any documents or communications

8   reflecting his career plans?

9   A.    I did not.

10  Q.    There was no employment contract that required Mr. Amiri

11  to stay with the Antioch Police Department until 2047?

12  A.    That is correct.

13  Q.    There was no employment contract that required him to stay

14  with Antioch for a fixed number of years?

15  A.    That is correct.

16  Q.    Okay.  So as we've talked about on direct, you identified

17  some of the documents that you relied on to support your

18  assumptions and to reach your conclusions; right?

19  A.    Yes.

20  Q.    You did not rely on officer retention or attrition

21  statistics for the Antioch Police Department?

22  A.    That is correct.

23  Q.    And you didn't rely on that sort of data for any police

24  department?

25  A.    That is correct.

1    Q.    In assuming that Mr. Amiri would stay with Antioch until

2    2047, did you consider that police departments across the

3    country have been struggling to keep officers?

4    A.    I don't know what the retention rate is.  I don't have

5    that data.

6    Q.    Okay.  You're not aware of all the national and local news

7    reports in the past few years about a staffing crisis in police

8    departments?

9              MR. KRISHNAMURTHY:  Objection.  Relevance.

10             THE COURT:  Overruled.

11             THE WITNESS:  I have read news reports on that; but,

12   again, I don't have the retention data and -- yeah, I don't

13   have the retention data.

14   BY MS. SUHR:

15   Q.    And you didn't consider retention data?

16   A.    No.  Because also in some cases, police officers would

17   leave a department and then transfer or get hired into another

18   department that may offer the same incentives.

19   Q.    Sure.  We'll get to other departments in a second.

20             In connection with your second opinion, did you

21   consider a study by the Police Executive Research Forum that

22   reported a 47 percent increase in resignations from police

23   departments between 2019 and 2022?

24   A.    No.

25   Q.    Mr. Tam, there are all sorts of reasons that police

1  officers leave police departments; right?

2  A.   That is correct.

3  Q.   One reason is that policing is dangerous?

4       MR. KRISHNAMURTHY:  Objection.

5       THE COURT:  I'll sustain the objection.  That's a good

6  objection.

7       MS. SUHR:  Okay.

8  BY MS. SUHR:

9  Q.   In making your assumption about Mr. Amiri's career-long

10 income, did you consider whether Antioch, the jurisdiction

11 where Mr. Amiri worked, has historically been a high-crime

12 jurisdiction?

13 A.   No.

14 Q.   Did you consider whether police officers are more likely

15 to suffer posttraumatic stress disorder than the rest of the

16 U.S. makes?

17      MR. KRISHNAMURTHY:  Objection.

18      THE COURT:  Overruled.

19      THE WITNESS:  No.

20 BY MS. SUHR:

21 Q.   You testified on direct that you were an FBI special agent

22 between 2002 and 2011; right?

23 A.   Approximately, yes.

24 Q.   During that time, you investigated violent crime?

25 A.   Yes.

1    Q.   And after nine years, roughly, of being an FBI agent who

2    investigated violent crime, you left law enforcement, right,

3    for a period of time?

4    A.   For a period of time, yes.

5    Q.   Right.

6         Okay.  And when you returned to law enforcement, I

7    think you said from the City of Manteca, as an accountant --

8    strike that, Your Honor.  I'm going to reformulate the

9    question.

10        So you became an accountant, after you were an FBI

11   agent, for the City of Manteca?

12   A.   Yes.

13   Q.   Okay.  And then when you returned to the Contra Costa

14   County District Attorney's Office as a forensic accountant, you

15   weren't, any longer, investigating violent crime; correct?

16   A.   I became a forensic accountant.  Most of the cases

17   involved financial crimes, but there were also cases that

18   involved violent crime where forensic accounting was used.

19   Q.   Okay.  Is it fair to say that accounting and forensic

20   accounting are safer lines of work than a police officer on the

21   street dealing with violent crime?

22             MR. KRISHNAMURTHY:  Objection.

23             THE COURT:  Overruled.

24             THE WITNESS:  I don't have any data on that either

25   way.

1  BY MS. SUHR:

2  Q.   Okay.  A police officer might also decide to change

3  careers to get a higher income; is that right?

4  A.   Yes.

5  Q.   An officer with children may be especially inclined to

6  switch careers for that reason so he can better support his

7  family?

8  A.   That would be some assumptions that I don't think I can

9  comment on.

10  Q.   Okay.  A police officer might also move from one agency to

11  another to improve their pay?

12  A.   Yes.

13  Q.   Because not all police departments offer the exact same

14  salary and benefits; right?

15  A.   Yes.

16  Q.   In assuming that Mr. Amiri would stay with Antioch, did

17  you consider differences in compensation rates and policies

18  among police departments in the Bay Area?

19  A.   No.

20  Q.   Did you consider whether there are other jurisdictions

21  that pay more than Antioch does but does not offer -- but do

22  not offer pay raises solely based on a bachelor's degree?

23  A.   I did not consider that.

24  Q.   Okay.  Did you compare -- strike that.

25       Did you consider whether other police departments in

1 | the Bay Area are offering lateral applicants hiring bonuses

2 | that are tens of thousands of dollars?

3 | **A.**   No.

4 | **Q.**   Are you aware, for example, that as recently as January of

5 | this year, the Alameda Police Department was offering a $75,000

6 | signing bonus to lateral officers on top of a starting pay of

7 | 113,000?

8 | **A.**   No.

9 | **Q.**   And did you know that the San Mateo Police Department's

10 | base salary range is substantially more than the Antioch Police

11 | Department's?

12 | **A.**   No.

13 | **Q.**   Were you aware that the San Mateo Police Department is

14 | also offering a $30,000 hiring bonus to lateral candidates?

15 | **A.**   No.

16 | **Q.**   Did you know that the San Mateo Police Department does not

17 | have an education incentive policy that awards officers with

18 | pay increases solely because they obtained a bachelor's degree?

19 | **A.**   No.

20 | **Q.**   Were you aware that the top base salary for a police

21 | officer in San Francisco is substantially higher than the

22 | top-step salary in Antioch?

23 | **A.**   From conversations I've had with some people, yes.

24 | **Q.**   Yeah.

25 |        Did you know that the San Francisco Police Department,

1  like the San Mateo Police Department, does not have an

2  education incentive policy that awards officers with pay

3  increases solely because they obtained a bachelor's degree?

4  A.    I did not know that.

5  Q.    Are you aware that the Berkeley Police Department is

6  currently offering lateral officers a $25,000 signing bonus?

7  A.    No.

8  Q.    Did you know that the Berkeley Police Department does not

9  have an education incentive policy that awards police officers

10 a pay increase solely for having obtained a bachelor's degree?

11 A.    No.

12 Q.    Okay.  With the exception of San Francisco, from the

13 conversation with your friend, you don't know about the

14 compensation rates and policies at these other departments

15 because you didn't look at them; right?

16 A.    For this analysis, no, I did not.

17 Q.    There are many officers who travel substantial distances

18 between where they live and where they work to make more money?

19 A.    Yes, I'm aware of that.

20 Q.    They also might travel substantial distances between where

21 they live and where they do their police work to be safer;

22 right?

23 A.    I don't think I could comment on that.

24 Q.    Mr. Tam, you assumed Mr. Amiri wouldn't leave the Antioch

25 Police Department for another agency before 2047?

1    A.    Yes.

2    Q.    And you assumed he wouldn't leave law enforcement for

3    another career opportunity before that year?

4    A.    Yes.

5    Q.    You simply assumed that Mr. Amiri was going to stay with

6    Antioch for his entire career?

7    A.    Yes.

8    Q.    Okay.  Thank you, Mr. Tam.

9          MS. SUHR:  No further questions.

10         THE COURT:  Thank you, Counsel.

11         Any redirect?

12         MR. KRISHNAMURTHY:  Yes, briefly.

13                    REDIRECT EXAMINATION

14   BY MR. KRISHNAMURTHY:

15   Q.    Mr. Tam, you were asked about the possibility of someone

16   going to a different law enforcement agency, and I think

17   Ms. Suhr rattled off a bunch of different possible agencies.

18   Do you recall that?

19   A.    Yes, she did.

20   Q.    Okay.  And you, yourself, have applied for a couple of

21   different law enforcement jobs over the years?

22   A.    Yes.

23   Q.    In those applications, did you happen to list your

24   educational credentials?

25   A.    Yes.

1  Q.   The thing I'd like to ask you is:  You mentioned earlier

2  about you taking conservative assumptions and projecting a

3  future retirement date?

4  A.   Yes.

5  Q.   Can you explain that one more time, please?

6  A.   The assumption is that the person will work to their first

7  eligible date that they can retire with a full pension.  In

8  many instances people work longer than that; in some instances

9  people work shorter than that.  But in the jobs that offer a

10 full retirement, generally speaking, people will work to at

11 least their full -- first full eligible retirement date.

12      And I'm being conservative in my estimate in that I'm

13 assuming the person will not receive any cost of living

14 adjustments or promotions or step increases from that certain

15 date to their projected retirement date.

16 Q.   Okay.  Thank you.

17      MR. KRISHNAMURTHY:  No additional questions.

18      THE COURT:  Any recross, Ms. Suhr?

19      MS. SUHR:  No, Your Honor.

20      THE COURT:  Thank you very much.  You may be excused,

21 sir.  You can leave the exhibits there.  We'll take care of

22 them.  Thank you very much.

23                    (End of excerpt.)

24           (Proceedings adjourned at 3:17 p.m.)

25                    ---o0o---

## CERTIFICATE OF REPORTER

       I certify that the foregoing is a correct transcript
from the record of proceedings in the above-entitled matter.


DATE:   Wednesday, August 7, 2024




_____
Ruth Levine Ekhaus, RMR, RDR, FCRR, CSR No. 12219
Official Reporter, U.S. District Court